# Respondent's Exhibit A

Page 1

s0001

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------X
JUNIOR MOHAMMED RICKETTS, a/k/a JUNIOR NATHANIEL RICKETTS, a/k/a PAUL MILTON MILES,

Petitioner, CASE NO.: 1:15-cv-00329-MKB-LB

-against-

U.S. ATTORNEY GENERAL, LORETTA E. LYNCH,

Respondent.
---------------------------------------------X

EXAMINATION BEFORE TRIAL of the Petitioner, JUNIOR MOHAMMED RICKETTS, by the Respondent, held at 201 Varick Street, New York, New York, on July 9, 2015, at 9:04 a.m., before a Notary Public of the State of New York.

Page 2

A P P E A R A N C E S:

THOMAS E. MOSELEY, ESQ.
Attorney for Petitioner
One Gateway Center - Suite 2600
Newark, New Jersey 07102

OFFICE OF IMMIGRATION LITIGATION
Attorney for Respondent
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

BY: ERIK R. QUICK, ESQ., Trial Attorney

OFFICE OF IMMIGRATION LITIGATION
Attorneys for Respondent
P.O. BOX, 878, Ben Franklin Station
Washington, D.C. 20044
BY: BENJAMIN MARK MOSS, ESQ.

ALSO PRESENT:
DANIEL MEYER
ALVI J. CASTRO
KAREN OATES
ICE OFFICERS

Page 3

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification, and the same are, hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to by an officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

Page 4

J U N I O R M O H A M M E D R I C K E T T S, the witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. QUICK:
Q. Please state your name for the record.
A. Junior Mohammed Ricketts.
Q. Mr. Ricketts, my name is Erik Quick, trial attorney at the U.S. Department of Justice, Office of Immigration Litigation, in Washington, D.C.
Have you ever had your deposition taken before, sir?
A. No.
Q. Let me just explain briefly that, obviously there's a court reporter here today. Although we are sitting informally here at the table across from one another, nodding or shaking of the head, any sort of gestures we may use to respond to one another can't be recorded properly. So it's important that perhaps we exaggerate and to always articulate yes or no for the court reporter. I may remind you of that at times.



Under Protective Order

Page 5

You understand you're under oath here today, to tell the truth today?
A. Correct.
Q. Within the last 24 hours, have you taken any medication that you think would interfere with your ability to testify today?
A. No.
Q. You're fine to testify today?
A. Yes.
MR. MOSELEY: If I can interrupt for one second. I have the time as 9:10.
MR. MOSS: You're the official timekeeper.
MS. REPORTER: I have it as 9:04 a.m.
MR. MOSS: Okay, 9:04.
Q. Mr. Ricketts, what is your birth name?
A. Paul Milton Miles.
Q. How do you spell your second name?
A. M-i-l-t-o-n.
Q. Why did your parents chose the name Paul?
A. I have no idea.
Q. They never told you?
A. No.

Page 6

J. Mohammed Ricketts
Q. Do you know why they chose the name Milton?
A. No.
Q. What is your date of birth?
A. It's supposed to be 8/31/1964.
Q. What do you mean "it's supposed to be"?
A. Well, the reason why I say that because the one I have now that ICE gave me.
Q. What has ICE given you?
A. Down here's [sic] it says, October 12, 1955.
Q. When did ICE give you that birth date?
A. I think this was 1998.
Q. Why do you say ICE gave you that birth date?
A. Because this birth date I got when I was placed in immigration custody.
Q. You got it from whom, if you know?
A. From the officers who did the investigation at the time.
Q. You don't know why they gave you that date?
A. No, not the 1955 date.
Q. What about the October 12th date?
A. Yeah, I had a passport I got from

Page 7

J. Mohammed Ricketts
Jamaican Embassy in New York, but the date I have there was 1965.
Q. We'll get to that.
What is your Social Security number?
A. 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.
Q. 68-4131?
A. Yes.
Q. Have you ever used any other number?
A. Yes. Yes, 122 -- I'm not quite sure. It's 122. I can't remember what the rest of the numbers were.
Q. When did you use that Social Security number?
A. Prior, before 1984.
Q. Why did you use that prior to 1984?
A. That's the one I had before. When I had my name changed, Social Security department gave me a new number.
Q. Where were you born, sir?
A. Brooklyn, New York.
Q. Where in Brooklyn?
A. Lafayette in Brooklyn, New York. It's a home birth.
Q. Do you know the address?

Page 8

J. Mohammed Ricketts
A. Not quite sure.
Q. Why are you not sure?
A. Well, I haven't been around there for years, but I think it's 844. I'm not sure.
Q. Who was present at your home birth, if you know?
A. I don't know who lives there right now.
Q. Who was present when you were born there?
A. I don't know.
Q. Was there a doctor presiding over your home birth?
A. Not -- no, not that I was told.
Q. Was there a midwife?
A. I have no knowledge of that.
Q. You say not that you were told, told by whom?
A. Well, I was at a covenant house over a period of time that where --
Q. A covenant house?
A. Yes.
Q. What is that?
A. It's a place for young kids without parents in Manhattan.

Page 9

J. Mohammed Ricketts
Q. When were you there?
A. Most of my life I could remember.
Q. Let's start there. So if you can tell me a bit about your early life. After you were born, you said in Lafayette in Brooklyn, where did you live that first year?
A. I can't recall. I only remember that all my life was a covenant house, different foster care homes in 1985.
Q. Did you live at the Lafayette address at any point?
A. I can't recall.
Q. I understand.
But did your parents or anyone tell you where you lived during your first year of life?
A. No, no one told me.
Q. Do you know where you lived when you were two?
A. No.
Q. Do you know where you lived when you were three?
A. All my life, my memories are covenant house and different homes. See, I was a ward of New York State so I was living from one home to

Page 10

J. Mohammed Ricketts
another.
Q. You say you were "a ward of New York State," tell me about that. What does that mean?
A. It's the -- the state would assign me to different homes.
Q. When did that assignment in different homes take place, when was the first time?
A. I don't remember the first time. It goes all the way up til I was 16, 18.
Q. What New York agency was responsible for this?
A. I'm not sure.
Q. Was this a New York City agency?
A. New York City, yes.
Q. When you say you were a ward, to use your term, was that a court ordered designation?
A. No. All my finance income support came from the City.
Q. From the City?
A. Yes.
Q. When did that income and support begin?
A. Well, I can't recall when it begins. I just remember.
Q. Where were you living when you were

Page 11

J. Mohammed Ricketts
four?
A. All my life, I was from one home to another.
Q. I'm just trying to understand what your first memories are, do you understand? Where were you living when you were four?
A. I can't recall.
Q. Do you know where you were living when you were five years old?
A. No.
Q. Do you know where you were living when you were six years old?
A. I think I was in a covenant house, six or seven.
Q. Is it your testimony that at six or seven years is your first memory, then?
A. I think so. Six or seven, all the way up until --
MR. MOSELEY: First memory of where he lived?
MR. QUICK: Of where he lived.
A. Yes.
Q. Where was this covenant house?
A. It was in Manhattan.

Page 12

J. Mohammed Ricketts
Q. What was it called?
A. It's called covenant house was the name.
Q. I'm sorry?
A. That's what it's called, covenant house.
Q. Where was it located?
A. In Manhattan. I can't remember the location.
Q. Do you know the neighborhood?
A. No.
Q. Do you know whether it was downtown, midtown, uptown?
A. I don't recall.
Q. East side, west side?
A. I don't recall.
Q. Do you recall any landmarks near the covenant house, anything we could identify where this could be?
A. No.
Q. How long did you live at this covenant house in Manhattan?
A. Most of my life, I think.
Q. At one particular covenant house?

Page 13

J. Mohammed Ricketts
A. I had been in other foster care homes that I was sent to and from there back to there. Things didn't work out well to me.
Q. Let's just go through this so we understand clearly. You say at six or seven you began or at least lived -- you remember living in that covenant house?
A. Yeah.
Q. Who was living in that house with you?
MR. MOSELEY: If I can just object. I think there's a misunderstanding of the record about what covenant house is. If you would ask the witness simply what was his understanding of covenant house. Because I think there is a misrepresentation that covenant house is one particular house as opposed to a social welfare organization known as Covenant House.
MR. QUICK: We can use your question if you'd like.
MR. MOSELEY: What's your understanding of Covenant House?
THE WITNESS: It's a shelter for young kids up until the age of 18.

Page 14

J. Mohammed Ricketts
Q. This is not a private home?
A. No. No. I said I was a ward of the state.
Q. It's not a private home. So it's a shelter where more than one child was living?
A. Yes.
Q. How many children lived there with you? And we're talking about that six- to seven-year-old time frame.
A. I can't recall other kids. I don't know their amount of people that were there.
Q. Were there fewer than five children?
A. More kids there that come and go. It's a shelter that young kids stay up until 16, I think.
Q. Was this a one-story unit or were there --
A. No, not one story. There were, other rooms were there.
Q. Other rooms. How many floors were there?
A. I don't know how many floors were there.
Q. You don't know?

Page 15

J. Mohammed Ricketts
A. No.
Q. So I can understand you, please correct if I'm wrong because my questions may be inartful. By the way, if you don't understand something today, please don't be shy and tell me, "you're not making any sense, Counsel". Because if you don't, I will assume that you understand my question. Okay?
A. Okay.
Q. So don't be shy there because some of my questions may not be clearly put to you.
Did you have a roommate?
A. It's not a room -- bedroom there. It's where kids stays. It's not just one room or two rooms. There's a lot of other kids there, if I can remember at that time.
Q. So I'm clear, you don't remember where it was on the island of Manhattan?
A. No. I know it was there, but I don't remember everything exactly about that. That was 30 years ago.
Q. Were you going to school at this age of six or seven?
A. They have in-school program for -- and

Page 16

J. Mohammed Ricketts
they do have -- you get to go to public school through them.
Q. When you were six or seven, you went to a public school in Manhattan?
A. I think so.
Q. What public school is that?
A. I think I went to -- I'm not quite sure if it's 44, P.S. 44. I'm not sure.
Q. Would P.S. 44 be the first school that you went to?
A. If I can remember, yes.
Q. Let's start with that. Did you ever attend kindergarten, sir?
A. No, I don't think so.
Q. When did you go to first grade?
A. All my schooling, I remember through P.S. 44 and junior high to 12th.
Q. Let me stop you there. Where is P.S. 44, where is that located?
A. That's in Manhattan.
Q. I understand. But where in Manhattan; do you remember?
A. I can't remember.
Q. Did you go to first grade at P.S. 44?

Page 17

J. Mohammed Ricketts
A. I think I did.
Q. Where did you go to second grade?
A. I think all my schooling I remember, I think is P.S. 44. I don't remember what grade actually they were. But I think, if I can recall, those were the schools that I attended to. What grade I went, I can't recall really.
Q. I'm just going to go right through the grades. If you can't recall, you tell me.
Third grade?
A. I can't recall.
Q. What about fourth grade?
A. I can't recall.
Q. Fifth grade?
A. I can't recall.
Q. When you say you can't recall, you can't recall whether it was at P.S. 44 or not?
A. I can't recall.
Q. You can't recall what?
A. What grade it was.
Q. Do you know where you went to sixth grade?
A. I think that was 227, junior high 227, I think. I'm not sure.

Page 18

J. Mohammed Ricketts
Q. Do you remember any of your teachers in the second grade?
A. No, none of my teachers.
Q. Third grade, do you remember any of your teachers?
A. None of my teachers. Neither from that to high school, I can't remember any of my teachers.
Q. Is it your testimony today that you don't remember any of your teachers until high school?
A. No. Even up to high school, I can't remember who any of my teachers were.
Q. You can't tell us a single name?
A. No.
Q. Sixth grade is P.S. 227?
A. I think.
Q. Where is that located, sir?
A. That's in Manhattan.
Q. Seventh grade, where did you go?
A. I think that's 227 also.
Q. Eighth grade?
A. I think Wingate. I'm not quite sure.
Q. I'm sorry?

Page 19

J. Mohammed Ricketts
A. I think it might have been Wingate. I'm not quite sure.
Q. What is Wingate, sir?
A. It's a high school.
Q. Where is that located?
A. That's in Brooklyn.
Q. For second grade, you were living in the covenant house, as you called it?
A. I think so, yes.
Q. This is the same covenant house you testified previously?
A. Yes.
Q. In the third grade, are you in the same covenant, the same location?
A. Yes.
Q. Fourth grade?
A. I think so.
Q. Fifth grade?
A. I'm not quite sure because I do spend some time with foster care homes, so I'm not quite sure. I'm just trying to go by my memory. I'm not sure.
Q. I understand. We're just here to know what you do remember.

Page 20

J. Mohammed Ricketts
Sixth grade, where were you living?
A. I can't recall.
Q. Do you recall where you were living in seventh grade?
A. No. I can't recall.
Q. Do you know where you were living in eighth grade?
A. No. I can't recall.
Q. Why can't you recall where you were living, for instance, when you were in eight grade?
A. I just can't recall.
Q. Do you know whether it was in Manhattan where you were going to eighth grade?
A. I can't recall.
Q. I believe you said eighth grade you were at Wingate High School?
A. I think so. That's in Brooklyn.
Q. Where were you living in Brooklyn or were you living in Brooklyn?
A. I think I was living in foster care somewhere in Brooklyn. I can't remember.
Q. You mentioned several times foster care homes. What was the first foster care home you lived in?

Page 21

J. Mohammed Ricketts
A. Well, there have been quite a few. I can't remember what age or remember when I first went in there.
Q. How many foster care homes have you been in?
A. I have been in quite a few. I can't remember what the exact number is.
Q. Fewer than five?
A. I'm not sure.
Q. More than five?
A. I'm not sure. I can't give you an exact number.
Q. When you say "foster homes," was this a private family or a private home in which you were living?
A. It's a home that will get income from the city for us to live there.
Q. But this is a single family hosting you?
A. Not all the time.
Q. Then you tell me what it was, then.
A. There was in one Brooklyn, I forgot what it is. For only boys foster home. I don't remember what the name is. But I know that was in

Page 22

J. Mohammed Ricketts
Brooklyn. I can't recall what that was.
Q. Do you know the address of any of these foster homes?
A. No.
Q. Where were these foster homes?
A. Brooklyn and a few in Manhattan.
Q. A few. How many in Manhattan?
A. I don't remember the exact number.
Q. What grade were you in when you first went into a foster home?
A. Maybe seventh or eighth grade.
Q. Before seventh or eighth grade, you were always, then, at Covenant House?
A. I'm not sure.
Q. Well, how old were you then in seventh grade?
A. I'm not sure.
Q. You don't know how old you were?
A. No.
Q. In the ninth grade, where were you going to school?
A. I think it was Wingate.
Q. You think, you don't know?
A. I'm not sure if it was junior high.

Page 23

J. Mohammed Ricketts
I'm not quite sure. Last year was 227. I'm not quite sure, but I think it was Wingate.
Q. Could it have been anywhere but Wingate?
A. Well, it's either 227 or Wingate Junior High School.
Q. Those are the only two choices?
A. I think the only two choices.
Q. Where were you going in tenth grade?
A. I think I was at Wingate. Yes, I was at Wingate because I dropped out. I think in tenth grade.
Q. The 11th grade?
A. I think Erasmus in Brooklyn.
Q. And you, correct me if I'm wrong, you said something about dropping out?
A. At Wingate. I went back to Erasmus.
Q. When did you drop out, sir?
A. I think it was tenth or 11th grade, then I went back to Wingate.
Q. Why did you drop out of Wingate?
A. I have no idea why.
Q. You have no idea?
A. No.

Page 24

J. Mohammed Ricketts
Q. Was it health related?
A. I have no idea why I dropped out.
Q. What is Erasmus?
A. It's a high school in Brooklyn.
Q. Do you remember where in Brooklyn?
A. No.
Q. For how long did you drop out?
A. Maybe, I would say, about three, four months.
Q. You dropped out of Wingate for three or four months, then you returned to Wingate or went to Erasmus?
A. Went to Erasmus and back to Wingate.
Q. For how long were you at Erasmus?
A. Two semesters.
Q. What is two semesters in that school, is that one year or half a year?
A. One year.
Q. This is tenth or 11th grade?
A. 11th grade.
Q. You were in Erasmus for one year. Where are you in 12th grade?
A. I went back to Wingate.
Q. Why did you go back to Wingate?

Page 25

J. Mohammed Ricketts
A. Because I had my own apartment then.
Q. Why is that part of your decision where to go to school?
A. To me it was a better school than Erasmus. That was one of the main reasons.
Q. So you said you had your apartment. Where was that?
A. Somewhere in Brooklyn.
Q. Where in Brooklyn?
A. I don't remember the location. I know it was in Brooklyn.
Q. Do you remember a street name?
A. I think -- I'm not sure, Dean Street or somewhere. I don't know the address there.
Q. Did anyone live with you?
A. No. I had a single room for myself.
Q. Did you graduate, then, from Wingate?
A. Yes.
Q. When did you graduate, what year?
A. I think -- I'm not sure. I think in 1985.
Q. So I understand your testimony as well, when you go to 12th grade at Wingate, you were living at Dean Street?

Page 26

J. Mohammed Ricketts
A. Yes.
Q. What about 11th, when you were at Erasmus, where were you living?
A. I think -- I can't remember. I think I was in foster care. I'm not sure if it's, Dean was the street I lived on.
Q. For 11th grade, where were you living?
A. I can't remember.
Q. Was it your own apartment?
A. I can't recall. I can't recall my own apartment at that time.
Q. Was it a foster care situation in 11th grade?
A. No. I can't recall a foster care situation.
Q. When you say you were in foster care, was this assigned by the City?
A. I'm not sure, but I know the income that was for my care came from the City, but I'm not quite sure.
Q. Why are you sure about that?
A. Because I used to have a city ID number, a welfare number.
Q. When did you get that welfare number?

Page 27

J. Mohammed Ricketts
A. Well, I had it for a while. I can't recall when I actually get the welfare number.
Q. Do you remember what decade it would have been? Are we talking the 1970's you would have received this or the 1980's?
A. I can't recall.
Q. Do you know what your welfare number was?
A. No.
Q. Did you have a caseworker --
A. Yes.
Q. -- assigned to you from the City?
A. I had a caseworker.
Q. How many caseworkers?
A. I had quite a few caseworkers.
Q. Do you remember the names of any of them?
A. No.
Q. When you were in 12th grade, do you remember the names of any of the teachers?
A. No.
Q. At Erasmus, do you remember the names of any of those teachers?
A. No.

Page 28

J. Mohammed Ricketts
Q. What did you do when you say you told us you graduated from 12th grade in, I think you said, 1985, perhaps?
A. Yes.
Q. What did you do then?
A. I went to college, Brooklyn College.
Q. In 1985?
A. Yes.
Q. Before we go past 1985, I just want to make sure so we understand. Did you have any friends in high school?
A. Yes, at that time.
Q. Do you recall the names of any of your friends?
A. No.
Q. Not a single one of your friends?
A. Not a single one of my friends.
Q. What was the first job you had, then?
A. I can't remember where I worked, but I had work while I was in high school. I had worked for certain hours I was allowed to work. I couldn't work all the hours. I think it was West 4th McDonald's, if I can remember. I started that when I was in high school. That was my first job,

Page 29

J. Mohammed Ricketts
I think.
Q. Do you remember what grade that would have been in?
A. I think that was 11th or 12th grade I started there.
Q. Was that Erasmus or Wingate?
A. I think it was Wingate.
Q. Was that McDonald's in Brooklyn or New York City?
A. That's Manhattan, West 4th Street. I can't remember.
Q. West Ford?
A. 4th.
Q. I'm sorry.
What's the cross street; do you know?
A. No.
Q. Why were you working in Manhattan at a McDonald's if you were going to school and living in Brooklyn?
A. Because that's the only employer that I could have had a job -- I was able to get a job at that time.
Q. Did you try anywhere else?
A. Yes.

Page 30

J. Mohammed Ricketts
Q. Where did you try?
A. I can't recall where I tried, but it was the only vacancy I had, so I went with them.
Q. How long did you work at that McDonald's?
A. Maybe a year or two. I'm not quite sure.
Q. What were you doing there?
A. Just making burgers.
Q. That was your first job?
A. Yes.
Q. What was your second job?
A. I can't recall what my second job was. I can't remember my second job.
Q. Do you recall any of your jobs after McDonald's?
A. My third job, I think I was working for the City of New York.
Q. That would have been your third job?
A. Yes.
Q. You don't know your second job?
A. I can't remember what my second job is.
Q. Was that also a restaurant?
A. I can't recall what it was.

Page 31

J. Mohammed Ricketts
Q. You don't know whether it was McDonald's or Saks Fifth Avenue?
A. I know it's not McDonald's. I can't recall where it was, what I was doing. But I know I had a second job, but I can't remember what it was.
MR. QUICK: Let's start with the first exhibit. We need to mark this. Start marking it as A.
MR. MOSELEY: Exhibit 1.
MR. QUICK: This is premarked as Exhibit A. Why don't we number them.
(Whereupon, a photocopy of Jamaica Passport was marked as Ricketts Exhibit 1 for identification as of this date by the Reporter.)
Q. Sir, have you ever traveled outside of the United States?
A. Yes.
Q. Where have you traveled?
A. I've been to Trinidad, Haiti, Jamaica, England.
Q. I'm sorry, Trinidad?
A. Haiti, Jamaica, England, Grand Cayman.

Page 32

J. Mohammed Ricketts
Q. Let's start with when did you go to, you said Trinidad? Is that the first place you traveled to outside the United States?
A. Yeah, I think.
Q. When did you go there?
A. It was the 1980's, but I'm not sure what year. I think it was 1985 or '86.
Q. How many times have you been to Trinidad?
A. One time.
Q. You mentioned Haiti. When did you go to Haiti?
A. I think the '80s as well.
Q. You mentioned a third country?
A. Jamaica.
Q. When did you go to Jamaica?
A. That was also in the '80s.
Q. How many times did you go to Haiti?
A. Jamaica?
Q. No, to Haiti.
A. One time.
Q. What about to Jamaica?
A. I've been to Jamaica many times.
Q. Many times. Do you know how many

Page 33

J. Mohammed Ricketts
times?
A. Two to three times, I think.
Q. You mentioned England?
A. One time.
Q. When was that?
A. I think that was in the '90s, 1990.
Q. For how long did you stay in England?
A. Just a week.
Q. You mentioned a fifth country?
A. Grand Cayman.
Q. How many times have you been to the Grand Cayman?
A. I think that was also in the '90s.
Q. How long were you in the Grand Cayman?
A. Five or six days.
Q. When you were traveling to Trinidad, what passport did you use?
A. U.S. Passport.
Q. When you were traveling to Haiti, what passport did you use?
A. U.S. Passport.
Q. When you were traveling to Jamaica those two or three times --
A. U.S. Passport.

Page 34

J. Mohammed Ricketts
Q. And when you were traveling to England once?
A. U.S. Passport. All of them are U.S. Passports.
Q. I ask you to look at Exhibit 1, sir, and ask you whether you recognize this.
A. I do recognize it.
Q. What is it?
A. It's a Jamaican Passport.
Q. Whose Jamaican Passport is it?
A. Well, this passport doesn't belong to me, anyway's. It was when I was placed on the ICE investigation in my criminal case.
Q. I'm sorry. I didn't understand.
A. Okay. When I was placed in the ICE investigation -- see, I had received a passport from the Jamaican Embassy.
Q. When did you receive that passport?
A. I can't remember what date I had a passport.
Q. What year?
A. I don't remember what year.
Q. Do you know what decade?
A. I know either the '90s, I think.

Page 35

J. Mohammed Ricketts
Q. In the '90s, you get a Jamaican Passport?
A. Either '90s or -- I'm not sure if it was late '80s or early '90s I had a Jamaican Passport from the Jamaican Embassy in New York.
Q. How did you get a Jamaican Passport?
A. Well, somebody gave me a burnt passport with a birth certificate. I got it from the Embassy.
Q. Who gave that to you?
A. I can't recall who gave it to me.
Q. Was it a friend?
A. It's a member of my, at the time, Muslin religion, but I can't remember who it was.
Q. Did you purchase this document?
A. I paid for it from the Embassy.
Q. Did you pay someone to get this other than the Jamaican Embassy?
A. Yes.
Q. Whom did you pay money?
A. I can't remember who it was.
Q. Did this individual give you this passport?
A. Yes.

Page 36

J. Mohammed Ricketts
Q. Why?
A. There's a reason that I can't talk about the reason why I got the Jamaican Passport.
Q. Why can't you talk about that, sir?
A. Because it's something that I shouldn't talk about, shouldn't talk about that, talk about why, what was the reason, what was it made for.
Q. And why not?
A. I was told not to.
Q. Told by whom?
A. By a member of the religious organization at this time.
Q. Who told you this?
A. I can't recall.
Q. Was it a layperson?
A. Well, I don't think Muslims call layperson's. I can't recall.
Q. Why were you instructed not to speak about this?
A. Because the purpose of that passport was meant to use for -- so I was told not to talk about it.
Q. You do have to answer my questions today. I just want to make sure that you, then,

Page 37

J. Mohammed Ricketts
refuse to respond to this line of questioning?
MR. MOSELEY: Maybe we can have a conference and I can speak with him about this.
MR. QUICK: Okay. There is no question pending at this moment.
MR. MOSELEY: I understand. Off the record.
(Whereupon, a discussion was held off the record.)
(Whereupon a short recess was taken from 9:43 a.m. until 10:02 a.m.)
MR. QUICK: We had a bit of a break where Mr. Moseley and Mr. Ricketts conferred about the prior line of questioning.
Q. Are you ready to proceed, Mr. Ricketts?
A. Yes, I am.
Q. We were speaking about Ricketts Deposition No. 1. Can you tell me why you had this passport in your possession?
A. Okay. First, this is not a passport that I had.
Q. What do you mean by that?
A. The one I received from Jamaican

Page 38

J. Mohammed Ricketts
Embassy, this is not it (indicating).
Q. So what is "this," then, Exhibit 1? You're pointing to Exhibit 1. What is Exhibit 1?
A. This is a passport where the Jamaican Embassy said I had in -- the one I had in my possession was issued based on this one. But it's not the one I had in my possession. I was issued this from the Jamaican Embassy. There's two passports.
Q. Two Jamaican Passports?
A. Yes.
Q. Exhibit A is not the one you were issued?
A. No. This is the one that they got this from the Jamaican Embassy, not from my possession.
Q. Who is "they"?
A. The immigration agents.
Q. Did you ever have this passport, Deposition Exhibit 1, in your possession?
A. No, I never had this in my possession. The one they found in my house, they took it to the Embassy and was trying to find out why I had this passport. And they were told --
Q. When you say "they," can you --

Page 39

J. Mohammed Ricketts
A. I'm talking about immigration agents.
Q. Can you say that instead of pronouns like, they, he or she is not clear.
A. The agents, they went there, and they were given copies of this passport. This was not in my possession. I never had this passport.
MR. MOSELEY: Just for the record, Ricketts Deposition Exhibit No. 1 is a copy --
MR. QUICK: Exactly.
MR. MOSELEY: -- that purports to be a copy of the passport, not the actual passport.
MR. QUICK: Exactly.
Q. Have you seen Deposition Exhibit 1 before today?
A. Yes, I did.
Q. When have you seen it?
A. During my immigration proceedings.
Q. When was the fist time you saw this particular exhibit?
A. It was, I think, 1998, when I was in front of an immigration judge that I saw a copy of this passport.
Q. Prior to the break, you said you obtained a Jamaican Passport from somebody in your

Page 40

J. Mohammed Ricketts
religion. Is this Deposition Exhibit 1, that passport you referred to?
A. No, this is not the passport.
MR. MOSELEY: Again, just for the record, the Government, I trust, will not dispute the Government which has in its possession the original passport of Deposition Exhibit 1 but merely this is a copy of the passport.
MR. QUICK: Mr. Moseley, I will say, this is what I have. Me being the Office of Immigration Litigation, this is what I have. I have nothing better today.
A. Could I ask a question?
Q. Yes, sir.
MR. MOSELEY: You can't ask a question.
Q. When you were traveling to each of those five countries, you said you used a U.S. Passport each of those times, each of those five countries?
A. Yes.
Q. When was the first time you obtained a U.S. Passport?
A. 1984.
Q. 1984. Where did you go to get the U.S.

J. Mohammed Ricketts
Passport?
A. It was the clerk's office downtown Brooklyn.
Q. So I'm clear, sir, with this Deposition Exhibit 1, did you ever have this in an apartment in which you lived?
A. Never.
Q. Was there ever a Jamaican Passport discovered in your apartment?
A. Yes.
Q. What Jamaican Passport was that?
A. It's in the Embassy record. I'm surprised it's not here.
Q. It's not Exhibit 1?
A. That's not Exhibit 1.
Q. I show you, then, what we can mark as Ricketts Exhibit 2.
(Whereupon, a birth certificate was marked as Ricketts Exhibit 2 for identification as of this date by the Reporter.)
Q. Mr. Ricketts, as we do proceed this morning and through the day, if you do need to take a break, you let us know, for the restroom or if



J. Mohammed Ricketts
you get hungry for lunch, you let us know or else we will assume that you're comfy and you can proceed with this day. Don't be shy on that regard.
A. Okay.
Q. Let me show you what has been marked as Deposition Exhibit 2 and ask whether you have seen this particular document before, sir.
A. Yes, I did.
Q. What is this particular document, Deposition Exhibit 2?
A. It's a birth certificate from Jamaica.
Q. When you say "a birth certificate," whose birth certificate is this?
A. It says here, Junior Nathaniel Ricketts.
Q. Is this your birth certificate?
A. No, it's not.
Q. Why do you say that?
A. I only saw this birth certificate the first time through my criminal proceeding when Mr. Castro presented it as an exhibit.
Q. What year was that?
A. That was 2010, I think it was.



J. Mohammed Ricketts
Q. Just so I'm clear, that's not your birth certificate, that's your testimony today?
A. That's my testimony, yes.
Q. Did you travel, ever, sir, on a Jamaican Passport?
A. No.
MR. MOSELEY: Give us one minute.
(Attorney and client confer.)
MR. QUICK: This could be the next exhibit, ma'am, Deposition Exhibit 3.
(Whereupon, the I94 document was marked as Ricketts Exhibit 3 for identification as of this date by the Reporter.)
Q. This is Deposition Exhibit 3, Mr. Ricketts. Have you, and I'm pointing --
MR. MOSELEY: Give counsel one moment.
MR. QUICK: Certainly.
Q. Mr. Ricketts, I'm pointing your attention to the middle portion or middle card here, not the one above or below, top or bottom, the middle portion. Have you ever seen this particular document before?
A. Yes.
Q. What is it?



J. Mohammed Ricketts
A. It's government exhibits. It's I94 form.
Q. Have you seen this particular I94 form before?
A. Yes.
Q. When have you seen it?
A. This is one of the exhibits that immigration had presented through my immigration hearing.
MR. MOSELEY: Just for the record, I will assume the Government has the -- obviously this is a copy -- the Government has the original of this document.
MR. QUICK: I guess it would depend, sir, on what your "original" definition is.
MR. MOSELEY: Well, the white card, I94 card, represents --
MR. QUICK: I don't know what it represents, sir.
MR. MOSELEY: You're the Government's lawyer.
MR. QUICK: I don't know what's there. This is what I have here today.
MR. MOSELEY: But by presenting a copy,

Page 45

J. Mohammed Ricketts
you're representing a copy -- by presenting a copy, are you not representing this is a true and correct copy of the original document within the Government's possession?
MR. QUICK: I'm not making any representation. I'm trying to understand what your client has seen or not, sir.
MR. MOSELEY: All right. That's fine. Go ahead.
Q. Sir, I ask you to look at that Jamaican Passport. You have that in front of you. Can you look at that, please? I believe that Jamaican Passport is -- the number is 114877; is that correct?
A. Yes.
Q. Then that appears to correspond, that Jamaican Passport, to this particular deposition exhibit, if you look on the card is 114877. Is this document, this I94, something you signed at one point?
A. I didn't sign this document. This document first was presented to me as an exhibit through my immigration proceedings.
Q. Did you ever live in St. Andrew,

Page 46

J. Mohammed Ricketts
Jamaica?
A. No, I did not.
Q. Did you ever visit 304 West Randolph Street in Chicago?
A. No, I did not.
Q. Did you, in fact, sir, go to Jamaica in May of 1980?
A. I didn't start to go to Jamaica until after 1984.
Q. Let me show you the next exhibit.
(Whereupon, the I94 document was marked as Ricketts Exhibit 4 for identification as of this date by the Reporter.)
Q. I ask you, again, have you seen this middle of I94.
MR. MOSELEY: This is Ricketts Deposition Exhibit 4.
A. Yes, I have seen this before.
Q. When have you seen this?
A. This is also another page of the exhibits that INS agents represented through the immigration proceedings.
Q. When did you first see this particular document?

Page 47

J. Mohammed Ricketts
A. 1998, I think.
Q. Did you ever live at 11 Lissant Road, St. Andrew, Jamaica?
A. No, not at all.
Q. Did you ever visit East 29th Street in New York, New York?
A. No.
MR. MOSELEY: If I may, just to save time here, the Government's position -- your position is that this is a document that you have today. You're not making a representation that the Government has the original of this document in its possession and that would be true with all of the documents that you intend to present today with an exception for whatever original documents you may have?
MR. QUICK: I'm not using any original documents today.
MR. MOSELEY: By presenting this document, you're not representing -- or any other document, you're not representing that the Government has the original in its possession?

Page 48

J. Mohammed Ricketts
MR. QUICK: Counsel, I'm not here to make representations. These are the true and accurate copies I have within my possession.
MR. MOSELEY: But you just represented these are true and accurate copies of the originals. Previously you had said they weren't, that you were not making any such representation.
MR. QUICK: Again, sir, you can characterize what I've said however you would like. I have said several times -- I'm not going to engage in this -- these are true and accurate copies. These have been part of the request ordination for which now have been deemed admitted, I believe.
MR. MOSELEY: Actually, they weren't requested for admission. That's besides the point. I don't mean to be difficult here. If you as a government lawyer tell me that the Government has the original of these documents in its possession and these are true and accurate copies of what the Government has in its possession, I'll certainly accept that.
MR. QUICK: Can we continue?

Page 49

J. Mohammed Ricketts
MR. MOSELEY: I'd like your response.
MR. QUICK: I've told you these are true and accurate copies of what I have in my possession.
MR. MOSELEY: Okay. That's fine.
MR. MOSS: Court reporter, if you can please note about how many minutes we've been engaged in this conversation led by Mr. Moseley.
MR. QUICK: Counsel, this is not part of the deposition. Counsel, if you were saying these were somehow altered or --
MR. MOSELEY: I'm not saying anything about these documents. I'm not saying anything of the kind. I'm prepared to accept any representation you make as a Government attorney about having the originals in your possession. That's all I wanted to know. I don't see a need to prolong this. The record is clear, so I understand what your position is.
MR. QUICK: Are we concluded?
MR. MOSELEY: Yes.
(Whereupon, from 10:16 a.m. to 10:18

Page 50

J. Mohammed Ricketts
a.m. there was colloquy between counsel.)
MR. QUICK: The next exhibit will be Ricketts Exhibit 5.
(Whereupon, the I94 document was marked as Ricketts Exhibit 5 for identification as of this date by the Reporter.)
Q. This is Ricketts Exhibit 5. I ask you to look at this, Mr. Ricketts. Have you seen this before?
A. Yes, I did.
Q. What is this?
A. An I94 form.
Q. When did you first see this?
A. Again, it was one of the exhibits that was presented during my immigration proceeding.
Q. You had not seen this document --
A. Not prior.
Q. -- before that?
A. Until the Government presented it, yes.
Q. You did not complete this document?
A. I did not complete the document.
Q. If you had the original I94 card to which your counsel has referred in which he seeks, would your answer change in any way?

Page 51

J. Mohammed Ricketts
A. I never had no I94 forms.
Q. If we had the actual --
A. It wouldn't change my testimony.
Q. It wouldn't change your testimony with regard to any of these, would it?
A. It wouldn't change my testimony.
MR. QUICK: This will be Ricketts 6.
(Whereupon, the I94 document was marked as Ricketts Exhibit 6 for identification as of this date by the Reporter.)
Q. This is Deposition Exhibit 6, Mr. Ricketts. Have you seen this before?
A. Yes, sir.
Q. When did you first see this?
A. During the immigration proceedings, again.
Q. Again, you did not use this particular card or fill this out at any time?
A. I did not, correct.
Q. Do you have any idea who would be using these I94 forms?
A. No.
MR. QUICK: This will be Ricketts Exhibit 7.

Page 52

J. Mohammed Ricketts
(Whereupon, the I94 document was marked as Ricketts Exhibit 7 for identification as of this date by the Reporter.)
Q. You have Deposition Exhibit 7 in front of you?
A. Yes.
Q. What is this, sir?
A. It's another I94 form.
Q. When did you first see this one?
A. '98.
Q. You never traveled on this particular document?
A. No, I did not.
Q. Did you ever enter into the United States on December 27, 1982?
A. I was already in the United States in 1982. As a matter of fact, I was in high school.
Q. I understand.
A. No.
Q. But did you at all leave the United States and then return and enter into the United States on December 27, 1982?
A. No.
Q. When was the first time, then, that you

Page 53

J. Mohammed Ricketts
left the United States?
A. I think it's -- I can't recall if it's '95 or '96.
Q. That was the first time?
A. Yes.
Q. How old were you then?
A. I can't recall.
MR. QUICK: This one will be Ricketts Exhibit 8.
(Whereupon, the school transcript was marked as Ricketts Exhibit 8 for identification as of this date by the Reporter.)
Q. This is Deposition Exhibit 8. Sir, I ask you, Mr. Ricketts, to look over this exhibit. It contains several pages. I'll ask you what that is.
A. Seems to be a transcript.
Q. Have you seen any of these documents before?
A. I think so.
Q. Can you tell us what this is, sir?
A. Seems like it's a transcript.
Q. Can you tell a transcript from what?

Page 54

J. Mohammed Ricketts
A. School attendance.
Q. On page 1 on this particular exhibit has the name Junior Ricketts, is this you?
A. Yes, I think so, yes.
Q. Are these pages in this particular exhibit your high school or your school records?
A. It seems to be part of it. Yes, it is.
Q. When it says "people's name, Ricketts, Junior," is this you?
A. Yes, it is.
Q. It says father's name on page 1, lower left-hand side, Ezier Ricketts?
A. Yes, that's the name.
Q. Is that your father?
A. No.
Q. Who is it?
A. I don't know.
Q. Do you know why Ezier Ricketts would be listed as your father on your school records?
A. No.
Q. Do you know where the school would get the name Ezier Ricketts?
A. Well, somebody had to give it to them.
Q. That's my point. Do you know who would

Page 55

J. Mohammed Ricketts
have done so?
A. Could be my foster care parents that I was staying with.
Q. What foster care --
MR. MOSELEY: If I may, would Counsel, just represent for the record from where this document was obtained?
MR. QUICK: Certainly, this was obtained in a subpoena.
MR. MOSELEY: Subpoena directed to the New York City school system.
MR. QUICK: And you were copied on this as well.
MR. MOSELEY: I understand.
MR. QUICK: This was received in response thereto.
MR. MOSELEY: Very good.
Q. To return to, Mr. Ricketts, when you said possibly one of the foster parents could have given the name Ezier Ricketts, do you know what foster parent that would have been?
A. No. I can't recall.
Q. Why, if you know, would they provide Ezier Ricketts?

Page 56

J. Mohammed Ricketts
A. There is no such person, as far as I know of.
Q. Would they just make this up, this foster parent?
A. I think it was.
Q. It says, "Mother's Maiden Name, Ketura Campbell," is that, indeed, your mother?
A. No.
Q. Do you know anyone named Ketura Campbell?
A. It sounds like one of the ladies -- one of the foster care. That is just when I got the passport from the Jamaican Embassy.
Q. I'm sorry, you said it's a lady what?
A. My foster care parents that I had. I think I told you I had dropped out of school and went back to Wingate. This doesn't have Erasmus here. It doesn't have complete records.
Q. So is it your testimony that Ketura Campbell was a foster parent of yours?
A. Yes.
Q. Did you, indeed, sir -- just under that it says, "1039 Rutland Road." Did you ever live at 1039 Rutland Road?

Page 57

J. Mohammed Ricketts
A. I think I did.
Q. You're not sure?
A. I'm not quite sure.
Q. It says, "1110 Bushwick Avenue." Did you ever live at that address?
A. No.
Q. You never lived at Bushwick --
A. No.
Q. Then continuing down, it says, "Admissions and Transfers." There's a date of 2/1/83. Would this have been the date you entered Wingate?
A. That's the date I went back to Wingate, 2/1/83.
Q. It says here 2/1/83. On the first page, sir, on the left-hand, perhaps your counsel can assist you, 2/1/83 is the date, from "Jamaica to Wingate," all on one line on that first page. So would 2/1/83 be the date you entered Wingate?
A. This may be the date I went back to Wingate. I told you I dropped out and went back to Wingate.
Q. You didn't provide me with dates. I was trying to ascertain a date.

Page 58

J. Mohammed Ricketts
A. It could be the date. I'm not sure.
Q. It says, "from Jamaica"?
A. Yes.
Q. Do you know why it would say "from Jamaica"?
A. I think I have -- when I went back to Wingate, I had a passport I received from the Jamaican Embassy. If you look at the date right there, 10/12/65. I told you I have that. This, they needed something else to get me back in school. So maybe that's the one they used.
Q. When you say, "one," you mean Jamaican Passport?
A. The one I got from the Embassy.
Q. From the Jamaican Embassy?
A. Yes.
Q. Why do you have a Jamaican Passport in your possession?
A. Because I go to Erasmus at the same time.
Q. I am sorry, I don't understand. You were going to Erasmus at the same time you were going to Wingate?
A. Yes.

Page 59

J. Mohammed Ricketts
Q. Correct me if I'm wrong --
A. I dropped out of Wingate. I went to Erasmus. While I was going to Erasmus, I switched over to the evening programs, the night program. I think we had used this passport to get back in the day program.
Q. You used a Jamaican Passport?
A. That I had in my possession, yes.
Q. Why did you have a Jamaican Passport in your possession?
A. While I was at Bushwick, I used to be a practicing Muslim at that time. This program --
Q. What program?
A. The Muslim program. The Hashim (phonetic), the leader of the Muslim origination. We were -- okay -- I was one of the persons that was selected to travel to Mecca. We decided that we couldn't go to Mecca on a U.S. Passport.
Q. Who is "we," sir?
A. You know, all the other kids.
Q. No, I don't know, sir. So I'm asking who is "we".
A. There was other brothers like myself.
Q. Who are they; do you know? Do you

Page 60

J. Mohammed Ricketts
remember any of their names?
A. No. I can't remember. I'm trying to explain what really happened. We were supposed to -- we were planning to go to Mecca. What I was told, we were not allowed to travel out of the U.S. on a U.S. Passport.
Q. Let me stop you there. You said you would not be allowed to travel outside of the U.S.?
A. With a Jamaican Passport.
Q. With a Jamaican Passport?
A. Right. That's what I meant. We were supposed to use a U.S. Passport, fly to Trinidad. From Trinidad, we switch to Jamaican Passport and go to Mecca.
Q. Why would you do that?
A. For training. Well, that's the program. That's the way -- that's why I didn't want to talk about it.
Q. Let me back up. You say that's the way "they", who is "they"?
A. Yeah, that's the Muslim Center in Bushwick, that was a group, how they have structured this trip.

Page 61

J. Mohammed Ricketts
Q. Was this a formal or organized Muslim center?
A. It's formal.
Q. Can you tell us a bit about it?
A. They take young kids, say, on the street.
Q. Who is "they"?
A. The program. I'm talking about the program itself.
Q. What is this program?
A. A Muslim program.
Q. Is it called anything in particular?
A. No. It's just called Bushwick Training Center.
Q. This is a formal Islamic institution?
A. Yeah.
Q. Okay.
A. So we are supposed to fly on a U.S. Passport to Trinidad. From Trinidad we change our passport to Mecca, because the reason why we change it because it's a dominant Muslim island. After training, we would have return back to Trinidad and we will return back to the U.S. with the passport.
Q. Whose idea was this?

Page 62

J. Mohammed Ricketts
A. That was the training group. The group selection -- I mean the entire program. That's why I had a Jamaican Passport from the Embassy.
Q. Did you apply for this Jamaican Passport?
A. Yeah. As I told you. Yes, I paid for it.
Q. How did you apply for a Jamaican Passport?
A. I had the burnt passport I had with the birth certificate they gave me, but it wasn't really a true birth certificate.
Q. You say a burnt U.S. Passport?
A. No, Jamaican Passport.
Q. Burnt Jamaican Passport?
A. Right.
Q. That's not the passport of Exhibit 1, I believe, that we already reviewed, that's not the same passport?
A. No, that's not the passport I got.
Q. That's not the passport?
A. That's not the one they issued to me.
Q. Did you use that burnt one?
A. All together, yeah, with the other.

Page 63

J. Mohammed Ricketts
Yes, it was burnt up. That's the one I use with the birth certificate they gave me to use.
Q. Can you show me if, indeed, you have in front of you the document you used to obtain this Jamaican Passport? Do you have that in front of you, sir?
A. Yes, this is all right here. This is it (indicating).
Q. That's Deposition Exhibit 1? You're pointing to the Deposition Exhibit 1 passport?
A. Yes.
Q. You used that Deposition Exhibit 1?
A. Right.
Q. You presented to whom?
A. Given to the Jamaican Consulate with a birth certificate.
Q. What birth certificate?
A. It's not here. I don't see it here.
Q. It's not here?
A. No.
Q. Who gave you the Jamaican Passport?
A. I got it from the group.
Q. The Bushwick Training Center?
A. Yeah.

Page 64

J. Mohammed Ricketts
Q. Can you name anybody in or from that center?
A. No.
Q. Who gave you this birth certificate?
A. Also comes from them.
Q. That was a Jamaican birth certificate?
A. Yes.
Q. Why not just travel -- I'm sorry, where is Mecca, what country?
A. In the Middle East.
Q. What country?
A. I think it's either Iraq or Iran. I know Middle Eastern. I was young at the time.
Q. Do you know today where it is?
A. No.
Q. Why not just travel from the United States to whatever country Mecca is in on your U.S. Passport?
A. No. They didn't want it to happen.
Q. Who is "they"?
A. The group. They didn't want them to know we were leaving the United States. That was the entire idea.
Q. Do you know why this was the case?

Page 65

J. Mohammed Ricketts
A. No.
Q. So if you can, then, turn to page 1 of the high school transcript, it's your testimony today that's why it says "from Jamaica to Wingate"?
A. Right. I went back because the Jamaican Passport because the Jamaican Embassy -- you see the date of birth here is '65.
Q. Did you have a U.S. birth certificate?
A. Yes.
Q. Why not just use the U.S. birth certificate when you were entering Wingate?
A. Because I was already registered at Erasmus High.
Q. Why not just say I'm registered at Erasmus High School?
A. You couldn't go to both programs at the time. Actually, I was going to both day and night schools.
Q. Where were you going to day school?
A. I went to day school back to Wingate. I was in Erasmus first. I switched to the night program to get back in to Wingate.
Q. You were at Erasmus during the day?
A. First, then I changed to the night

Page 66

J. Mohammed Ricketts
program.
Q. The night program you were at Erasmus?
A. Yes.
Q. When you're in the night program at Erasmus --
A. I was going to day school.
Q. At?
A. Wingate.
Q. Why are you doing two?
A. So I could graduate faster.
Q. Was it your understanding this was somehow not permitted?
A. That you couldn't go to both schools at the same time.
Q. Right below this line, sir, if you can read with me, and correct me if I'm misreading, "9/18/84, from Wingate to Erasmus." Would that be correct?
A. Yes.
Q. It says, "Erasmus, perhaps "Hall Evening HS," is that what it says?
A. Yes.
Q. And then below that is "1/85 Wingate to graduation." Would that been when you graduated?

Page 67

J. Mohammed Ricketts
A. '85, yes.
Q. You graduated from what school?
A. Wingate.
Q. Where it says your name, "Junior Ricketts, 10/12/65." Why does it say 10/12/65?
A. Because that's the date of the passport I got from the Jamaican Embassy.
Q. Is this the correct date?
A. No.
Q. Do you know where that date comes from?
A. From the birth certificate, I told you.
Q. Did you make up that birth date?
A. No. I got it from the leader of the Muslim.
Q. The Bushwick Training Center?
A. Yes.
Q. Does that training center still exist?
A. I'm not sure.
Q. Are they called temples in the Muslim religion or what are they called?
A. Mosques.
Q. Mosques. Was that a former mosque?
A. It's not a mosque. It's a training center for young Muslim boys on the street.

Page 68

J. Mohammed Ricketts
Sometimes, you know, you can -- they have a place to sleep if you have nowhere to go.
Q. What were they training you --
A. In Bushwick.
Q. You said a training center. What were they training for, was it religious, secular education training?
A. Just Muslim teachings.
Q. Muslim teachings. On the second page, sir, if I can ask you to look towards the bottom. There's some handwriting. It seems to say, "Secondary school, St. Ann's, Jamaica." Did you ever go St. Ann's in Jamaica?
A. No. There's no such school in Jamaica.
Q. You're laughing. Why are you laughing?
A. There is no such schools.
Q. No such what schools?
A. Secondary schools.
Q. How do you know that there are no secondary schools in Jamaica? How do you know, sir?
A. I have been to Jamaica. So there is no such school.
Q. What kind of schools are there?

Page 69

J. Mohammed Ricketts
A. They have junior high and high schools.
Q. Do you know why it would say, "secondary school St. Ann's in Jamaica" in what you identified as your own high school records?
A. No.
Q. Sir, on the bottom of the same page, it gives you, almost the very bottom of the page, it has a date of birth of 10/12/65. It's your testimony today that's not your date of birth?
A. No. That's the -- like I said, that's one I have on my Jamaican Passport.
Q. Your birth place says, "Jamaica." It's your testimony today that is not your birth place?
A. That's my testimony today, yes, it is not my birth place.
Q. Three pages there beyond, sir, let me ask you to look at what is stated as a "Report to Parents." Do you have that in front of you?
A. Uh-huh.
Q. It says, "Linton Park Secondary School, St. Ann Parish." Did you ever attend that school?
A. No.
Q. When it says for term ending December 18, 1982, you never went to that Linton Park

Page 70

J. Mohammed Ricketts
Secondary School --
A. No.
Q. -- in 1982?
A. No.
Q. If you can wait for me to finish the question, just for the ease of the reporter.
A. Okay.
Q. It says, "Name, Junior Ricketts." Would this refer to you, sir?
A. That's my name, now, yes.
Q. "Age, 17." Would you have been around 17 years old in 1982?
A. 18.
Q. It says, "17 plus"?
A. Okay.
Q. So you would have been about 18?
A. Yes.
Q. When it says, "No. in Grade, 55," do you know what refers to?
A. No.
Q. It's your testimony today this is not referring to you?
A. No. Is it possible you could get some more from the school if this exist for real?

Page 71

J. Mohammed Ricketts
Q. Ask your counsel. Don't ask me a question.
MR. MOSELEY: Don't ask the government lawyer a question. I would -- this -- I don't have a question. Go ahead.
Q. Do you have any idea, sir, you personally, why this would have been produced as part of your high school records?
A. No.
Q. On the following page, sir, it's entitled "Health Promotion Data Sheet." It says, "Name, Junior Ricketts." Would this be you?
A. Uh-huh.
Q. "Parent's name, Keturah Campbell." Again, who would this be?
A. This could only be one of my foster parents.
Q. Was, indeed, Keturah Campbell one of your foster parents?
A. I'm not sure.
Q. You're not sure?
A. Right.
Q. When you're saying "could be," is this a guess as you're sitting here today?

Page 72

J. Mohammed Ricketts
A. Yes.
MR. MOSELEY: Don't guess.
A. I'm not sure.
Q. You're not sure?
A. I'm not sure.
Q. Before today, have you heard the name Keturah Campbell?
A. I can't remember.
Q. It says, "Home Address, 24-31 Dean Street," did you ever live at 24-31 Dean Street?
A. I lived on Dean Street, but I don't remember if it was 24-31.
Q. "Agency where health care was obtained," says, "new in country." Indeed, were you new in this country?
A. No.
Q. Do you have any idea why it would say that?
A. No.
Q. Did you ever tell anyone at either Wingate or the other school you were new in the country?
A. No.
Q. Did you ever tell any of the teachers

Page 73

J. Mohammed Ricketts
or the administrators that you were new to the country?
A. No.
Q. When it talks about activities of daily living, I believe -- turn the page, it says, "sleep pattern, nine hours a night, sometimes sleeps four hours a night." Was this, indeed, your sleep pattern any time in high school?
A. Not that I can recall.
Q. What was your sleep pattern?
A. You mean high school? I can't recall what it was.
Q. So "nine hours a night," sometimes sleeps four hours a night; is not correct?
A. I can't recall.
Q. Could it be correct?
A. I'm not sure.
Q. It says, "Social Patterns: Friends, family, and clubs." Is that correct?
A. No.
Q. Why do you say no?
A. I have no clubs, actually.
Q. I'm sorry?
A. No.

Page 74

J. Mohammed Ricketts
Q. No clubs. Did you have any family?
A. I'm not sure.
Q. You're not sure. Why are you not sure whether you had family?
A. Because all my time I lived with just foster care parents so nobody cares about me.
Q. Do you have any friends?
A. Not anymore.
Q. When you were in high school?
A. Yeah, I had friends.
Q. And "Recreation: Yoga exercise." Did you ever do yoga?
A. All types of exercises.
Q. What types of exercises?
A. Played basketball. That's it.
Q. That's it?
A. Yes.
Q. No yoga?
A. Not yet.
Q. Did you ever do yoga?
A. No. I like yoga, though.
Q. It talks about "Nutritional Pattern: Breakfast, cereal, orange juice, egg." Was that your breakfast pattern?

Page 75

J. Mohammed Ricketts
A. I can't recall what pattern breakfast or food I had in these years.
Q. Do you have any idea what you were eating for breakfast then?
A. No idea.
Q. In lunch, it says, "skip because of program." Do you know what that refers to?
A. No.
Q. Supper says, "veg, meat and starch." Is that correct?
A. No idea.
Q. Can you, as you sit here today, recall anything you would have eaten for dinner when you were in high school?
A. No.
Q. Do you recall a single meal you would have had when you were in high school?
A. No.
Q. Says, "Height: 5'9"." Was that your height in high school?
A. I can't recall. I don't know.
Q. Do you know what you are today?
A. I think I'm 5'10".
Q. "Weight: 135." Was this your weight at

Page 76

J. Mohammed Ricketts
any time in high school?
A. I can't recall.
Q. You can't recall?
A. No.
Q. "Blood Pressure: 120/70." Do you know whether, indeed, that was your blood pressure?
A. I can't recall.
Q. It says, "Teeth: All present, no cavs." Cavitieis I think it refers to. Was this correct in high school, did you have cavities?
A. I can't recall if I did or not.
Q. Do you have cavities today?
A. I haven't seen a dentist in years.
Q. Do you have any cavities, sir?
A. I don't know.
Q. Have you ever had a filling?
A. Yes, and two have been taken out.
Q. You have had cavities before?
A. If filling mean cavity then, maybe, yes.
Q. On the following page, it says, "Current Medications: No." Did you take any medications in high school?
A. I can't recall.

Page 77

J. Mohammed Ricketts
Q. Further on this same exhibit, sir, I think it's three pages or so from the back. There's a George Wingate HS Grade Report, 3/10/83. I believe it's one or two pages beyond what you have in front of your, sir. This is in the -- it's one of your report cards. Perhaps your counsel can assist?
MR. MOSELEY: Just for the record, so it's clear, 21 on the Bates stamp.
MR. QUICK: I'm referring to actually page 22, which is a grade, 3/10/83 grade report.
Q. Have you seen this before, sir?
A. I don't remember.
Q. It mentions your subjects here and the corresponding teachers. Indeed, did you have a teacher names Fields?
A. I can't recall.
Q. Can you recall if you had a teacher named Goldstein?
A. I can't remember.
Q. Can you recall whether you had a teacher named Maimouni?
A. No.

Page 78

J. Mohammed Ricketts
Q. Can you recall whether you had a teacher names Miesas, Miesas?
A. No.
Q. Can you recall whether you had a teacher named Kampel?
A. No.
Q. Can you recall whether you had a teacher named Kupferman? Do you remember that teacher?
A. No.
Q. Or Crawford?
A. I don't remember any of these teachers.
Q. Do you remember any teacher aside from these teachers at Wingate?
A. No.
Q. Is there any reason to think this is not your particular grade report dated March 10, 1983?
A. No.
Q. Below that is a grade report, 6/21/84. Have you seen that before?
A. No.
Q. Is there any reason to think this is not your grade report?

Page 79

J. Mohammed Ricketts
A. I have no reason.
Q. When it says, for instance, in the March, 10 1983 Grade report E in the column. Do you know what the "E" refers to?
A. No. I don't know what it stands for.
Q. In that March 10, 1983 grade report, it says total absent, TOT, I guess absent total. Does that seem to correspond how many times you have been absent during this time at Wingate?
A. I can't recall.
Q. On the 6/21/84 report, below that says, "Attendance," then there is a TOT column. It seems to mean total. Underneath that says 23. Seemingly to indicate you were absent 23 instances. Do you know whether that was, indeed, correct?
A. No.
Q. Is there any reason to think this was inaccurate?
A. No, no reason.
Q. Did you have any sort of learning disabilities throughout high school?
A. I'm not sure. I can't recall.
Q. You're not sure?

Page 80

J. Mohammed Ricketts
A. No.
Q. Why are you not sure?
A. Because I can't remember if anyone told me I had a problem.
Q. Well, as you were going through high school, do you remember any sort of academic difficulties you may have had?
A. No. I can't remember.
Q. When you say, "I can't remember," do you remember if you had some or did not have some or can't remember any difficulties?
A. I can't remember any difficulties.
Q. How did you do in high school? Academically, did you perform well?
A. I think so.
Q. What would you consider well?
A. I think so.
Q. Did you have any sort of eye problems in high school?
A. No.
Q. No? Were you wearing glasses in high school? I see that you're wearing glasses today.
A. No, not in high school.
Q. When did you first get glasses?

Page 81

J. Mohammed Ricketts
A. I think it was 2006.
Q. You saw fine in high school?
A. Yes.
Q. Did you have any hearing problems in high school?
A. No.
Q. Were you ever assigned to any special tutors or teachers in high school for any learning disability?
A. I have a few tutors, but -- yes, I have a few tutors.
Q. In high school?
A. Yes.
Q. Provided by the high school?
A. Yes.
Q. For what?
A. I think it was math, problem with math.
Q. Why did you have that tutor?
A. Help me with my math grade.
Q. Was your math grade poor?
A. Not poor, but it wasn't that great. I had to work hard on that.
Q. On the final page of this exhibit, sir, it says, "RickettsDepo24" on the bottom right-hand

Page 82

J. Mohammed Ricketts
corner. If you can look at that.
A. Yes, I see that.
Q. Have you seen this before?
A. Yes, on the first page.
Q. I'm sorry.
A. On the first page.
Q. You've seen this on the first page?
A. Yes.
Q. I'm sorry, I don't understand.
A. You showed me page 1.
Q. Have you seen this final page before?
A. No.
Q. It seemingly says or a signature of Keturah Campbell. Would this be the same Keturah Campbell mentioned in this document previously?
A. Yes, I think so.
Q. But you don't know whether she was or whether she was not any sort of foster parent?
A. I can't remember.
Q. Can you tell me today whether, indeed, this was Katurah Campbell's signature?
A. I'm not sure. I can't recall.
Q. When you talk about the foster parents, were these foster parents designated by a court?

Page 83

J. Mohammed Ricketts
A. I'm not sure. You were just sent there sometimes by whatever center you had or, you know, you were sent there for a period of time, so I'm not sure how they get appointed. I know they are usually able to get funded from the City to take care. I don't know how they were appointed.
Q. That's why you had that welfare number that you mentioned before? You mentioned a welfare number?
A. Yeah.
Q. That welfare number, to your understanding, would then follow you throughout this foster care assignment process?
A. Maybe. I think so. I'm not really sure.
Q. Do you know how many years you would have been from, as you say, from one foster parent to another?
A. No.
Q. Could it be more than two years?
A. I can't tell, I mean, you know, how many foster parents I had been through.
Q. Not how many. How many years?
A. I can't tell how many years.

Page 84

J. Mohammed Ricketts
Q. So it could be just two years, perhaps?
A. Could be more. I'm not sure.
Q. Could it be ten years?
A. I'm not sure if it was.
Q. You don't know whether it was two years or ten years?
A. I can't recall.
Q. You don't know whether it was two years or 15 years?
A. No. I'm not sure.
Q. I just want to make sure I understand what you remember sitting here today.
MR. QUICK: This will be Ricketts Exhibit 9.
(Whereupon, high school diploma was marked as Ricketts Exhibit 9 for identification as of this date by the Reporter.)
Q. The court reporter has handed you Deposition Exhibit 9, sir. I will ask you whether you've seen this before.
A. Yes.
Q. What is this?
A. A high school graduation certificate.

Page 85

J. Mohammed Ricketts
Q. Whose?
A. Mine.
Q. You are the Junior Ricketts this refers to in this certificate?
A. Yes.
Q. It says, "January 1985." Would this, indeed, be correct?
A. I think so.
Q. You're not certain, though?
A. If it says '85, then it is.
Q. Is there any reason to think this is not your high school diploma?
A. No, no reason whatsoever.
MR. QUICK: This one will be Ricketts Exhibit 10.
(Whereupon, the Selective Service System Card was marked as Ricketts Exhibit 10 for identification as of this date by the Reporter.)
Q. In front of you is Deposition Exhibit 10, sir. I ask you to take a look at that and tell me whether you have seen that before.
A. This looks like Selective Service System record.

Page 86

J. Mohammed Ricketts
Q. Is this your Selective Service record?
A. Yes, I think so.
Q. On the bottom there is a signature, "Junior Ricketts, 12/12/84." Does that look like your signature in December 1984?
A. I think it may be, yes.
Q. On the top left-hand side, it says, "Date of birth," seemingly, "SEP 31, 1964." Is that your birthday?
A. No.
Q. Is this your handwriting?
A. I think it is.
Q. Do you know why you would write September 31, 1964?
A. No.
Q. Did you ever use that date as your birthday?
A. No.
Q. Previously?
A. No.
Q. Did you ever use that date, September 31, 1964, after signing this particular document, Deposition Exhibit 10?
A. I can't recall. I don't recall. I

Page 87

J. Mohammed Ricketts
don't think so.
Q. It says, "Social Security Number, 097-68," perhaps "4131." Was that your Social Security at that point?
A. Yes.
Q. When did you receive that Social Security number?
A. I think in '94.
Q. "Current address: P.O. Box 874, Brooklyn, New York." Did you ever use that?
A. Yes. I think so.
Q. Was that your personal --
A. Yes.
Q. Why did you have a personal P.O. Box?
A. To get my mail sent there.
Q. It says you lived, underneath, block 6, 2431 Dean Street. Did you, indeed, live at that address?
A. Yes.
Q. Telephone number in block 7, 718-342-1824. Did you ever use or have that telephone number?
A. I think so.
Q. You think so?

Page 88

J. Mohammed Ricketts
A. Yes.
Q. Is there any reason to think this is not your Selective Service System card?
A. No.
Q. Do you know where Wingate was located in Brooklyn?
A. I don't remember.
Q. Do you remember the cross streets at all?
A. No, I don't remember cross streets.
Q. In high school, did you ever use the name Paul Milton Miles?
A. The first year.
Q. The first year?
A. Yeah, before I dropped out, before I went back.
Q. Mr. Ricketts, can you tell us anywhere in those high school records that we've shown you here today as part of those deposition exhibits where it refers to you as Paul Milton Miles?
A. No, you didn't show me any of those.
Q. I did not. Can you show me; do you know?
A. No.

Page 89

J. Mohammed Ricketts
Q. Can you show me anywhere where it says Paul Milton Miles?
A. No, not in the record you gave me. But I explained to you earlier that this is when I went back, when I got the Jamaican Passport. These are not all the records.
Q. So did you tell the high school at some point your name was Paul Milton Miles?
A. I think they know about it, yes.
Q. You think they know about it, why?
A. I used to attend there before I dropped out.
Q. Did you ever live at 307 Winthrop Street in Brooklyn?
A. I can't remember.
Q. Why can't you remember?
A. I can't remember where I used to live before. I can't recall.
Q. Why not?
A. Just, I can't remember.
Q. Can you, as you sit here today, remember any addresses you've ever lived at?
A. The one that only comes in my mind is Dean Stret.

Page 90

J. Mohammed Ricketts
Q. Aside from the Dean Street address, sitting here today, do you remember any other addresses you've ever lived?
A. Pine Street.
Q. Pine Street. Where was that located?
A. That's also in Brooklyn.
Q. What number was that?
A. 375 Pine.
Q. So we have the Dean Street address, the Pine Street address. Can you name to me any other address?
A. No, I can't remember any address.
Q. Is it your testimony today that when you started at Wingate you were Paul Milton Miles?
A. I started on that name before, before I dropped out.
Q. When did you drop out?
A. I can't remember when I dropped out.
Q. The high school records you have referred to and looked at today did have a date. Was that date, indeed, correct? Perhaps you want to look at it.
MR. MOSELEY: Which exhibit are you referring, Counsel?

Page 91

J. Mohammed Ricketts
MR. QUICK: I think it's Exhibit 8 Ricketts Depo 13 is the Bates.
A. As I said before, I am sure, again, when I got the passport from the Jamaican Embassy, went back to the -- when they gave me when I went back to Wingate.
Q. I will ask you again, sir. Perhaps your counsel can show you. 9/18/84, Wingate, Erasmus Hall Evening High School. Does that refer to the date you dropped out of high school?
A. I can't remember. I can't recall.
Q. Is it your testimony today that in February 1983, when this page 1 of Exhibit 8 of RickettsDepo13, when it says, "2/1/83, from Jamaica to Wingate," is this the date you would have entered Wingate?
A. As I said, I don't remember the day I went back in but I attend fall --
Q. Not went back in. The date you entered Wingate?
A. No. I think it was Wingate prior to before that.
Q. Is it your testimony 2/1/83 is not correct?

Page 92

J. Mohammed Ricketts
A. It could be the date when I returned back to Wingate.
Q. Because two lines below it says, "1/85 Wingate to Graduation." I'm trying to understand this. So you went back twice to Wingate?
A. I was at Wingate. I dropped out and went to Erasmus.
Q. I understand.
A. I went back to Wingate.
Q. I understand. But you just said 2/1/83 may have been the date you went back to Wingate?
A. Okay.
Q. Did you go back to Wingate twice?
A. Yes. When I dropped out first, went to Erasmus, went back to Wingate.
Q. You were in Wingate, you dropped out, you came back to Wingate, you go to Erasmus, and then you come back to Wingate?
A. Yes.
Q. That's your testimony today, just so I understand that correctly?
A. Yes.
Q. So in 2/1/1983, were you, indeed, Junior Ricketts?

Page 93

J. Mohammed Ricketts
A. I think so, yes.
Q. You think so?
A. Yes.
Q. Was there ever a Paul Milton Miles, another Paul Milton Miles at Wingate, to your knowledge?
A. No.
Q. No what?
A. To my knowledge, there was not another one at the same time.
Q. To your knowledge, was there ever another Paul Milton Miles?
A. No.
Q. So I understand, Mr. Ricketts, you enter Wingate as Paul Milton Miles; is that correct?
A. That's correct, yes.
Q. At some point you change your name to Ricketts?
A. That's correct.
Q. Why do you need your Jamaican Passport with the name of Ricketts to go back into the system at Wingate?
A. Because I was attending Erasmus. I

Page 94

J. Mohammed Ricketts
couldn't have the same program at the same time.
Q. You were attending Erasmus under the name of Ricketts?
A. Yes.
MR. QUICK: The next one will be Ricketts Exhibit 11.
(Whereupon, Birth certificate was marked as Ricketts Exhibit 11 for identification as of this date by the Reporter.)
Q. I will ask you to look at Deposition Exhibit No. 11, Mr. Ricketts. Have you seen this before?
A. Yes.
Q. When did you first see this?
A. This was a birth certificate that I had used to get the Jamaican Passport from the Jamaican Embassy.
Q. Where did you get this?
A. This one was given to me by the Muslim leader with the burnt passport at the same time.
Q. In that training center?
A. Yes.
Q. Do you know where the training center

Page 95

J. Mohammed Ricketts
would have obtained it?
A. No.
Q. Did you provide any of the information on this birth certificate?
A. No.
Q. To anybody?
A. No.
Q. All of the information in this birth certificate was created by someone other than you?
A. No.
Q. It says on the upper left-hand corner, "Place of birth, hospital, date, 12, October 1965." Was this your birth date?
A. No.
Q. Do you know why it says that?
A. No.
Q. It says, "Mother, Katurah Campbell." Again, do you know who this particular Katurah Campbell is?
A. No.
Q. Do you have any idea whatsoever?
A. No. Like I said, it sounds similar to one of my foster parents, because it does appear on the high school records, so it's got to be.

Page 96

J. Mohammed Ricketts
Q. Did the individual at the training center know Katurah Campbell?
A. I'm not sure.
Q. Did you tell them at the training center about Katurah Campbell?
A. I'm not sure.
Q. Can you think of any reason why the training center would know the name, Katurah Campbell?
A. I think so because I think she was a Muslim at the time.
Q. You think she was?
A. Yeah.
Q. But you don't know?
A. I'm not quite sure.
Q. Why are you not quite sure?
A. I'm not sure.
Q. Did you ever speak with her about the Muslim faith?
A. No.
Q. Why do you think she may be Muslim if you never spoke about it?
A. Because I remember that she had -- I had to get permission from her sometimes to go on a

Page 97

J. Mohammed Ricketts
trip with the group.
Q. What trip are you referring to?
A. You know, from Muslim training from one mosque to another.
Q. Mask?
A. Yeah.
Q. What does that --
A. A mosque.
Q. Mosque?
A. Yeah.
Q. Where would these mosques be that you're traveling to and from?
A. Visit from a mosque in Bushwick, in the Bronx to Manhattan.
Q. Within the New York metropolitan area?
A. Yes.
Q. Do you know whether she cooperated with this training center in creating this document?
A. I have no idea.
Q. When is the last time you saw Keturah Campbell?
A. About 20 years.
Q. 20 years?
A. Yes.

Page 98

J. Mohammed Ricketts
Q. Perhaps 1995?
A. Maybe after 1995.
Q. So as much as ten years after you graduate from high school, you're still keeping in touch with Katurah Campbell?
A. Not really. But I -- maybe the last time I heard about her. No, in 1995, when I got my first conviction, I lost contact with most of the people.
Q. Was Keturah Campbell born in the United States?
A. I'm not sure.
Q. You don't know?
A. I don't know.
Q. Did she have any sort of accent?
A. I'm not sure.
Q. You don't know whether she spoke English with an accent?
A. No.
Q. Do you know whether she spoke English?
A. She did.
Q. But you don't know whether it was with an accent?
A. No.

Page 99

J. Mohammed Ricketts
Q. Do you know what she looked like?
A. She was African-American.
Q. Any other characteristic?
A. No.
Q. Do you know how tall she was?
A. No.
Q. Approximately?
A. No.
Q. Did she seem to be more than five feet tall?
A. I don't know how tall.
Q. She could be less than five feet?
A. I can't say.
Q. Why can't you say?
A. Because I would be guessing. I don't know.
Q. When you were in high school and looking at her in the face, were you looking up or were you looking down?
A. I can't really say that.
Q. No recollection?
A. No recollection.
Q. Was she, I'll say the word skinny in a relative term, slim like you?

Page 100

J. Mohammed Ricketts
A. I can't remember.
Q. Was she obese?
A. No. I can't remember.
Q. You can't remember whether she was going from one extreme to another, anorexic or morbidly obese?
A. No.
Q. You don't know whether it was either?
A. No.
Q. Did she have a job?
A. The only income she get was from human resources. I don't know if she had any other job. That was it.
Q. Do you know for a fact she got income from human resources?
A. Yes.
Q. Why do you know that?
A. Because she told me that she received money from them.
Q. Did she say how much?
A. No.
Q. Do you know how long she received this money?
A. No.

J. Mohammed Ricketts
Q. Do you know what year you would have been in her care, starting to be in her care?
A. No. I can't remember.
Q. Do you know what year you would have been out of her formal care?
A. Yes.
Q. What year would that be?
A. I think I went on my own in '96, '97.
Q. I'm sorry, '96 or '97?
A. Yeah. I was in a shelter for a while, then I was on my own, my own place.
Q. So correct me if I'm wrong, she was your foster parent in high school there in the '80s when you were in Wingate. You just told us you'd been out of her care in 1985 or so, 10 years, 12 years later?
A. '95 or '95, I'm not sure.
Q. How old were you when you graduated high school?
A. I went back -- I think it was when I was 20.
Q. So for 10 or 12 years after turning 20, you remained in the care of Ms. Campbell?
A. On and off, you know.


J. Mohammed Ricketts
Q. In your 20's, sir?
A. I don't think it was in my 20's. I can't recall.
Q. I'm just trying to understand. You said 10 or 12 years in her care.
A. There was a time that, you know, I was on the street on my own and sometimes I spent time in the shelter and stuff like that. I can't remember exactly how long she received any income for me or anything.
Q. Would she be receiving income for taking care of you into the 1990's?
A. No, I don't think so. I don't think she received any income for me after 1984, '85. I'm not sure.
Q. So is this the Dean Street address you were living at with Ms. Campbell?
A. No, she didn't live on Dean Street.
Q. Where did she live?
A. I think she lived -- I don't remember.
Q. Didn't you live with Ms. Campbell?
A. Yeah, but I don't remember exactly what street.
Q. It's not the Dean Street address?


J. Mohammed Ricketts
A. No.
Q. It's not the Pine Street address?
A. No.
Q. And the address you don't remember?
A. No. Dean Street, I lived on my own.
Q. And you lived with Ms. Campbell, correct?
A. Uh-huh.
Q. Who lived there with you?
A. With Ms. Campbell?
Q. Yes.
A. There were other young kids there.
Q. How many?
A. About four of them.
Q. Four, inclusive of yourself?
A. Yes.
Q. Do you know any of their names?
A. No, I don't remember who they are.
Q. Was she married at that time?
A. No.
Q. A spouse did not live with her?
A. No.
Q. Did a partner of any sort, domestic partner, live with her?


J. Mohammed Ricketts
A. No, not where were at, no. There was no spouse by that time.
Q. Do you remember whether she had any brothers or sisters?
A. No.
Q. You don't recall?
A. No.
Q. Did Ms. Campbell have any children herself that were living with her?
A. No. I can't recall if she had children living with us.
Q. No children of hers lived with you?
A. Right, no.
Q. Do you know if she had any children living elsewhere?
A. No. I don't know.
Q. Did she have any sort of hobbies, anything you can tell us about?
A. No.
Q. You can't tell us anything about her?
A. No.
MR. QUICK: Make this Ricketts Exhibit 12.
(Whereupon, Application for Jamaican

Page 105
J. Mohammed Ricketts
Passport was marked as Ricketts Exhibits 12 for identification as of this date by the Reporter.)
Q. Mr. Ricketts, this is Deposition Exhibit 12. I ask, Mr. Ricketts, to look at that and tell me whether you've seen it before.
A. Yes.
Q. What is this?
A. This was an application that was used for me to get a passport with the Jamaican Embassy in New York.
Q. Used by whom?
A. Passport.
Q. You said it was used to get a passport?
A. By me.
Q. Not the training center?
A. No.
Q. Why are you getting a Jamaican Passport?
A. I told you, to go on a trip to Jamaica. That's why I had a passport.
MR. MOSELEY: Is this the best copy you have?
MR. QUICK: This is the best copy I

Page 106
J. Mohammed Ricketts
have, yes, sir.
Q. On page 2, sir, the very bottom, it seems to be a signature that says, "Junior Ricketts," on page 2 of this exhibit. Would this be your signature at that time?
A. It could be.
MR. MOSELEY: You're referring to?
MR. QUICK: Ricketts Depo 17.
Q. In the present address block, sir, on page 2, Ricketts Depo 17, it seems to say 163 something, Rutland Road in Brooklyn. Did you ever live there?
A. I can't remember.
Q. Do you recall of any personal association with that address, whatsoever?
A. I can't remember.
Q. When it says, "Place and country of birth, country: Kingston, Jamaica." Did you write that?
A. Maybe I did.
Q. Why would you say that?
A. Because it would have to match the exhibit No. 15, otherwise, I wouldn't have been able to get the passport.

Page 107
J. Mohammed Ricketts
Q. Why did you choose Jamaica?
A. That's the only documentation they gave me.
Q. The training center?
A. Yes.
Q. So is it your testimony that the training center, then, assigned you Jamaica as a birth place?
A. Yes.
Q. It says, "Usual place of residence: St. Ann, Jamaica." Why does it say that?
MR. MOSELEY: What item are you referring?
MR. QUICK: Still on the same page. It's in block 1.
A. I see right here. I have got no idea why it says St. Ann.
Q. You wrote it. Did you write it?
A. Maybe I did.
Q. Is there any reason to think you didn't write it?
A. Maybe not.
Q. You don't recall why you wrote that?
A. No.

Page 108
J. Mohammed Ricketts
Q. This says your last birth date in the same block was 17. Was this, indeed, your last birth date?
MR. MOSELEY: You're referring to a last birth date?
Q. Was that your last birth date?
A. No.
Q. What was the --
A. No.
Q. What was the last time?
A. It was 17 corresponds what the birth certificate.
Q. So if your usual place of residence is not St. Ann, Jamaica, what was it at the time?
A. Have to be Brooklyn, New York.
Q. You don't know where in Brooklyn?
A. No. I couldn't put that on the application to get one.
Q. Exactly.
A. Maybe that's why I didn't put Kingston. It says right here on the birth certificate St. Ann.
Q. This also, in the same block, "profession or occupation." Is that accurate?

J. Mohammed Ricketts
A. Yes, 17, you have to be a student.
Q. On page 2, Ricketts Depo 18, in block eight, entitled "Declaration." It seems to state that, "I further declare that I have not previously held or -- well, there is something handwritten in here. It looks like 114877 are those numbers. Do you see that, sir?
A. Uh-huh.
Q. Correct me if I'm wrong, that purports with the same number at least on that Jamaican Passport we discussed in Exhibit 1?
A. Uh-huh.
Q. It's the same number in each of these I94 exhibits; is that correct?
A. Uh-huh.
Q. Yes, it is correct?
A. Uh-huh.
Q. Do you know why that same number would appear in this particular exhibit?
A. Well, it seems to me if you look at the -- put in there by the passport agency. Because remember I told you I took up the burnt passport. I think they are the one who submit this information in this section.


J. Mohammed Ricketts
Q. Is it your testimony that the burned passport was that 114877 number that was used in support of this Jamaican Passport?
A. In the birth certificate.
Q. Used by you?
A. Yes.
Q. Do you have any idea why this particular number, then, would appear on the I94's we discussed previously?
A. No. As I said before, I never seen I94's until during the immigration proceedings.
Q. You don't know why the same number keeps turning up?
A. No. Like I said, I didn't see the I94 until the immigration proceeding.
Q. Exactly. But you don't know why, as you sit here today, why that number keeps coming up?
A. No.
Q. Just so I'm clear, this indeed was the document you used to get the Jamaican Passport?
A. Yes, Jamaican Embassy, yes.
MR. QUICK: The next one will be Ricketts Exhibit 13.


J. Mohammed Ricketts
(Whereupon, the handwritten letter was marked as Ricketts Exhibit 13 for identification as of this date by the Reporter.)
Q. I ask you to look at Exhibit 13. Mr. Ricketts, I ask, have you seen this before?
MR. MOSELEY: Your question is, has he seen this before?
MR. QUICK: Yes.
Q. It's also on the screen, Mr. Ricketts. If you have problems with them in front of you, all of these are on the screen behind me blown up a little bit.
Have you seen this before today?
A. I think I might have.
Q. Where would you have seen this?
A. I think this was maybe near when the passport was submitted. I just don't recognize the signature.
Q. You recognize it?
A. No. K.L. Campbell, no.
Q. That's a good question. Who is K.L. Campbell?
A. That's what I'm saying, I can't recall


J. Mohammed Ricketts
who that is.
Q. Is that Keturah Campbell we keep referring to?
A. Could be. I don't think I recall seeing what she signed, doesn't correspond with the rest of the documents that you have her name on there.
Q. When would you have first seen this when applying --
A. Would have been the Jamaican Passport I applied for.
Q. In the upper-right hand corner, 1634 Rutland Road is that address again. You don't know whether that was an address where Ms. Campbell was living at the time?
A. I can't recall.
Q. In June 15, 1983, was that the time period in which you were applying for the Jamaican Passport?
A. Yes, I think so.
Q. "Dear sir or madam," do you know to whom she's addressing this?
A. No. I think maybe this was for the Jamaican Consulate.


Under Protective Order

Page 113

J. Mohammed Ricketts
Q. This letter is to, maybe, says to inform. "This letter is to inform you that I am giving my consent for my son, Junior Ricketts, to hold his Jamaican Passport. Thank you for your cooperation." Did I read that correctly?
A. Yes.
Q. Why does she refer to you as her son?
A. I don't know if she were my foster parent maybe she referred to me as son. Maybe just for the purpose of getting the passport.
Q. Did you ever refer to your yourself as her child or her son?
A. No.
Q. Did you ever hear her refer to you as her son?
A. I can't remember.
Q. Did you ask her to write this particular letter?
A. No. I don't remember. No.
Q. Ms. Campbell --
A. No. I can't remember.
Q. Did Ms. Campbell have any personal contact with the training center?
A. Yes.

Page 114

J. Mohammed Ricketts
Q. Mr. Ricketts, I'm just looking at the signature here, that certainly you can read, we can agree it reads Campbell? Perhaps a K is the first initial?
A. Uh-huh.
Q. Yes.
Q. Perhaps an L?
A. Yes.
Q. Certainly K. Campbell?
A. Yes.
Q. If you recall on your high school records, on the final page, there was a signature of Keturah Campbell. Do you recall that? It's the final page of that particular Exhibit 8. Perhaps your counsel can show you?
MR. MOSELEY: Page 24 of the high school records of Exhibit 8.
MR. QUICK: Can you show that to your client?
Q. Can we agree that the signature on the high school record, Bates Ricketts Depo 24, appears to be different than the current exhibit, Ricketts Depo 20. There is a different signature?
A. It looks different.

Page 115

J. Mohammed Ricketts
Q. Do you have any idea why the signatures look different?
A. No.
Q. Do you know whether, indeed, Ms. Campbell wrote this particular letter, this Deposition Exhibit 13?
A. Not to my knowledge.
Q. So do you have any knowledge whether she signed it herself?
A. I can't say.
Q. Did Ms. Campbell -- was she able to read English?
A. I don't know. I didn't have any reason to believe she couldn't read.
Q. Did you ever see her read newspapers or books or anything?
A. No.
Q. I'm sorry?
A. No.
Q. You never saw her read?
A. No. I wasn't really interested. I wasn't paying attention at the time whether she could read or not.
Q. Do you have any idea whether she could

Page 116

J. Mohammed Ricketts
write?
A. No. I'm not sure.
Q. You don't know what her signature looked like in the time period we're talking about in June 1983 or so?
A. No.
Q. Did Ms. Campbell have any sort of physical disability that would impair her ability to write?
A. I have no idea.
Q. You can't recall if, for instance, her writing hand would have shaken or not?
A. No.
Q. So I understand your testimony, then, Deposition Exhibit 13, you don't really know who wrote this letter; do you?
A. No. I'm just saying it got to be one of the passports. I can't remember exactly who wrote it.
Q. Did you write it?
A. No.
Q. Why do you say you didn't write it?
A. No, I didn't write it.
Q. Why do you say that?

Page 117

J. Mohammed Ricketts
A. No.
MR. QUICK: Next one is Ricketts Exhibit 14.
(Whereupon, the Jamaican Passport was marked as Ricketts Exhibit 14 for identification as of this date by the Reporter.)
Q. I ask you to look at Deposition 14, Mr. Ricketts, and ask if you've seen this particular document before.
A. Yes.
Q. When have you seen this document?
A. This was a passport taken from my house. This one I got from the New York Embassy.
Q. You got it from the Embassy?
A. Yes.
Q. Which embassy?
A. Jamaican Embassy in New York.
Q. In New York?
A. Yes.
Q. Did you physically go to the embassy or consulate in New York?
A. Yes.
Q. Tell me about this process. You

Page 118

J. Mohammed Ricketts
completed the application. Do you take this to the consulate, do you mail it, what do you do?
A. Once you get the application, you take it and give it to the window, pay them for it.
Q. What do you present to the Jamaica Consulate?
A. The birth certificate, the application. I think I had the birth certificate and application. That's what I think I have.
Q. What is Bates Ricketts Depo 23, is has the birth date 12th, October, 1965. That's not your birth date?
A. No.
Q. It says your height was 5'9". Was that your height?
A. No.
Q. It was not your height at that time?
A. No.
Q. Why would it say 5'9" for your height?
A. Nobody knows what your height was.
Q. Nobody knows?
A. No. Approximately what height might have been, I don't think it's accurate measured to that's your height.

Page 119

J. Mohammed Ricketts
Q. It says the color of your eyes are brown?
A. No. I don't know.
Q. You're saying that the height is not correct, the eye color is not correct?
A. Yes.
Q. Is this your signature on the same page?
A. Yes.
Q. Indeed, is this your picture that we're talking about?
A. Yes.
Q. On the following page, again, we see this passport number, 114877. Do you see that?
A. Yes.
Q. That's the prior passport?
MR. MOSELEY: Excuse me. To what are you referring to?
MR. QUICK: The final page.
MR. MOSELEY: Page 24?
MR. QUICK: 24.
Q. Again, we refer to passport number 114877?
A. Uh-huh.

Page 120

J. Mohammed Ricketts
Q. We can agree that is the same number on the first Jamaican Passport we discussed earlier?
A. Yeah.
Q. We can agree that number also appeared on the I94's?
A. Okay, yes.
Q. Yes, we agree on that?
A. Yes.
Q. Can we agree that was also on your Jamaican Passport that we just discussed?
A. Yes.
Q. Now, it says here on the same block, "cancelled and retained." Was that passport 114877 cancelled? That's the burnt one?
A. Yes.
Q. Why was it cancelled?
A. I don't know. That's what they stamped in there. I don't know all the procedures, how the Jamaican Passport -- I can't tell you that.
Q. It says -- when are you applying, first of all, for this passport, what year?
A. It says 1993.
Q. I believe that says it expires 1993.
A. 1983.

Page 121

J. Mohammed Ricketts
Q. You're applying ten years before the expiration date in 1983?
A. Yes.
Q. Here on Ricketts Depo 24, it says that that prior Jamaican Passport 114877 is valid until 9/4/90. Why are you getting a new or second Jamaican Passport when that prior one, 114877, was valid for more than seven years?
A. Well, as I said, I got the Jamaican Passport. The original passport was not mine, so I couldn't -- I needed the passport, the Jamaican Passport with the name and picture on it. The other one, that was burnt so it could not be used. That was not my picture and my signature. They needed something with my picture and my signature.
Q. This Jamaican Consulate didn't note the 114877 passport --
A. I don't think they cared at that time.
Q. You don't think they cared?
A. Yeah, because later on down the line they cancelled this session that they issued to me.
Q. So I understand, you said the Jamaican Consulate cancelled this new passport, 565227, up

Page 122

J. Mohammed Ricketts
on the screen?
A. Yes. When it was brought to their attention, when ICE -- I mean, immigration found it in my apartment and took it to the Jamaican Embassy. The Jamaican Embassy said you should have never received this one.
Q. Why is the Jamaican 114877 passport burned?
A. I don't know. I have no idea why.
Q. Was it burned when you had it?
A. It was given to me burned with a birth certificate.
Q. It was given to you burned?
A. Yes. In order for me to get the passport, Jamaican Passport.
Q. Who burned it?
A. I have no idea.
Q. It was given to you burnt in 1983, 1982, what year?
A. At the time I went to get the new passport, that's the time I got the birth certificate.
Q. Did you burn the passport?
A. No.

Page 123

J. Mohammed Ricketts
Q. Why are you laughing?
A. Why would I burn a passport?
(Whereupon, a short recess was held from 11:52 until 12:01.)
Q. Mr. Ricketts, perhaps this is a good time for us to talk about your parents. Who was your mother?
A. Well, the only thing I knew of was the birth certificate.
Q. Can you speak up, please?
A. Yeah. The only thing I knew was from my birth certificate that my parents are Lizzie Mae Page.
Q. Tell us about your mother, Lizzie Mae Page. What do you know about your mother?
A. When I was in the covenant house, that's where I recall my parents are deceased but --
Q. Who told you that?
A. That was one of the social workers that worked there.
Q. Do you know the name of that social worker?
A. No. Over a period of time, I

Page 124

J. Mohammed Ricketts
personally tried to travel down to South Carolina to find out who my real parents are.
Q. Why South Carolina?
A. Because that's where -- on my birth certificate I had that's where I was born.
Q. You traveled to South Carolina?
A. Yes.
Q. When did you do this?
A. This was through my college year, maybe 1991, I think.
Q. Did you drive down to South Carolina?
A. No. I flew down.
Q. Where do you fly to?
A. I went to Charleston and from there Dillon County. But I have problems down there.
Q. What do you mean "problems"?
A. I couldn't -- there were -- I couldn't find any relatives that could give me information.
Q. Well, tell me about the process here. First of all, where did you stay when you're in South Carolina?
A. There was a Youba Center (phonetic). It's like an African Village in Sheldon, South Carolina. I went from Charleston to Sheldon. From

Page 125

J. Mohammed Ricketts
Sheldon, I rent a car down there and drive to Dillon County.
Q. You go to Charleston, South Carolina?
A. Yes.
Q. Go to a Youba in North Carolina?
A. No. They are all in South Carolina yes.
Q. Where in South Carolina is this Youba located?
A. It's called a Youba Center.
Q. Where?
A. Sheldon County. That's in South Carolina. That's where the village is.
Q. From the Youba Center in Sheldon --
A. Went to Dillon County.
Q. How close is this from one another when you when to Dillon County?
A. It's not pretty close, but I had someone from Sheldon, from the Youba Village who knew the area more better than I have. I didn't really -- like I said, I couldn't find any information that I needed.
Q. You were driving from the Youba in Sheldon?

Page 126

J. Mohammed Ricketts
A. To Dillon.
Q. To Dillon County?
A. Yeah.
Q. Who was driving?
A. I was driving along, but I had somebody else with me from Sheldon.
Q. Do you know who was with you?
A. No. I don't recall the names.
Q. Can you spell Youba?
A. Y-o-u-b-a.
Q. How did you know about this Youba in Sheldon?
A. Well, when I started college, I realized I lost my Muslim faith. So I started studying Cubans called Santeria link in Nigeria, South Africa. Since I was African-American, I thought to study that type of religion. That's where I began to know where the religious sites are. Once you are entrusted in the religion, they all welcome you for training, plus my religious godfather, he is in Bronx, New York.
Q. Your religious godfather is in the Bronx?
A. Yes.

Page 127

J. Mohammed Ricketts
Q. Who is your religious godfather?
A. It's called Miseal Corriel, M-i-s-e-a-l, C-o-r-r-i-e-l. There is a webiste called --
Q. Your godfather in what faith?
A. Santeria.
Q. How do you spell that?
A. S-a-n-t-e-r-i-a.
Q. When did you meet your godfather?
A. That was, I think, 2003.
Q. Do you know whether that person is still alive?
A. Yes, still alive.
Q. He is still alive? It's a he?
A. Yes, godfather.
Q. You're traveling, then, to the Youba in, you said mid '90s?
A. Yes.
Q. Is Dillon County in South Carolina?
A. In South Carolina.
Q. I understand. Do you know where it is in South Carolina?
A. I can't tell you from here, like exactly what. I know South Carolina.

Page 128

J. Mohammed Ricketts
Q. Can you tell us whether it's the northern, the southern, the eastern, the western?
A. I said, I don't know exactly where on the map. Because as I said to you, I had someone from Sheldon who knew the area with me.
Q. You were driving?
A. Yeah. But I don't know on the map what is east, west, north, south. I know the best way to get to Dillon County.
Q. You're driving from the Youba to Dillon County. You ever stay in Dillon County overnight?
A. No. We went there, then went back to Sheldon.
Q. How much time or in days are you spending in Dillon County?
A. Well, I couldn't -- I didn't have additional information I needed to get anywhere further.
Q. What additional information did you need?
A. Like documentation's.
Q. Like what?
A. I need authorizations to do my studies, to see what the person from there --

Page 129

J. Mohammed Ricketts
Q. Authorizations from whom?
A. Like to figure out how do you, you know, find where your family were. I couldn't get anything from the clerk or anything without proper identification and stuff. They couldn't match -- no.
Q. You said proper identification. You didn't have proper identification?
A. No.
Q. Why do you say you didn't have proper identification?
A. My driver's license wasn't enough. I couldn't -- they had to show how this person was related to you, otherwise, it was useless.
Q. Wasn't this person -- we're speaking now about your mother, right, know -- she was deceased you said?
A. I was told that. I didn't really -- I didn't have a copy of any of the death certificates. I wanted to find out on my own.
Q. Had you prepared in any manner before going to Dillon County --
A. Well, I think it's Page, if it's a local family name, it would be easy for me to

Page 130

J. Mohammed Ricketts
find. I shouldn't have any problem because it's local. I thought it would be quite easy for me.
Q. So I understand. You have a name. You have a name only Lizzie Mae Page. You decide to go to Dillon County, South Carolina. You go, and where is the first place you go in your investigation?
MR. MOSELEY: The first place in Dillon County?
MR. QUICK: Yes.
A. I tried -- I went to the probate office. But as I said, I didn't have -- I couldn't show any connection, you know, why was this relative to you or, you know, to get any further information. But I couldn't -- I didn't obtain a death certificate. I was trying to figure it out.
Q. So I understand it correctly, it's your testimony today that to have performed any familial research or research on your ancestors, you needed to show you were related to them in some way?
A. Yes.
Q. You can't do that?
A. No.
Q. Your birth certificate isn't enough?

Page 131

J. Mohammed Ricketts
A. No.
Q. Why not?
A. Because the birth certificate has Junior Ricketts on there.
Q. Your birth certificate has Junior Ricketts?
A. Right. So I couldn't, you know, get any further information on my parents.
Q. Could you not prove you changed your name at some point to Junior Ricketts?
A. Yeah, I could. But I thought based on the fact that it was supposed to be a southern family, I though it would be quite easy.
Q. So you could have proved -- and I'm using your terminology -- you could have proved you were related?
A. If I had more information.
Q. But you just didn't bring it with you?
A. No.
Q. So you go to the probate office?
A. Yes.
Q. They tell you they can't help you?
A. No.
Q. What do you do then?

Page 132

J. Mohammed Ricketts
A. I try to use auto research computer research.
Q. Where did you try to do this?
A. On Internet. It wasn't helpful, either.
Q. What sites were use using?
A. Yahoo, and telephone Yellow Pages. I did find a Robert Miles Junior and a Lizzie Mae Page in South Carolina but a telephone number listed, but before I was able to contact them I was taken in custody for another case.
Q. That's interesting.
You say you found Lizzie Mae Page, your mother, and Robert Miles Junior; who is that?
A. That's supposed to be my father.
Q. Right.
You found them in the phone book?
A. Right, in South Carolina.
Q. In which phone book?
A. In the yellow Pages.
Q. You found them in the Yellow Pages during the trip we're speaking about?
A. No. This is when I returned.
Q. So you return to New York?

Page 133

J. Mohammed Ricketts
A. Yes.
Q. You returned to New York?
A. Uh-huh.
Q. Where do you get a copy of the Dillon County Yellow Pages?
A. No. It's on the Internet.
Q. On the Internet you saw it?
A. Right. Once you put a name in, it pops up.
Q. You're telling me in 1994/1995, when you're doing this research, you're going onto either Yahoo or one of the Internet phone bases and you're finding Lizzie Mae Page and Robert Miles Junior --
A. Yes.
Q. -- as having current addresses in where?
A. In Dillon County.
Q. Dillon County?
A. Yes. There were phone numbers provided. I couldn't call because I was taken in custody. I didn't further research.
Q. Did you print this material out at any point?

Page 134

J. Mohammed Ricketts
A. I may have some. I'm not quite sure, but I'll look.
Q. Did you find corresponding addresses for these people?
A. No, because the site requires you to pay additional funds to access further.
Q. So you go to the probate office. They say they can't help you, you don't provide any further documentation of who you are?
A. Yes.
Q. Do you return to New York, then?
A. Yes.
Q. Immediately?
A. Yes, because I thought it would be easier than it was, but it wasn't quite easy.
Q. Did you attend any schools in South Carolina?
A. No.
Q. No elementary schools?
A. No.
Q. No middle schools?
A. No.
Q. No undergraduate?
A. No.

Page 135

J. Mohammed Ricketts
Q. Did you ever work in South Carolina?
A. No.
Q. You're in South Carolina in 1994/1995, you said?
A. Yeah.
Q. Was that the first time you've been in South Carolina?
A. Yeah -- well -- actually, yes.
Q. Have you been to South Carolina since that one visit?
A. No.
Q. Do you know how old your mother would have been when she had you?
A. No.
Q. Do you know how old your father would have been when you were born?
A. No.
Q. Do you know whether there were siblings, any brothers?
A. I believe I had two older brothers.
Q. Why do you believe you had two, you say two older brothers?
A. Yeah.
Q. Why do you believe that?

Page 136

J. Mohammed Ricketts
A. Because -- I don't know. I think -- I don't know.
Q. You don't know why you believe that?
A. No.
Q. Do you know whether you have any sisters?
A. Not -- no. Not until -- well, no.
Q. You don't have any or you don't know?
A. I don't know if I have any.
Q. Sir, what's your A number; do you know your A number?
A. Right here, 027 --
Q. 027?
A. Yeah. 024.
Q. 024?
A. Yeah. 434.
Q. 434?
A. Yeah.
Q. Is that the only number you've ever had, A number?
A. Yes.
Q. When were you assigned that number?
A. I got it when -- I think it was 2000 -- no, '98. When I was in immigration court, that was

Page 137

J. Mohammed Ricketts
on the Notice to Appear.
Q. That was the number you saw?
A. Yes, first time I saw the number.
Q. In what year? I'm sorry.
A. I think it was '98.
MR. QUICK: Mark this as Ricketts Exhibit 15.
(Whereupon, Notice of Approval of Relative Immigrant Visa Petition was marked as Ricketts Exhibit 15 for identification as of this date by the Reporter.)
Q. I ask you to look at No. 15, Mr. Ricketts, and ask whether you've seen this before.
A. No, I've never seen it before.
Q. You've never seen it before?
A. No, first time.
Q. In the upper right box, "Name of Beneficiary, Ricketts, Junior N." Is that M or N?
A. N.
Q. Is that your name, sir?
A. My name is M, actually. I'm Junior Ricketts, yes.
Q. It has "File No. A27024434." Is that your A?

Page 138

J. Mohammed Ricketts
A. Yes.
Q. It says, "Date petition filed, 9/14/83." Do you know what that refers to?
A. No.
Q. To the left of that under address, "Name and Address of Petitioner," it has it as "Keturah Moulton." Do you know who that is?
A. No.
Q. Do you have any idea whatsoever?
A. No.
Q. 2223 Contelyore, C-o-n-t-e-l-y-o-r-e, Road in Brooklyn. Do you know what address that is?
A. No.
Q. Did you ever live there?
A. No.
Q. Do you know whether Keturah Campbell ever lived there?
A. No -- this is -- no. Look at the box, No. 3.
Q. Okay. Yes, sir.
What box are you referring to?
A. That has double X's in the box.
Q. Yes, sir.

Page 139

J. Mohammed Ricketts
That begins "Your petition for preference has been forwarded to the United States Consulate."
A. To "Montreal." Montreal. If this says Jamaica, why would this say Montreal?
Q. Do you know, sir?
A. No.
Q. It says when the petition session was filed, September 14, 1983. Were you still at Wingate at that point?
A. I think so. Yeah.
Q. "Classification P2-2," do you know what that is?
A. No.
MR. MOSELEY: I assume this is a true and correct copy? And I assume --
MR. QUICK: It is.
Q. Was your middle name ever anything that begins with N?
A. No, middle name was Mohammed. But the Jamaican Passport I told you about from the Jamaican Embassy had an N there.
Q. It had Nathaniel of some sort; did it not?

Page 140

J. Mohammed Ricketts
A. Yes.
Q. So that name, Ricketts, Junior N., purports with that Jamaican Passport?
A. Yeah. But this also here, it gives me enough additional to prove that there are really a Junior Ricketts out there.
Q. But it is your A number; is it not?
A. The one assigned. It was given to me. As I said, when I started immigration proceedings, that was the A number that I had.
Q. You never applied for an A number?
A. Never.
Q. No one applied for you?
A. Not that I know of.
Q. You have no idea who Keturah Moulton is?
A. No idea. The birth certificate I used to get the Jamaican Passport don't have the same last name so how can someone file for you if it's not the same name?
Q. Sir, with regard to Lizzie Mae Page and Robert Miles Junior, your mother and father you told us about you, do you know their birth dates?
A. No. Well, not by heart, not off my

Page 141

J. Mohammed Ricketts
head.
Q. Did you ever know their birth dates?
A. Yes.
Q. How did you know that?
A. Because it's listed on my birth certificate.
Q. It's on your birth certificate that you have?
A. Yes. I had the original birth certificate.
Q. Do you have that today?
A. No.
MR. QUICK: Mark this as Ricketts Exhibit 16.
(Whereupon, the U.S. Passport application was marked as Ricketts Exhibit 16 for identification as of this date by the Reporter.)
Q. I'm handing you two pages of Exhibit 16, Bates 27 and 28 respectively, sir. Again, I ask have you ever seen either of these two pages?
A. Yes, I did.
Q. What are they?
A. This is application for U.S. Passport.

Page 142

J. Mohammed Ricketts
Q. Is this an application you completed?
A. Yes.
Q. Both of these pages?
A. Yes.
Q. One page and a second page has a larger picture on it. Were there two pictures, sir, do you know, that were taken?
A. No, same pictures.
Q. I will note just the bottom of the passport service says, "Use Only," the date, "10/26/64," signature seems to be the same, just a different copy image or quality copy between the two of them. Do you know whether these are actually the same application?
A. They are the same.
Q. They are the same application. Okay.
This says your date of birth is 8/31/64?
A. Yes.
Q. Is that your birth date?
A. Yes.
Q. Do you know what Social Security number -- I just can't read it -- it seems to start with 122; do you know?

Page 143

J. Mohammed Ricketts
MR. MOSELEY: The copy that you have projected on the screen behind you is somewhat legible.
MR. QUICK: It is.
Q. Is that your Social Security number, sir?
A. That's the first one.
Q. It's your first Social Security number?
A. Remember I told you that when I changed my name, they issued a new Social Security number, 122. I couldn't remember the rest of the numbers.
Q. 2431 Dean Street, that's the address you were living at the time?
A. Yes.
Q. Again, you see Robert Miles and Lizzie Mae Page there as your birth parents, their respective birth dates. Where did you get that information when you were completing this application?
A. This I got off from the original birth certificate that I had.
Q. It says that you're going to the Caribbean and Europe. Where were you going?
A. Trinidad, Haiti. I think I told you I

Page 144

J. Mohammed Ricketts
traveled to Trinidad before.
Q. You did that?
A. Yes.
Q. This also says -- it seems to say on the right-hand side of the picture that you've been married before. Have you been married?
A. No.
MR. MOSELEY: If you look at the document better projected, the "no" is checked.
Q. So the "no" is checked?
A. The "no" is checked.
Q. When did you get this 122 Social Security number?
A. That's the one I had at the covenant house. That's the only one I had before.
Q. You don't know how old you were?
A. No.
Q. Do you know who applied for that number?
A. No.
Q. Is that your signature, then, sir? It says Paul Miles?
A. Yes.

Page 145

J. Mohammed Ricketts
Q. That is your signature?
A. Yes.
Q. Although the photo is poor, to say the least, would this have been the photo you attached, if you can tell?
A. No. It's a photo, but it would have been better.
Q. Exactly. I think one of those copies, I think with the smaller picture seems to have a better quality picture image. Would that have been you, to the extent that you can tell?
A. Yes.
Q. This would be your picture?
A. Yes.
MR. QUICK: Next one mark as Ricketts Exhibit 17.
(Whereupon, a copy of driver's license and Social Security card was marked as Ricketts Exhibit 17 for identification as of this date by the Reporter.)
Q. Have you seen Exhibit 17?
MR. MOSELEY: Would you bring that up on the screen?
MR. QUICK: Sure.

Page 146

J. Mohammed Ricketts
Q. It appears to have a driver's license and a Social Security number copied on the same page?
A. Yeah.
Q. Have you seen this before, sir?
A. This is one of the exhibits that the Immigration Officer Castro has provided during criminal proceedings, I think it was.
Q. With regard to the Social Security card we see here, was this at all your Social Security card?
A. It used to be but not anymore.
Q. It used to be. It says it was -- at least it has a date of 5/1/2007?
A. Uh-huh.
Q. In May of 2007, did you apply for a Social Security card or ask for a Social Security card?
A. No. I was in ICE custody in 2007.
Q. So you didn't seek a Social Security card at that point?
A. No.
Q. The number is 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?
A. Yes.

Page 147

J. Mohammed Ricketts
Q. That seems to purport with the Social Security number on the passport application we just saw?
A. Yes.
Q. That was your Social Security number?
A. That was the one I had before, yes.
Q. Before it changed?
A. Yes.
Q. When did it change?
A. 1984.
Q. '84 it changed?
A. Yeah.
Q. The driver's license on the top of this same Exhibit 17, do you recognize that at all?
A. Yes.
Q. Again, because of Mr. Castro?
A. Right, because of the criminal proceedings.
Q. This is not a New Jersey driver's license you have held before?
A. No.
Q. With that driver's license we just talked about, it that your picture?
A. No, it's not.

Page 148

J. Mohammed Ricketts
Q. You can definitely tell sitting here that's not you?
A. That's not me.
MR. QUICK: Mark this as Ricketts Exhibit 18.
(Whereupon, the U.S. Passport was marked as Ricketts Exhibit 18 for identification as of this date by the Reporter.)
Q. I show you Exhibit 18 and ask if you have seen this before, sir?
A. Yes.
Q. What is this?
A. This is the passport issued from the application you previously showed.
Q. Passport 060041569. That could then be matched up with the application we just discussed?
A. Yes.
Q. Is this your picture on that passport?
A. Yes, it is.
Q. Where did you apply for this passport?
A. It was applied in the Brooklyn clerk's office, downtown Brooklyn.
Q. Did you apply in person?

Page 149

J. Mohammed Ricketts
A. Yes, I did.
Q. Not by mail?
A. No, in person.
Q. Do you recall what documents you provided in support of that?
A. I know birth certificate. I can't remember what else I had with me at the time.
Q. Did you have a driver's license at that time?
A. I'm not sure. I can't be sure if I had my driver's license.
Q. That's actually an interesting issue.
Did you ever have a driver's license?
A. Yes.
Q. When did you first get a driver's license?
A. I think it would be '85 or '86.
Q. 1985 or 1986?
A. Yes.
Q. What jurisdiction would have issued that?
A. Brooklyn, New York.
Q. New York driver's license?
A. Yeah.

Page 150

J. Mohammed Ricketts
Q. In 1985 or '86, what name is this driver's license under?
A. Junior M. Ricketts.
Q. Junior M. Ricketts?
A. Yes.
Q. Have you held a driver's license in any state but New York?
A. No, only New York.
Q. That 1985 or 1986 driver's license, did you renew that driver's license at one point?
A. Yes.
Q. How many driver's licenses have you held in New York?
A. Well, that's the only one I had.
Q. I understand. Usually -- I don't know about New York -- but other jurisdictions, the last five or ten years and one has to renew them. Did you renew this?
A. I had one 20 years.
Q. 20 years?
A. Yes.
Q. You renewed it a couple of times?
A. Yes.
Q. One time; do you know?

Page 151

J. Mohammed Ricketts
A. I think a couple of times.
Q. You did that each time in Brooklyn?
A. No, because when I was -- right there, Pennsylvania. I was in custody. I had to let them know I was in custody.
Q. Let who know?
A. Motor Vehicle. I think I sent the application from there back to Motor Vehicle to let them know I was in custody.
Q. From Deer Park, Pennsylvania --
A. Yes, in Deer Park.
Q. -- to get a New York State driver's license?
A. Yes.
Q. Why did you want to keep your New York State driver's license if you were incarcerated?
A. Because I didn't want, when I got home, to do the test all over again.
Q. Was, indeed, your driver's license renewed when you reapplied in Pennsylvania?
A. Yes, but it didn't have a picture on it. Whenever you get a picture on there -- I forget what they call it on the driver's license.
MR. QUICK: Mark this as Ricketts

Page 152

J. Mohammed Ricketts
Exhibit 19.
(Whereupon, the Application for Social Security Number Card was marked as Ricketts Exhibit 19 for identification as of this date by the Reporter.)
Q. This is Deposition Exhibit 19, Mr. Ricketts, and ask if you have seen this before.
A. Yes, I think so.
Q. What is this?
A. It's a Social Security application card.
Q. Whose Social Security application card?
A. It looks like mine.
Q. It is yours, then?
A. Yeah.
Q. The signature on block 13, is this, indeed, your signature?
A. Yes.
Q. Do you recall that on June 6, 1984 that you applied or signed this application?
A. Yes, I think I did.
Q. If you notice on the upper left-hand corner before name set forth, the word "replacement" is circled. Did you circle that?

Page 153

J. Mohammed Ricketts
A. Yes, I think I did.
Q. Why did you circle that?
A. That was circled, because when my name was changed, I had to let them know the name was changed on my Social Security card. That's why we circled it.
Q. Your name hadn't changed yet; had it?
A. Yes.
Q. To Junior Ricketts?
A. Yes.
Q. Why are you applying under the name Paul Milton Miles if your name, indeed, is Junior Ricketts?
A. I think I had to submit covenant court order, change name court. I think that's the time -- the same time after the name changed. I had to put -- I had to fill it in and put the court order with it.
Q. Why not circle correction instead of replacement?
A. I don't know.
Q. Again, 2431 Dean Street, you were living there in 1984?
A. Yeah.

Page 154

J. Mohammed Ricketts
Q. Block 6, "Date of birth, 8/31/64." That is your birthday?
A. Yes.
Q. Block 9, "Lizzie Page and Robert Miles"?
A. Yes, that's correct.
Q. There's no middle name for either of them, why not?
A. I don't think it was necessary to put it in.
Q. On block 10 C, no Social Security number is completed, why not?
A. Social Security number card was requested, yes. I had a Social Security number before. Why would I say no if I had a number before?
Q. It says, "Enter the Social Security number assigned to the person." There's no Social Security number in 10 C. Do you know why?
A. No. I don't know if there was a card already issued.
Q. You already had a card in June 1984?
A. I had a card, yes.
Q. Do you know what happened to that card?

Page 155

J. Mohammed Ricketts
A. No.
Q. Do you have that in your possession?
A. No, I don't have that Social Security card.
Q. What would have happened to that card?
A. I have no idea. The card get lost. I have no idea.
Q. On the bottom left, "Types of evidence submitted," you have "U.S. Passport 060041564." We can agree, then, that is the passport number we just discussed?
A. Yes.
Q. I understand you're using that passport number and passport filled this in, this application. It says, "Mandatory in-person interview conducted." Is that the case?
A. Maybe it was. I can't recall.
Q. Do you recall where that would have been?
A. Maybe in Brooklyn.
Q. So I'm clear, Lizzie Page and Robert Miles were intended to be your parents?
A. We discussed that before.
Q. Yes. Exactly.

Page 156

J. Mohammed Ricketts
MR. QUICK: Mark this as Ricketts Exhibit 20.
(Whereupon, Petition for change of name was marked as Ricketts Exhibit 20 for identification as of this date by the Reporter.)
Q. You have been handed Deposition Exhibit No. 20, sir. Can you identify this?
A. Yes.
Q. What is it?
A. Petition for change of name prepared by an attorney, I think.
Q. You think?
A. I think.
Q. Do you remember who this attorney was?
A. No.
Q. Did you, indeed, have an attorney?
A. Yes, I had an attorney.
Q. Did you retain that attorney yourself?
A. Yes, I did.
Q. Do you remember how you met that lawyer?
A. No.
Q. On the third page, Ricketts Depo 35 is

Page 157

J. Mohammed Ricketts
the Bates number on the right, "Sworn to before me this 7th day of June, 1984." That would have been the date that you signed this, correct?
A. Yes.
Q. It says you were a college student. Were you a college student at that point, 1984?
A. No. I was in high school.
Q. No. 5 says, "I am a college student and a citizen of the United States", No. 5 on page 1.
A. I made a mistake. I was probably a high school student.
Q. That is not correct?
A. No.
Q. You were a high school student in June 1984?
A. Yes.
Q. Do you know whether you told the lawyer that you were a college student?
A. No, I can't recall if I told him that.
Q. The notary stamp on page 3, what did you provide to the notary to prove who you were?
A. I can't recall. I can't remember.
MR. MOSELEY: Just a minor objection. That assumes under New York law you are

Page 158

J. Mohammed Ricketts
required to provide evidence who are you to a notary before your signature gets notarized.
Q. No. 2, "The name which I propose to assume is Junior Mohammed Ricketts." Why the name Junior?
A. Well, there's two reasons. One, on the birth certificate was father, which is Robert Miles Junior. And in Islam, if your father is actually not the person you grew up with, in Islam, it was required that you take whatever Muslim name that, that you now are going to be recognized for, that you usually take each alphabet from your father's name to create your new name.
Q. This is a religious father?
A. Yes.
Q. Who is this religious father?
A. It's a Muslim tradition.
Q. Who was this Muslim father that you had?
A. No. No. According to the Muslim religion, when you are brought up by a father that doesn't take care of you and you're going to change your name, usually you take each letter from your father's name to create your Muslim name. So on my

Page 159

J. Mohammed Ricketts
birth certificate you will have Robert Miles Junior. So if you notice, for each one of those letters, you create a new name. That's what that is.
Q. So who chose Junior as the first name?
A. Well, I did. I mean, it worked out perfectly.
Q. You chose it?
A. Yes, because Junior, that was with Robert Miles Junior, Junior, Robert becomes, Ricketts and Mohammed, Miles.
Q. Why the Mohammed middle name?
A. Because I didn't really want the Mohammed name to be my first. I didn't want to be called Mohammed first. I wanted Mohammed to stay in the middle. Even though I'm called Mohammed by fellow Muslim brothers.
Q. In this spelling of M-o-h-a-m-m-e-d, is that the most common spelling of Mohammed?
A. Yeah, that's the spelling from the prophet, Mohammed.
Q. Let's go onto the third, why Ricketts?
A. Remember I had the Jamaican Passport I told you from the Jamaican Embassy? I wanted both

Page 160

J. Mohammed Ricketts
passports perfect. Remember I told you earlier in this deposition that was for me, because I'm a Muslim brother leaving the United States using a U.S. Passport going to Trinidad, from Trinidad will switch to Jamaican Passport to Mecca, from Mecca back to Trinidad and switch back to U.S. Passport? Both passports would have matched. To you it may not make sense. But that's what it is.
Q. You didn't choose the name Ricketts?
A. Not really.
Q. Not really. What do you mean?
A. It had a purpose at the time.
Q. You didn't choose it?
A. No. It had a purpose at that time.
Q. You've spoken several times about your found Muslim faith. Were you raised in a particular faith?
A. Well, how shall I put it? I was trained as a Sunni. I wouldn't use the word trained. You're not trained in a particular faith.
Q. Were you brought up --
A. Not brought up. I absorbed at a young age, absorbed the Muslim faith. So it's not a

Page 161

J. Mohammed Ricketts

matter of training. It's a matter of what I absorbed at the time.

Q. So in the covenant house, were you practicing any religion whatsoever?

A. I don't know at a young age. I can't recall a very young age.

Q. When did you develop an interest in Islam?

A. I can't remember when I started. I thought -- I was invited by the other brothers, then, you know. I believed it was African-American we were taught.

Q. Were you a teenager?

A. I was young. What age I started, I can't recall.

Q. Do you know whether you were younger than ten?

A. I can't recall what age I started.

Q. Do you know what religion, if any, Lizzie Mae Page was?

A. No.

Q. Or Robert Miles Junior, do you know what he was?

A. No.

Page 162

J. Mohammed Ricketts

Q. Was there ever sort of any ceremony to acknowledge your acceptance of the Islamic faith?

A. Yeah. They call it a Shia any Muslim prior to you can do it. You don't have to become the way like other religions does. Any other prior Muslim can give you the Shiha. It depends. It's Arabic.

Q. Do you know what age you would have been?

A. I can't recall.

Q. When in changing your name, you mentioned that Ricketts was, indeed, the name that you used on that first Jamaican Passport?

A. Uh-huh.

Q. Another name on the same Jamaican Passport was Nathaniel?

A. Uh-huh.

Q. Why not just use Nathaniel?

A. That's not a Muslim name.

Q. Is Ricketts a Muslim name?

A. No, but Mohammed is. I could have just called myself Mohammed. But because as I explained there was other purposes.

MR. QUICK: Mark this as Ricketts

Page 163

J. Mohammed Ricketts

Exhibit 21.

(Whereupon, the Application for Social Security Number Card was marked as Ricketts Exhibit 21 for identification as of this date by the Reporter.)

Q. Please look at Exhibit 21 and tell me whether you have seen this before.

MR. MOSELEY: You will represent presumably that this comes from the Social Security Administration in response to your subpoena?

MR. QUICK: It does.

Q. What is it?

A. Social Security application.

Q. Is this a Social Security application you completed?

A. Looks like I did.

Q. Is the signature on block 13 your signature?

A. Looks like I did.

Q. There is a date in block 11, June 11, 1984. If you notice it's just five days after Exhibit 19, the prior application we spoke about. Why five days later are you completing another

Page 164

J. Mohammed Ricketts

application?

A. I have no idea.

Q. In block 1, it states your first name is Milton?

A. I have no idea.

Q. Was that your first name?

A. No.

Q. It also lists in block 1, "Middle." It says, "P." Do you know why you would have stated P?

A. No.

Q. In block 2, "2431 Dean Street," were you living there?

A. Yes, I was.

Q. In block 6, "August 31, 1964," did you state that as your birthday?

A. Yes.

Q. In block 9, "Mother." It says, "Keturah Campbell." Why would it say Keturah Campbell for your mother's name?

A. I have no idea.

Q. Yet we can agree, can we not, that Katurah Campbell is the name you have seen, for instance, in your high school records?

Page 165

J. Mohammed Ricketts
A. Yes, it is.
Q. Did you write this Keturah Campbell?
A. One second. I just want to make sure.
Q. Yes, sir. Please take the time that you need.
A. Obviously, I see --
Q. You're comparing, for the record, Exhibits 19 and 21?
A. Yes.
Q. I'll ask you again --
A. I can't remember if I wrote this one right here because (indicating) --
Q. What are you pointing to?
A. I'm pointing at 21. Because I was looking at the -- how the writing is entered on page -- the first one, they're not the same writing as you complete on both applications.
Q. But you testified that on Exhibit 21 --
A. Yeah. I know I signed it.
MR. MOSELEY: You're referring to Exhibit 19 when you say you signed it?
THE WITNESS: Right, right here (indicating).
A. if you notice these aren't the same

Page 166

J. Mohammed Ricketts
writing here that fill in the blocks. I can't remember what I wrote in one.
Q. You testified that Exhibit 21, block 13, was your signature?
A. Yes. Why would I write this one? They are not the same handwriting at all.
Q. In block 9 of Exhibit 21, David Miles is listed as the father?
A. Yes.
Q. Was that the father?
MR. MOSELEY: Was this his father?
MR. QUICK: Yes.
A. No. The writing doesn't look familiar to me. So I don't know if I wrote it.
Q. At the bottom of Exhibit 21, it says, "U.S. Passport, Types of evidence, U.S. P/P 060041569." Do you see that?
A. Yes.
Q. So we can agree the passport numbers on Exhibit 19 and 21 do match?
A. Yes.
Q. The two that matches one another on 19 and 21 are also the same passport number on the passport we discussed a few minutes ago; is it not?

Page 167

J. Mohammed Ricketts
A. Yes, it is.
Q. On Exhibit 21, it talks about mandatory in-person interview conducted and the box is checked. Do you recall that mandatory in-person interview?
A. I can't remember. But the passport numbers match, but I can't recall.
Q. In adjacent to, at least -- or I think it's block 12, "Home phone number, 212-342-5155." Was that ever your telephone number?
A. No. That's a Manhattan number. I never had a Manhattan number.
Q. You never had a Manhattan telephone number?
A. No.
Q. Do you remember any of your telephone numbers?
A. Not off my head, no.
Q. Not one of them?
A. No.
Q. Again, on Exhibit 21, block 10, no Social Security number set forth on this. Do you know why?
A. No.

Page 168

J. Mohammed Ricketts
MR. MOSELEY: Would you bring up 21 on the screen, the top part? I just want to see something. Okay. Thank you.
MR. QUICK: Mark this as Ricketts Exhibit 22.
(Whereupon, Court Order for change of name was marked as Ricketts Exhibit 22 for identification as of this date by the Reporter.)
Q. Exhibit 22, Mr. Ricketts, can you identify this for us?
A. There is the official court order for the change of name.
Q. This is your court order?
A. Yes.
Q. You have seen this before?
A. Yes.
Q. Tell us about this process. Did you have a court hearing?
A. No. The lawyer took care of all that. I didn't have to make an appearance.
Q. Did you meet this lawyer in person?
A. Yes.
Q. Where was this lawyer located?

Page 169

J. Mohammed Ricketts
A. It was Manhattan, I think.
Q. Was that a referral, if you know, to that lawyer? Did you know that lawyer?
A. I can't remember how we got in contact with each other.
MR. QUICK: Mark this as Ricketts Exhibit 23.
(Whereupon, Proof of Publication was marked as Ricketts Exhibit 23 for identification as of this date by the Reporter.)
Q. You have been handed Exhibit 23, Mr. Ricketts. Have you seen this before?
A. Yes.
Q. When did you see this?
A. Maybe '84.
Q. 1984?
A. Yes.
Q. What is it?
A. It's a report by a newspaper that whenever you change your name, they have to announce it, so if anyone who opposes the name change have to come forward.
Q. So this is indeed, perhaps, we can call

Page 170

J. Mohammed Ricketts
it the proof of publication at the top with regard to your particular name change?
A. Yes.
Q. Did you have anything to do with the name change published in this newspaper?
A. No. I think the attorney took care of it.
Q. Do you need to use the restroom?
A. I'm fine.
(Whereupon, a short recess was taken at 1:08 p.m. until 1:17 p.m.)
SUPERVISOR MEDINA: Mr. Ricketts, this is Supervisor Medina. Would you like to get something to eat now?
THE WITNESS: No.
SUPERVISOR MEDINA: At any point in time you feel ready to eat, let the officer know so you can get something to eat.
THE WITNESS: Okay.
MR. MOSELEY: Before we go back on the on the record, how much time has elapsed?
MR. QUICK: I have no idea. Do you know how much time has elapsed?
MS. REPORTER: We started at 9:04 and

Page 171

J. Mohammed Ricketts
we took a couple of breaks that I have marked in the transcript.
MR. QUICK: Off the record.
(Whereupon, a discussion was held off the record.)
MR. QUICK: Mark this as Ricketts Exhibit 24.
(Whereupon, the birth certificate was marked as Ricketts Exhibit 24 for identification as of this date by the Reporter.)
Q. This is Exhibit 24, Mr. Ricketts. Have you seen this before?
A. Yes.
Q. What is it?
A. A copy of my birth certificate.
Q. So Mr. Ricketts, is this your birth certificate, sir?
A. Yes.
Q. It's your testimony today?
A. That's my testimony today.
Q. The interrelation that has scratched out Paul Milton Miles and in place has Junior Mohammed Ricketts, did you have a copy of a birth

Page 172

J. Mohammed Ricketts
certificate before this that did not have the Junior Mohammed Ricketts written in hand?
A. Yes, I did.
Q. So it looks like this particular document that we have here, Exhibit 24 --
A. Yes.
Q. But for the scratching out and the new name in handwriting?
A. Uh-huh.
Q. Was that the only --
A. That was the only original one issued from Greenpoint Hospital.
Q. This Exhibit 24 has Robert Miles Junior as your father?
A. Yes.
Q. Lizzie Mae Page?
A. Yes.
Q. There are no birthdays for either of those parents, are there?
A. No, I don't see here.
Q. Correct me if I'm wrong, you've testified previously today in this deposition that you knew your parents' birth dates because it was on your birth certificate?


Under Protective Order

Page 173

J. Mohammed Ricketts

A. Uh-huh.

Q. Where would you have known, then, your parents birth dates if they are not here, on the birth certificate?

A. I think I might have made an error on the first testimony. I think I might have got on the marriage certificate that was presented to me.

Q. You have a marriage certificate?

A. Uh-huh.

Q. Where did you get that?

A. I think I got it from part of the exhibits that I got from Mr. Castro.

Q. I understand you may have gotten it from prior legal proceeding. Here we are in the 1980's. When would you have obtained your parents' birth certificates with their birth dates?

A. Well, the only time I see it is when Mr. Castro presented it to me. There were a lot of things crossed out. I think I may have seen it on the marriage certificate.

Q. Prior to seeing your parents' marriage certificate as provided by Mr. Castro, you had not been aware of your parents' respective birthdays?

A. Not the exact date, maybe how old they

Page 174

J. Mohammed Ricketts

were, not the exact dates, how old they were, not exactly month, days, year.

Q. You may not have known?

A. I may not have known, that is correct.

Q. If you didn't know your parents' respective birth dates, month, day, or year, why did you go down to South Carolina armed with, for lack of a better term, just the name?

A. Because, as I said to you, it's supposed to be a well established family.

Q. What family is?

A. The Lizzie Mae Page.

Q. Not the Miles family?

A. Not the Miles family. I did tell you I found a Robert Miles Junior that is still currently living in Dillon County, South Carolina, but all I had was the telephone number. I never got contact because I made contact with the person -- before I make contact with the person, I was taken into custody. And also there is also Lizzie Mae Page, I think I found somewhere else.

Q. If you recall, Mr. Ricketts, on your May 1984 passport application --

MR. QUICK: Mr. Meyer, can you bring

Page 175

J. Mohammed Ricketts

that up? I don't recall the deposition exhibit number. It is Bates 27 and 28 respectively.

Q. For Robert Miles and Lizzie Mae Page respectively, their respective birth dates in that document --

A. Uh-huh.

Q. -- for Robert Miles, January 7, 1938. For that birth date, where did you get that date from?

A. I can't recall. Honestly I can't recall.

Q. What about Lizzie Mae Page? It says 1/1, I presume that is January 6, 1940?

A. I cannot recall.

MR. MOSELEY: It looks like an 11 there.

A. I don't recall.

Q. Do you recall whether -- it's an 11. Can we agree that it's 11/6/40 is what you wrote there?

A. Yes.

Q. That is your handwriting, then, for those birth dates?

Page 176

J. Mohammed Ricketts

A. Yes, it is.

Q. You just don't recall where you got them from?

A. No.

MR. QUICK: Mark this as Ricketts Exhibit 25.

(Whereupon, the birth certificate was marked as Ricketts Exhibit 25 for identification as of this date by the Reporter.)

Q. With regard to Exhibit 25 that's been handed to you, Mr. Ricketts, can you identify this for us?

A. Yes. It's a birth certificate.

Q. Whose birth certificate?

A. Supposed to be mine.

Q. I'm sorry?

A. It's supposed to be my birth certificate.

Q. Why do you say "it's supposed to be"?

A. I'm trying to remember from the 1998 change. Why would I have a birth certificate? This is my birth certificate. I can't remember when I had --

Page 177

J. Mohammed Ricketts
Q. Well, it does have a date of birth on Exhibit 25 of August 31, 1964. You testified today that is your birthday?
A. Yes.
Q. The certificate number to the right of that, 156-64-337372, can we agree that is the same certificate number on the interlineated birth certificate, Exhibit 24?
A. Yes, it is.
Q. So they do correspond to one other?
A. Yes, it does.
Q. This particular birth document says date issued 9/12/89. Do you know why it would have been issued 9/12/89?
A. I think this was the one --
Q. "This" meaning Exhibit 25?
A. Yes. The article was published in the Brooklyn newspaper, and I think --
Q. The order of publication that you mentioned previous?
A. Yes. I think that is a copy of that. I'm not quite sure. It was submitted at the same time with the newspaper article.
Q. But that name change was from July

Page 178

J. Mohammed Ricketts
1984; was it not?
A. Right.
Q. This is September 1989, that this particular certificate was generated. So my question was, do you know why it was generated September 12, 1989?
A. No.
Q. Was it at your request?
A. I'm not sure.
Q. So it could have been?
A. It could have, but I'm not quite sure.
Q. Do you know why it doesn't have the name Junior Ricketts or Junior Mohammed Ricketts --
A. No.
Q. -- five years after your name change?
A. No. I'm not sure.
MR. QUICK: Mark this as Ricketts Exhibit 26.
(Whereupon, Application for Social Security Number Card was marked as Ricketts Exhibit 26 for identification as of this date by the Reporter.)
Q. Deposition Exhibit 26, Mr. Ricketts, take a moment and tell me whether you recognize

Page 179

J. Mohammed Ricketts
this document?
A. Yes. It looks like the one I submitted, yes.
Q. In block 13 on Exhibit 26, is that your signature, Junior Ricketts?
A. Yes, it looks like my signature.
Q. At least it would have been in August 1984?
A. Yes.
Q. In the upper left-hand corner, "Original, replacement, or correction." Do you know what that is?
A. No.
Q. In the bottom with "Types of evidence submitted, NYC B/C," New York City birth certificate, "156-64-337372." We can agree, then, that is the same certificate number on the interlineated birth certificate --
A. Yes, it is.
Q. -- on Exhibit 25; is it not?
A. Yes, it is.
Q. Then underneath that, "USA PP" presumably passport, "060041569." Can we agree that passport number is the same passport number

Page 180

J. Mohammed Ricketts
associated with the U.S. Passport we discussed previously today?
A. Yes, it is.
Q. The "Change of name court papers." Can we agree that's probably the New York City court order changing the name to Junior Mohammed Ricketts?
A. Yes, it is.
Q. Do you recall submitting this material for this particular application?
A. I don't recall, but I say, yes, because I submit this application.
Q. Block 2, "2431 Dean Street"?
A. Yes.
Q. Again, that is correct?
A. That is correct.
Q. Block 9, your "mother's name at birth." Again, we see Keturah Campbell. Why is that?
A. Yeah.
Q. Why is that?
A. I might have taken that from -- that was -- one second.
Q. Of course. Take the time you need,

Page 181

J. Mohammed Ricketts

sir.
A. Yes.
Q. Your counsel just showed you a document?
MR. MOSELEY: I showed him Exhibit 21.
A. Yes. I might have taken the name from off my foster parent's name. But maybe I put it there, because when I gave them the application, they had my birth certificate, so they knew whether or not -- I think it wasn't really relevant, seeing my real parents never really do anything for me so I put foster care. They didn't have the original birth certificate with it. They didn't say anything about it. They didn't say anything so I didn't say nothing. That could be the reason.
Q. In August of 1984, you knew your mother was Lizzie Mae Page?
A. Uh-huh.
Q. Your faster parent you say was Keturah Campbell. Did you have a foster father?
A. No.
Q. The reference in Exhibit 26 to David Miles, then --
A. No.

Page 182

J. Mohammed Ricketts

Q. Who is that?
A. No. Well, I put my father's name there, but I maybe put the other name. Like I said, they had my original birth certificate. When they were looking at the application, they didn't say anything.
Q. You reached my question. Your father was Robert Miles Junior. Do you know why you said David Miles in August 1984?
A. Like I said, I felt my parents were not there for me or whatever.
Q. I understand. Who is David Miles?
A. Well, there is no such David Miles.
Q. You don't know why you put in the name if there's no such name?
A. No. Like I said, the Social Security office had my original birth certificate in front of them at the same time. They didn't say anything about it.
Q. On block 12, it lists the phone number 212-342-1824. Was that ever you telephone number?
MR. MOSELEY: The question is the telephone phone number you can be reached during the day, not home number.

Page 183

J. Mohammed Ricketts

MR. QUICK: Exactly.
A. I don't remember why I gave them this number. If it was a work number or something, I can't recall.
Q. Were you working -- 212, is exclusively Manhattan?
A. Yes.
Q. So were you working in August 1984 in Manhattan?
A. Maybe. '94.
MR. MOSELEY: '84.
A. '84, I'm not quite sure if I was working. I'm not quite sure.
Q. That number in box 12 is your handwriting, the telephone number?
A. Maybe it is.
Q. Is there any reason to doubt that any of the handwriting on Exhibit 26 is not yours?
A. No, I'm not going to doubt it.
Q. Do you know why in block 10 for the first time you see a Social Security number filled in?
A. This already had a Social Security number. Maybe I might have lost a card or

Page 184

J. Mohammed Ricketts

something.
Q. That was also -- you've anticipated my question since we have a June 6, 1984, June 11, 1984, August 22, 1984 form SS5 filled out. Do you know why you're filling out three within this space of a couple of months there?
A. No idea why I filled out three Social Security applications within a short period of time.
MR. QUICK: Mark this Ricketts Exhibit 27.
(Whereupon, Updated information for U.S. Passport was marked as Ricketts Exhibit 27 for identification as of this date by the Reporter.)
Q. You have been handed Exhibit 27, Mr. Ricketts. Can you identify this for us?
A. Yes, it is.
Q. What is it?
A. It's an update for my U.S. Passport.
Q. This is a form that you completed?
A. Yes.
Q. Then you submitted it to the U.S. Department of State?

Page 185

J. Mohammed Ricketts
A. Yes.
Q. What were you seeking to change, if anything?
A. Update my original passport to reflect Junior Mohammed Ricketts.
MR. MOSELEY: This is the best?
MR. QUICK: It is the best copy I have, yes.
MR. MOSELEY: If can you just bring that down a little bit to see the top. It obviously appears to be a set of passport applications.
Q. It's your testimony it is some sort of passport application, Mr. Ricketts?
A. Yes.
Q. Now, on page 1 under the block labeled "Other Action requested" previously Social Security wrong number is 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 is the right number?
A. Uh-huh.
Q. Why did you write that?
A. Because as I told you, when the name change, Social Security gave me a new Social Security number.

Page 186

J. Mohammed Ricketts
Q. How do you know it gave you a new one?
A. Because that's when I received the card that I had a new number on there.
Q. When did you receive this card?
A. I can't recall when I received the card, but I know that's why the numbers were given to. They give me a new number.
Q. Did you request a new number?
A. No.
Q. Were you expecting a new Social Security number to be issued to you?
A. No.
Q. So I understand, this just came in the mail?
A. That's what was sent to me, gave me a number.
Q. Social Security Administration just sent to you a new card?
A. That's correct.
Q. That new number is the 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, is that the new number?
A. Yes.
Q. Is it your testimony today that -- at least your understanding, is that each time someone

Page 187

J. Mohammed Ricketts
changes a name, a new Social Security number is assigned to them by the Social Security Administration?
A. I don't know how the Social Security Administration operates, so I can't say that. I'm just saying to my belief that when I had changed the name maybe because I was under 21. I don't know how their policy of doing things. When they give me the number, I have it correct also on the passport application.
Q. Yet again, on the first page, Junior Ricketts signature, is that your signature?
A. I think it is.
Q. On page 2 "For Acceptance Agent's Use, State University New York student." Is that, indeed, the case? What were you providing, if you can recall, in support of this passport application?
A. I don't recall what I provided.
Q. Well, in August 1984, were you a student in the State University New York system?
A. 1984?
Q. This is August 23, 1984 when you signed this document. You're providing, at least it says

Page 188

J. Mohammed Ricketts
on page 2, State University New York."
A. No.
Q. Were you ever a state --
A. No. I was city but not state.
MR. MOSELEY: Just to save time, can I ask one question?
MR. QUICK: Yes, sir.
MR. MOSELEY: If you take a look at the form, Mr. Ricketts, it says "For Acceptance Agent's Use Only." Did you write the description, "State University New York;" is that your handwriting?
THE WITNESS: No. That's only for agency, not me.
Q. You didn't write that?
A. No.
Q. Did you ever attend State University New York?
A. Yes.
Q. You did?
A. Yes.
Q. When did you attend?
A. I started in 1985.
Q. Was it called the City University of

J. Mohammed Ricketts
New York?
A. No. Brooklyn College, but belongs to City of New York.
Q. That was in 1985?
A. Started in 1985.
Q. You don't know why you put issue date 2/2/84 of a State University student ID number?
A. No. I was still in high school then.
Q. Then we can agree as well, then, that the Social Security number on Exhibit 27 of 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, that's the same Social Security number that was on the Paul Milton Miles Social Security number card; is it not?
A. That's correct.
MR. QUICK: Next exhibit, 28.
(Whereupon, the Amendment and Endorsements Modifications et Mentions Speciales was marked as Ricketts Exhibit 28 for identification as of this date by the Reporter.)
Q. Do you recognize this Exhibit 28, one page, sir?
A. Yes.
Q. What is this?


J. Mohammed Ricketts
A. This is the back of my passport.
Q. The prior passport --
A. The first passport.
Q. -- we discussed? The U.S. Passport?
A. Yes.
Q. It says, "This passport is amended to change bearer's name to read Junior Mohammed Ricketts."
A. Yes.
Q. Indeed, that was the case?
A. Yes, it was.
Q. This Exhibit 28 would then be the result of the application we just discussed?
A. Yes.
Q. You mentioned Brooklyn College?
A. Yes.
Q. So you graduate from Wingate, actually, it says on your diploma 1985, you said?
A. Yes.
Q. When do you start college or university?
A. 1985.
Q. When in 1985; do you remember?
A. I think it's either the January


J. Mohammed Ricketts
semester or it was the September semester.
Q. In what name did you attend?
A. Junior Mohammed Ricketts.
Q. Did you complete some sort of college application to go there?
A. I think I did.
Q. Do you remember what courses -- first of all, was this a four-year program?
A. Yes.
Q. What was your intention to study?
A. First, I wanted to do education, but then I branched off to business. I changed my major.
Q. When did you change that major?
A. I think I changed it my sophomore year.
Q. Did you receive a degree?
A. Yes.
Q. When did you do that?
A. '91, I think.
Q. In what did you receive a degree?
A. Business management and finance.
Q. It took you five and a half to six years?
A. Yes.


J. Mohammed Ricketts
Q. Were you attending school full time?
A. Yes.
Q. Why did it take you that amount of time?
A. Because I had to do core curriculums.
Q. Was that not a requirement?
A. It's a requirement.
Q. Did you go full time the entire duration, five and a half or six years?
A. Yes. Well, I had more credit than I needed to graduate.
Q. You did?
A. Yes.
Q. Did you withdraw at some point from the university?
A. No.
Q. Not at all?
A. No.
Q. How did you pay for this education?
A. I had some student loans and I borrowed.
Q. From whom?
A. From the programs. From the bank. I had some help, then I had to borrow the rest from

Page 193

J. Mohammed Ricketts

the bank to pay for school loans.

Q. Just to be clear, you said you had help from the programs. That was from the Brooklyn College program?

A. Yes.

Q. Not from any private citizen?

A. No.

Q. Katurah Campbell didn't help you?

A. Nobody helped me.

MR. QUICK: Mark this as Exhibit 29.

(Whereupon, Brooklyn College transcript document was marked as Ricketts Exhibit 29 for identification as of this date by the Reporter.)

Q. Have you seen Exhibit 29 before today, Mr. Ricketts?

A. I might have seen a copy of the school transcript before but not this formal. This is the first I seen this formal.

Q. In some semesters it seems like you take two courses, for instance, in the summer of 1985. In the fall of 1985 you take four; spring of 1986 you take four; summer of '86 you take two. You're taking classes in the summer as well

Page 194

J. Mohammed Ricketts

throughout your stay. Did you work at all during the summers?

A. No. I couldn't work until I graduated because I was also on welfare.

Q. Were you working at all while attending Brooklyn College?

A. No. Well, when you talk about work, I was on welfare. There were a time the department have you do certain things. It wasn't really like an individual job or something.

Q. You said you were on welfare?

A. Yes.

Q. While you were attending --

A. Yes.

Q. Welfare from whom?

A. Human resource.

Q. The City of New York?

A. Yes.

Q. When did you first receive welfare assistance?

A. I've been getting it as a young child.

Q. When you talked about the welfare, perhaps going to some foster parent, when did you personally receive welfare assistance?

Page 195

J. Mohammed Ricketts

A. By myself?

Q. By yourself.

A. Directly I was in college.

Q. You applied for that?

A. Yes.

Q. Why did you apply for welfare assistance while in college?

A. Because I didn't have any job. I couldn't get a job at the time. They wanted to help me out, but they would let me work, you know, clean up places.

Q. The college?

A. No, the department. They send you to a site for, like I said, cleaning up or something if you qualify for the assistance.

Q. Exhibit 29 is your Brooklyn College transcript?

A. Yes.

Q. What clean-up sites are you talking about? I didn't quite follow that.

A. The welfare department had you do a little work.

Q. In order to qualify for the welfare, the City requires you do some work on behalf of the

Page 196

J. Mohammed Ricketts

City?

A. Yes.

Q. How many hours a week was that?

A. Sometimes two hours.

Q. A week?

A. Yeah, sometimes.

Q. That was in Brooklyn or Manhattan?

A. Whatever they sent you to. It doesn't make a difference.

Q. When were you doing this work?

A. While I was in college.

Q. Throughout the entire duration?

A. Up until my senior year.

Q. So that's the duration?

A. Yes.

Q. So you testified that from 1985 to your senior year, the entire duration?

A. Uh-huh.

Q. How much were you receiving, if you can recall, each week?

A. You're not paying for the work you do because you get a regular check. I can't remember what it was. They used to pay my rent for me. I can't recall the food stamps or the regular check.

J. Mohammed Ricketts
I can't recall what it was.
Q. After you graduated, did you continue to receive City welfare benefits?
A. No. I was hired by the human resource administration.
Q. I'm sorry?
A. I was hired by the City.
Q. You were hired upon graduation?
A. Yeah.
MR. QUICK: This is Ricketts Exhibit 30.
(Whereupon, Application for Social Security Number Card was marked as Ricketts Exhibit 30 for identification as of this date by the Reporter.)
Q. You can look at Exhibit 30, Mr. Ricketts. Tell us if you recognize this.
A. I think it's a Social Security application.
Q. In block 13, is that your signature?
A. That doesn't look like my signature.
Q. There is a date in block 11 of 12/1/85, December of 1985, would this had been your signature?



J. Mohammed Ricketts
A. I can't recall.
MR. MOSELEY: Would you bring that down so I can see the top of it?
Q. Is it your testimony, it is or it is not your signature?
A. I can't recall.
Q. Can we rule it out that it could be your signature?
A. Yeah, I think we can rule it out.
Q. On block 1, Mohammed Junior Ricketts, that was your name at the time; was it not?
A. At the time it was Junior Mohammed Ricketts.
Q. Your first name was not Mohammed?
A. No.
Q. Here it says, "middle, Junior"?
A. No. It's switched around.
Q. "Full name at birth, Paul Milton Miles" it says. Is that your full name at birth?
A. It doesn't say Paul Milton -- oh, yes.
Q. "Mailing address, P.O. Box 874." You were using that P.O. Box?
A. Yes.
Q. Was anyone sharing that P.O. Box with



J. Mohammed Ricketts
you?
A. No.
Q. "Date of birth, 8/31/64," although it has some numbers have been scratched out. It seems to be 8/21/64 is the intended final result.
A. I can't recall.
Q. Do you know why that would have been crossed out?
A. No.
Q. "Mother's name at birth," block 9, "Lizzie Page" and father is "Robert Miles." Did you write those words?
A. I can't recall.
Q. On "Types of Evidence submitted, U.S. Passport 060160759." Do you know what passport that was?
A. I can't recall which one it is.
MR. MOSELEY: Again, to save time, that does not correspond to the passport, Exhibit 21?
MR. QUICK: Exactly.
Q. You have no knowledge of this document, sir?
A. I can't recall.



J. Mohammed Ricketts
Q. Indeed, Lizzie Page and Robert Miles are your parents; were they not?
A. Yes.
Q. On block 12, it has a phone number of where you can be reached, 718-342 perhaps, 1624, something like that?
A. I can't recall.
Q. Were you ever reachable at a number such as that?
A. I can't recall.
Q. The prefix 718, does that mean anything to you?
A. No.
Q. Do you know where that's located?
A. No.
MR. QUICK: Next one is going to be Ricketts Exhibit 31.
(Whereupon, the Application for a Social Security Number Card was marked as Ricketts Exhibit 31 for identification as of this date by the Reporter.)
Q. This is Exhibit 31. I ask if you have seen this before, Mr. Ricketts. The Junior Ricketts signature, is that your signature in

Page 201

J. Mohammed Ricketts
August of 1986?
A. Yes.
Q. This Exhibit 31 is a document you completed?
A. I think so.
Q. It's in your handwriting?
A. Looks like it.
Q. The name Junior M. Ricketts in Brooklyn, that was your name at the time?
A. Uh-huh.
Q. The address in Brooklyn, 2375 Pine Street, were you living there at the time?
A. Yes, I think so.
Q. Was there any reason to think you weren't living there?
A. No.
Q. Again, block 9, Keturah Campbell, we see.
A. Yes. As I mentioned the first testimony where I said I might have put my -- what do they call them again; foster care parents. I don't know where Robert Ricketts --
Q. Your father here is listed as Robert Ricketts?

Page 202

J. Mohammed Ricketts
A. Yeah.
Q. Why did you put Robert Ricketts?
A. No idea.
Q. But that is your handwriting?
A. It is.
Q. You have no idea why you didn't just put your parents as reflected on the birth certificate which you possess at this time in August --
A. Yes.
MR. QUICK: Next one will be Ricketts Exhibit 32.
(Whereupon, the Application for Social Security Number Card was marked as Ricketts Exhibit 32 for identification as of this date by the Reporter.)
Q. Exhibit 32, Mr. Ricketts, have you seen this before?
A. Yes.
Q. Is this your handwriting?
A. Yes, it is.
Q. This is dated, Exhibit 32, August 8, 1988?
A. Yes.

Page 203

J. Mohammed Ricketts
Q. "Name to be shown on card, Paul M. Miles." Why is the name Paul M. Miles shown on card?
A. I don't know why I put that there.
Q. We can agree the name Junior Mohammed Ricketts doesn't appear on Exhibit 32?
A. No.
Q. And your mailing address P.O. Box 330874 in Brooklyn. Were you using that P.O. Box number?
A. Yes.
Q. Was anyone using that P.O. Box number with you?
A. No, not that I know.
Q. "Mother's maiden name," block 9, "Lizzie Page, your father Robert Miles," did you write those?
A. Yes.
Q. In block 13, "Paul Miles," is that at least in your handwriting?
A. Yes, it is.
Q. We can agree perhaps that the signature block in block 13 on Deposition Exhibit 19, which is the June 6, 1984 Social Security Card

Page 204

J. Mohammed Ricketts
application, and the signature in block 13 on Deposition Exhibit 32 have you in your hand, each of which --
A. Say Paul Miles.
Q. They look similar; do they not?
A. Yes.
Q. You wrote each of those?
A. Maybe I did.
Q. Is there any reason to think maybe you did not?
A. No.
Q. On Exhibit 32, "Types of evidence submitted" at the very bottom, "U.S. Passport No. 060041569." We can agree that was then your correct passport number; was it not?
A. Yes.
Q. With which in August of 1988 had already been amended to show it as Ricketts?
A. Yes. Amended in the back, yes.
Q. This says, Voter's REG No." at the very bottom; is that your understanding?
A. Yes.
Q. With the number 90020702. Did you ever register to vote?

Page 205

J. Mohammed Ricketts
A. Yes.
Q. In the United States?
A. Yes.
Q. When did you first register to vote?
A. I think I did when I filled out my driver's license application.
Q. What year was that?
A. Maybe 1986, 1987 or 1988.
Q. 1986 or 1987?
A. Yeah.
Q. That was the first time?
A. Yes.
Q. So you would have been how old?
A. I would have been 20, 23.
Q. Did you ever vote in any elections?
A. Not really. Just wanted a card.
Q. Not really, yes or no?
A. Not sure. I don't remember. No. Did I vote?
Q. Well, did you vote in any presidential elections?
A. I think I voted in presidential, but not in my -- yeah, I think it was a president election.

Page 206

J. Mohammed Ricketts
Q. Do you recall how many presidential elections you voted in?
A. Bill Clinton.
Q. Which of his?
A. Maybe both of them.
Q. Any other presidential elections?
A. No, only those two.
Q. After presumably the second Bill Clinton election, did you vote in any other, say, local elections?
A. No, none that I recall. I don't think so. I don't remember.
Q. Is there a reason to think Exhibit 32, that voter registration number is not your own voter registration number?
A. I think it's mine.
Q. Do you know what would have happened to that card?
A. No.
Q. You mentioned a McDonald's job, which would have been your first. Correct me if I'm wrong, the second job you had you don't recall --
A. Yes.
Q. -- as you sit here today? Has that

Page 207

J. Mohammed Ricketts
changed in the last few years?
A. No.
Q. Third job you had was what?
A. I think that was New York City.
Q. New York City?
A. Yes.
Q. What year would that have been?
A. 1991.
Q. Approximately when you graduated from Brooklyn College?
A. Yes. I was still in my final year, senior year.
Q. You were in your senior year in Brooklyn College, you applied to the City?
A. Yes.
Q. To where did you apply?
A. HRA, human resources.
Q. Human Resources Administration?
A. Yes.
Q. Why did you apply there?
A. That was the only one available. I mean, I did some other examination. I don't recall.
Q. Other examinations for city work or

Page 208

J. Mohammed Ricketts
state?
A. State.
Q. New York State?
A. Yes.
Q. What kind of exams?
A. I did one for -- at the time they had park ticket things, park wardens or whatever. I think they are now part of the New York Police Department. They don't no longer exist. I did a physical and everything. That was it.
Q. So you go to this Human Resources Administration?
A. Yes.
Q. What were you applying to, what position?
A. The welfare department as a caseworker.
Q. That welfare department, did that have a formal name? Was it called the welfare --
A. I forgot. I don't remember what the position is. I forgot what the position I had there.
Q. You go to the welfare department. What is your job title there?
A. It was people on welfare doing

Page 209

J. Mohammed Ricketts
application, making sure the application and all the forms on there are entered into the computer.
Q. Do you recall your job title?
A. No.
Q. Just tell me, what exactly were you doing? Were you taking applications from potential welfare recipients?
A. Yeah.
Q. What were you doing when you got these applications?
A. Inputting them into the system.
Q. The computer system?
A. Yes.
Q. What else were you doing?
A. That after six months, I have to do like a recertification. That was it.
Q. What does that entail, to recertify?
A. That after six months, they're still eligible for welfare.
Q. You're taking physical applications and you're inputting it into in a computer, kind of data entry?
A. Yes.
Q. Are you, yourself, doing

Page 210

J. Mohammed Ricketts
recertification's?
A. Only whenever they're short of staff members, they ask me to go down, but not really.
Q. Not really?
A. No.
Q. When someone else can't do it?
A. Right.
Q. The recertification process you did participate in, did you have face-to-face interviews?
A. Yes, sometimes.
Q. Were they presenting you in the course of that interview with any supporting documents?
A. Yes.
Q. What were they providing you with?
A. Work, paycheck stubs that they had, basically.
Q. Any sort of supporting identifying documents?
A. Not really, because they were, already have an identification card.
Q. From whom?
A. From the City.
Q. They just provide you the City ID card,

Page 211

J. Mohammed Ricketts
that's all you need?
A. Even if they didn't have the identification, we were told to still input them in the system.
Q. What else did you do on that job?
A. That was it.
Q. How long did you have that position?
A. I'm not quite sure. After a year and a half, I just transfer over to the caseworker.
Q. What did you do with the caseworker?
A. I work with the HIV department.
Q. Were you, yourself, a caseworker?
A. Yes.
Q. That was your job title?
A. Yes.
Q. What did that entail?
A. My job was to go out and see a client, HIV client, and make sure they're getting their benefits from the welfare department. If not, we would inform the welfare department they aren't getting their benefits and make sure their rent is paid.
Q. The HIV recipients?
A. Yes.

Page 212

J. Mohammed Ricketts
Q. You were interviewing these HIV patients?
A. Yes, you have to go.
Q. To go out where?
A. To the patient's house.
Q. What are you doing with them?
A. You have to make sure they're getting benefits and all their rent is paid; otherwise, you have to inform the welfare department that the client is not getting their benefits.
Q. Are you recording this into a computer?
A. No, not anymore.
Q. You're just a caseworker?
A. Yes.
Q. How long did you have that position?
A. Maybe roughly two years, I think.
Q. Two years, what happened then?
A. From there I got criminal convictions.
Q. Let's talk about some of your criminal convictions since you brought it up.
A. Yes.
Q. Did you have criminal convictions in 1987?
A. Yes.


Under Protective Order

Page 213

J. Mohammed Ricketts
Q. That was with the state or federal system?
A. City.
Q. What was that for?
A. Misconduct.
Q. Misconduct, what is that?
A. Misdemeanor.
Q. Misdemeanor for what, misconduct; what does that mean?
A. Misconduct.
Q. What does that mean, "misconduct," were you swearing in public, drinking in public?
A. No.
Q. Were you having a fight with people?
A. (Indicating).
Q. You're shaking your head. Are you going to respond?
A. I can't remember the entire incident, what happened to me. The only thing I know I was put in on the weekend because I was still in -- I don't remember if I was in college at the time. I think I was in my first or second year in college. So I was given probation and weekends. That was it.

Page 214

J. Mohammed Ricketts
Q. You can't remember the entire incident. Was it one incident or more than one?
A. That's just one.
Q. You don't recall at all what that incident was?
A. Not at all.
Q. Were you arrested?
A. Yes. Like I said, the Court gave me probation.
Q. Did you go to trial?
A. No. I just took a plea.
Q. You pled?
A. Yeah.
Q. You don't know what you pled to?
A. I can't recall what it was. I know something misconduct.
Q. Did you receive any jail time?
A. Weekends.
Q. Weekend jail time?
A. Yes.
Q. For how long?
A. I think for six months it was.
Q. Every weekend for six months you go to jail?

Page 215

J. Mohammed Ricketts
A. Yeah.
Q. Where did you go to jail?
A. Rikers Island.
Q. After that six-month weekend sentence, were you on probation?
A. Yes.
Q. For how long?
A. Three years.
Q. As you sit here today, you don't remember at all why you were arrested or pled guilty on this --
A. Fully, no.
Q. You say "fully," do you remember partially?
A. Well, I just explained to you what I remember.
Q. You said misconduct?
A. Yes.
Q. I don't know what that means. Were you drinking in public?
A. I can't remember what it was.
Q. Did you have a fight?
A. I don't remember. I know I was -- six months after I got arrested for something I do. I

Page 216

J. Mohammed Ricketts
can't remember what it was because I'm in college, you know. You know, so I got probation, then went to jail on weekends, then three years probation, I think.
Q. Do you remember what jurisdiction that was in, New York City?
A. Yes, Brooklyn.
Q. Brooklyn, New York City?
A. Yes.
Q. Was that a misdemeanor you said?
A. It is a misdemeanor.
Q. With the misconduct, sir, before we move on, does that involve one person or more than one people?
A. You know I have to take the Fifth on that criminal conviction.
MR. MOSELEY: No. No. No. If you have a criminal conviction, we're not asserting the Fifth Amendment privilege. But, I mean, it's your time. You use it as you wish. Obviously you're competent. You have all the records with respect to his convictions. Are we going to have to sit through here while you quiz him about his

Page 217

J. Mohammed Ricketts

recollection and then spring a conviction or records on him and say, no, no, you did this or you did that? It would be much easier, I submit -- again, it's your deposition. You can do it as you wish if you want to provide records, ask him about those records from 25 years ago or more recently, which will obviously refresh your recollection.

MR. QUICK: Are you done?

MR. MOSELEY: I'm done.

MR. QUICK: This will be Ricketts Exhibit 33.

(Whereupon, the information document was marked as Ricketts Exhibit 33 for identification as of this date by the Reporter.)

Q. I ask you to look at Exhibit 33 and ask if you have seen this before.
A. Yes.
Q. What is it?
A. This is the information.
Q. Regarding what?
A. Information I've been accused of.
Q. Does this at all relate to the City

Page 218

J. Mohammed Ricketts

employment you were talking about before from 1985 on?
A. Yes.
Q. You started in 1985 and you continued through the early '90s still working for New York City, right?

MR. MOSELEY: If I can just ask, when did you start work for New York City?

THE WITNESS: 1990.

MR. MOSELEY: Had you ever worked for New York City prior to 1990?

THE WITNESS: No.

Q. What were you doing, then, in 1985? You told us 1990 is the first time you worked for the City?
A. Yes.
Q. That's the welfare department?
A. Right.
Q. That's one and a half years?
A. Assignment, yes.
Q. After 1991, you're doing the HIV caseworker material. These are two different positions you held in the city?
A. Yes.

Page 219

J. Mohammed Ricketts

Q. Is that work as an HIV caseworker, was that an eligibility specialist?
A. Oh, yeah, that was the title I had first when I start with the City.
Q. Before you became a caseworker, you were an eligibility specialist?
A. Yes.
Q. Did you provide or did you fill out a job application for that?
A. Yes.
Q. Do you remember who your supervisor was?
A. No.
Q. Exhibit 33 is, indeed, the information relating to you, sir?
A. Yes, it is.
Q. Do you remember anyone named Rubin Nieves, N-i-e-v-e-s?
A. He used to be my roommate.
Q. Your roommate?
A. Yes.
Q. Where?
A. 375 Pine Street. He had access to my post office box as well.

Page 220

J. Mohammed Ricketts

Q. Do you remember the years he was your roommate?
A. I think it was either from '88 up to 1990.
Q. At the Pine Street address?
A. Yes.
Q. And only the Pine Street address?
A. Yes.

MR. QUICK: This will be Ricketts Exhibit 34.

(Whereupon, judgment in a criminal case was marked as Ricketts Exhibit 34 for identification as of this date by the Reporter.)

Q. Do you recognize 34?
A. Yes.
Q. What is this?
A. This is the judge order judgment, I think.
Q. Relating to the information we just discussed?
A. Right, the final outcome of the case.
Q. This is a true copy of this?
A. Yes.

Page 221

J. Mohammed Ricketts
MR. QUICK: We don't dispute that.
Q. Can you tell me what led to this conviction?
A. It was a complaint came from this, from Exhibit 33, and this was the result.
Q. Do you recall what you were doing to --
A. The complaint is right here.
Q. That is an accurate summation of what you did?
A. Well, because I took a plea in there.
Q. As you sit here today, you're not disputing that the information within that exhibit is correct as far as the allegations?
A. As far as -- not the actual act, but as far as what I was accused for.
Q. Are you denying the act?
A. Well, there are other people involved and the deal was if I take this plea, that would have been the end of it. I just took the plea and that was the end of it.
Q. Were you sent to jail or prison as a result of this?
A. Yes. I was in White Deer, Pennsylvania.

Page 222

J. Mohammed Ricketts
Q. That's where the White Deer comes up again?
A. Yes.
Q. How long were you there for?
A. I was there from, I think it was 1995 to 1998.
Q. Three years, approximately?
A. Yeah, maybe 1999. I went straight from there to ICE custody.
Q. On Exhibit 34, you plead to four different crimes?
A. That's correct.
Q. Are you denying that you did these things, deny the acts behind these?
A. Well, it doesn't make a difference now. It's a done deal.
Q. On the first page of Exhibit 34, it has a Social Security of 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, what is that?
A. That's not -- they made a mistake, that was a typing error.
Q. Was that ever one that you used?
A. No. That's a typo.
Q. Again, we see the 10/12/55. Why do we see that?

Page 223

J. Mohammed Ricketts
A. Okay, this date was there because during the investigation in which we talked prior, a disposition where Jamaican Passport to make an appearance, the one I told you that I had from the Jamaican Embassy. During the investigation when they went to my house, they found the one that I had from the Jamaican Embassy. When they went to the embassy, the embassy say they had the burnt one. What they did, they didn't give me the birth date of the one that was on the -- the one in my house, but gave me one of the burnt birth date, the burnt up. So during the time we had a discussion between my citizenship in this case, Judge Kimbawood, she moot any argument on my claim that I'm not a United States citizen. But she said, according to the agreement with the prosecutor, that she will allow the date of birth, whatever immigration give them the information, then she will leave it up to me to deal with the immigration situation at the end of my time.
Q. Did she do that?
A. Yes, she did.
Q. What happened?
A. Any issue about whether or not I was a

Page 224

J. Mohammed Ricketts
U.S. citizen was moot by the judge. She said take the information ICE had because the prosecutor asked to take on. That was the only way to put on, detain me, hold me. Then she said I have to deal with that when I finish doing my time.
Q. So I understand, that 10/12/55 date would have come from the passport?
A. Yes.
Q. The burned Jamaican Passport?
A. Yes.
MR. QUICK: Mark this as Exhibit 35.
(Whereupon, the February 7, 1996 letter was marked as Ricketts Exhibit 35 for identification as of this date by the Reporter.)
Q. Mr. Ricketts, have you seen Exhibit 35 before?
A. Yes, I did see it before.
Q. What is it?
A. It's a letter I think I sent when I was in White Deer, Pennsylvania.
Q. It says, "Enclosed with this letter is a copy letter of my birth certificate with my corrected name."

Page 225

J. Mohammed Ricketts
A. Uh-huh.
Q. Is that the interlineated birth certificate copy, in other words --
A. No.
Q. -- the item crossed off, Paul Milton Miles and then --
A. No. Birth certificate is Junior Mohammed Ricketts.
Q. Typed out?
A. Right.
Q. Do you have a copy of that one?
A. It's in the administrative records.
Q. It says, "along with a copy of my high school diploma."
A. Yeah. That's the one we already seen.
Q. Today?
A. Yes.
Q. Was that an original high school diploma you supplied here in 1996?
A. No, just copies.
Q. You had in your possession only a copy?
A. Only a copy.
Q. Do you know where the original is?
A. No.

Page 226

J. Mohammed Ricketts
Q. "Also, further information on my U.S. citizenship can be obtained by examining my driver's license." Do you have a copy --
A. Yes.
Q. That's the driver's license we already mentioned?
A. Yes.
Q. Voting records, what are you referring to?
MR. MOSELEY: Just a moment. You provided a New Jersey driver's license and he testified that this was not his photograph in the driver's license.
MR. QUICK: Not the one in the exhibit. He's already testified to a driver's license being renewed while in White Deer, Pennsylvania.
MR. MOSELEY: Okay. Very good.
Q. That was the driver's license you were speaking about that was renewed?
A. Renewed, yes.
Q. Exactly. Voting records, what are you referring to in voting records?
A. That was on the voting card.

Page 227

J. Mohammed Ricketts
Q. You supplied a copy of your voting record?
A. Yes.
Q. Medical records?
A. I don't remember what that was.
Q. That was my question, what did you supply for medical records?
A. I can't recall.
Q. Would those have been medical records at FCI Allenwood or are those --
A. I'm not sure.
Q. Etc. E-t-c, what other items are you providing?
A. I'm not sure.
Q. You say "Also, further information on my U.S. citizenship can be obtained by examining my driver's license, voting records, medical records, etc." Are you providing that or are you just saying go look at them?
A. They could get them on their own. I think they were already in the administrative records, anyway.
Q. To be clear, you're not enclosing those items, driver's license, voting records, medical

Page 228

J. Mohammed Ricketts
records, etc. with this particular letter?
A. Oh, no.
MR. QUICK: This will be 36.
(Whereupon, the July 3, 1996 letter was marked as Rickettes Exhibit 36 for identification as of this date by the Reporter.)
Q. Have you seen Exhibit 36 before, Mr. Ricketts?
A. Yes. This was the response that I got from the letter.
Q. This is the response you received from that prior letter we just mentioned?
A. Yes.
Q. This is a true copy, then, of that response you received?
A. Yes, this is.
Q. You received that while in White Deer, Pennsylvania?
A. Yes.
Q. What did you do, if anything, in response to that 1996 letter?
A. Because they were saying all present to immigration, I just waited. There was nothing

Page 229

J. Mohammed Ricketts
else.
Q. You did nothing in response to this particular July 3rd letter?
A. Nothing that was done.
Q. Were you ever removed, Mr. Ricketts, to Jamaica?
A. Yes, I was.
Q. When was that?
A. 2000.
Q. When in 2000?
A. That was, I think April 2000.
Q. I want to talk a little bit about this process. Were you, in April of 2000, in Pennsylvania in jail?
A. Yes.
Q. So you go from that FCI Allenwood to where?
A. No. I think I was in Snyder County in Pennsylvania.
Q. I'm sorry?
A. Snyder County.
Q. How do spell that?
A. I think S-y-n-d-e-r.
Q. What is that?

Page 230

J. Mohammed Ricketts
A. It's a county jail, but it also holds immigration.
Q. How long were you there?
A. Almost a year.
Q. So you go from that ICE facility?
A. No. From White Deer to that county jail.
Q. You go from jail to removal?
A. From there to Jamaica, yes.
Q. Now, when you were removed to Jamaica, had you received any travel document from the Jamaican government?
A. Yes, they had a travel document.
Q. What kind of document was that?
A. It was a copy that I received. It was, like, a piece of paper with a picture in there and the date of birth and statement that I have.
Q. What date of birth was used, if you remember?
A. I think October 10, 1965. That is also in the records.
Q. You said that was in April 2000, you're removed to Jamaica, the plane lands, what happens that day?

Page 231

J. Mohammed Ricketts
A. In Jamaica?
Q. Yes, sir.
A. The immigration there, the document that I have, they say when they try to verify, they're saying that --
Q. This is the Jamaican immigration authorities?
A. Yes. They're saying you're not a Jamaican citizen.
Q. This is at the airport?
A. Yes. So they never allowed me the land. So they told me, we're going to take you back to the U.S. Embassy and get you out of their country. But they didn't take me to the embassy.
Q. Let's slow down here.
You said they wouldn't let you land?
A. Yes.
Q. The plane didn't land?
A. The plane land, but I was actually not admitted in.
Q. You were still at the airport?
A. Right. If you're not given entrance, you're not officially in Jamaica. You are illegally in Jamaica.

Page 232

J. Mohammed Ricketts
Q. Presumably you have a Jamaican travel document?
A. They had a Jamaican travel document.
Q. What made the Jamaican authorities not admit you into Jamaica?
A. When we got to the airport, they called -- I don't know if it's the register or something, the entire document couldn't match with anything. That was one of the reasons why they -- I couldn't get in. They started questioning saying I'm not Jamaican. I'm from the U.S. They told me that they would take me up to the U.S. Embassy in Kingston to deal with a situation, but instead they took me to a prison over there.
Q. Jamaican authorities took you to a Jamaican prison?
A. Yes.
Q. On the same day you land?
A. Same day.
Q. Where was this prison?
A. It's in Kingston.
Q. Were you charged with any sort of crime?
A. They said it was just safekeeping until



Under Protective Order

Page 233

J. Mohammed Ricketts

they can resolve the issue.

Q. How long were you in prison in Kingston?

A. I been there from 19 -- I mean, from 2000 -- I think about 2001.

Q. You're there from April of 2000 when you land up until when in 2001?

A. I can't real -- when I was released. I wasn't actually released. I knew somebody that came to the U.S. and I met him -- I used to participate in a drum and bugle band. I met a musician from Jamaica while I was volunteer working with the Warriors. It's a drum and bugle Corp. in the Bronx. So I knew he was working for an all boys school. He was the music director.

Q. Do you know the name of this individual?

A. I think it's in the records. I don't have his name off the top of my head. He came and he spoke to Jamaican immigration. He knew me, met me in the United States and they ask him to release me into his custody.

Q. Into his custody?

A. Yes.

Page 234

J. Mohammed Ricketts

Q. Do you recall what month you were then released into this gentleman's custody?

A. No. But they have it in the records. They have books.

Q. The Jamaican government?

A. They have their own diary that day I got there and the day I got released.

Q. It was sometime in 2001?

A. Yes.

Q. And you don't recall his name?

A. No.

Q. But you are released to his custody?

A. Yes.

Q. Where do you go from there?

A. Well, I was with him and every weekend I had to report back to Jamaica immigration to make sure I was okay. I was with him for a while, for a long time.

Q. For how long?

A. Maybe about -- I can't exactly say the year.

Q. Do you know where his house was?

A. No, I don't have the address. I know it was in Kingston, Jamaica.

Page 235

J. Mohammed Ricketts

Q. Can you describe the home?

A. I think it was two homes in one entire area. He lived in the back house and there is another family in the front of the house.

Q. Was anyone living with you in your section of the house?

A. No. He had a room that have his musical equipment because he's a musician, so I stayed with him for a while.

Q. Were you employed during this time?

A. No. I couldn't work or anything.

Q. What do you mean you couldn't work?

A. I was not admitted in Jamaica. I could not go back to work at all. I had to report to immigration.

Q. How often did you report?

A. Every weekend.

Q. What did you have to report?

A. That's what I said. I'm not admitted. And they took the travel document that I have and the passport, the one that I have from the Jamaican Embassy, and they took the original passport, the one that was burnt, and say you're not same person. We talked to him. You're not this guy. I

Page 236

J. Mohammed Ricketts

couldn't get, you know --

Q. How did you support yourself?

A. I was living with someone.

Q. I'm sorry?

A. I was living with a person there.

Q. With the same man?

A. Yes.

Q. He was supporting you?

A. Yes. He was looking out for me.

Q. So he paid for your food?

A. Well, he shares his food with me. That's what it was.

Q. So then what happened?

A. So I've been going to the embassy for a period of time, but nothing was working out. And the embassy said it's not their responsibility to prove I am a U.S. citizen. It is my responsibility to prove that. So they were dragging their feet. But I had at the time, I had my driver's license at the time and --

Q. Your U.S. driver's license?

A. Yeah, but no picture was on there. Remember, I told you there was no pictures on there. When I was release, I was given a driver's

Page 237

J. Mohammed Ricketts
license. And I had my inmate ID that I had from Pennsylvania and I have a copy of my birth certificate. And I don't remember what year, I just came home. That was it.
Q. You mentioned your Jamaican birth certificate, that one that was burned you said -- Jamaican passport that had been burned?
A. Yes.
Q. How did the Jamaican authorities get that?
A. They get it from the Jamaican Consulate through their investigation. They had their own investigation.
Q. They had the original?
A. From the Jamaican Embassy, yes.
Q. Presumably they retained that original burnt Jamaican Passport?
A. I think so. Because they told me the person who it belonged to say he lost the passport. That's why they wouldn't let me out of prison.
Q. Then what happens?
A. As I said, I've been going back and forth. They even have me -- one of the other

Page 238

J. Mohammed Ricketts
things, while I was at the Remand Centre where they keep people incarcerated, not allowed to go out or people going to court -- it's almost similar like -- well, I wouldn't say like here. It's a little different. I got a charge for possession of marijuana and they took me to this court in half a tree and the judge told them that, you know, over there that ICE over there, immigration, why are they keeping me in custody and they were saying you're not getting any help from the U.S. Embassy. The judge ordered them that they should release me. That's when they get this gentleman that I knew before came up and released me in his custody because they were forced, otherwise, I would have be in the Remand Centre indefinitely.
Q. You're living with this gentleman for approximately a year, you say?
A. Uh-huh.
Q. What happens then?
A. Well, like I said, I had my driver's license, my ID that I had and I had a copy of the birth certificate and I came home. That was it.
Q. How did you come home?
A. Just came home. He gave me a ticket,

Page 239

J. Mohammed Ricketts
take a plane, came to JFK.
Q. You flew directly from Kingston?
A. Yes.
Q. To JFK?
A. Yes.
Q. What airline?
A. I think Air Jamaica, I think it was.
Q. When would this be?
A. I don't know if it was 201 or 202.
Q. You don't remember?
A. I can't recall exactly what day it was.
Q. You don't remember the year?
A. No. I think it was 202.
Q. You land at JFK --
A. Yes.
Q. -- with what documentation was in your possession?
A. I have my driver's license and I have my ID from the White Deer and the birth certificate, the U.S. birth certificate.
Q. They admitted you without a passport?
A. Yes. All the time passport is not needed.
Q. So the birth certificate would have

Page 240

J. Mohammed Ricketts
been sufficient you're saying?
A. Yes.
Q. You've used the word repatriation. Why do you use that word?
A. It's coming back home. This is the only home I knew.
Q. Did the U.S. Government cooperate in your return trip from Jamaica to JFK in any way?
A. Well, as I said, I was waiting on the U.S. Embassy. They were, as I told you, a couple of the times I've been there, they told me first when I went there they wanted documents that I couldn't receive. And I keep on going back there, going on back there. They told me that it's not their responsibility to prove I'm a U.S. citizen, it is my responsibility. So, you know, after a period of time, I said okay. I came home on my own.
Q. In JFK, did customs ever question you at all?
A. No.
Q. Do you have any family photos of when you were growing up?
A. No.


Under Protective Order

Page 241

J. Mohammed Ricketts
Q. Any photos of any time when you were at the covenant houses?
A. I don't have no photos at all except detainees photos, none in school. I lost all those. I don't have no photos.
Q. You don't have any school records; do you?
A. No.
Q. Other than what we've seen today?
A. No, nothing else.
Q. Do you have any children, sir?
A. Well, in 1984, while I was in high school in Wingate, I met this girl, she's Jamaican, I went to see her. She wasn't there. I met her sister who came from Jamaica. We started dating for a while before she went down. When she was in Jamaica, she told me she had a child from me. I was like sending money down there. I can't remember what year, 1990 I went down there to bring the kid up. I thought it was my child.
Q. Where was this child born?
A. Jamaica, but he become an American citizen through abroad from the embassy. When I found out he was not my child -- I did the blood

Page 242

J. Mohammed Ricketts
test before New York State took him in custody. He was not my child.
Q. New York State took the child in custody?
A. Yeah, took the child from me.
Q. Why is that?
A. Because he was living with me at the time when the investigation was going on.
Q. What years are we talking about?
A. Talking about '92, '93.
Q. Do you speak any languages other than English?
A. No.
Q. Did you ever have any language classes?
A. Little Spanish but not much.
Q. On the Exhibit 35, sir, the June 27, 1996 letter you wrote to U.S. Immigration, you sign in Junior M. Ricketts, Sr. Why senior?
A. Because this kid, this little boy that I thought was mine, I also had named him, you know, Jerome Junior Ricketts, Jr. So I started using the word senior at the end of my name. It wasn't official.
Q. Had you used the senior designation

Page 243

J. Mohammed Ricketts
before this June 1996 date?
A. No.
Q. Have you used it since?
A. No, not after I found out that the boy was not really my kid.
MR. QUICK: Mark this as Ricketts Exhibit 37.
(Whereupon, the application for U.S. Passport was marked as Ricketts Exhibit 37 for identification as of this date by the Reporter.)
Q. Did you ever provide a birth certificate on behalf of your son? What was his name?
A. Jerome Ricketts.
Q. Did you ever provide documentation on his behalf?
A. You mean -- what do you mean?
Q. This is Exhibit 37, have you seen this before?
A. Yes.
Q. What is it?
A. Passport application.
Q. Is this your passport application?

Page 244

J. Mohammed Ricketts
A. Yes, it is.
Q. This your signature here?
A. Yes, it is.
Q. Why are you filing this application?
A. To renew my passport.
Q. Had the other one expired?
A. Yes.
Q. Did you intend to travel at this point?
A. I did travel.
Q. On this?
A. Yes.
Q. Where did you go?
A. I went back down to Jamaica because I had to get my property from the police department. That's when I went back down there.
Q. With regard to block 4 on this particular exhibit, where it talks about your father and mother and their birth dates, you do put birth dates. It looks like Robert Miles 7/1/1930?
A. Yes.
Q. Is that what that says? This is your handwriting?
A. It is, yes.
Q. Where did you get that date from?

Page 245

J. Mohammed Ricketts
A. I don't recall.
Q. The Lizzie Page, it says birth date, 10/7/32?
A. I don't recall that either.
Q. But it is your handwriting?
A. Yes.
Q. Is any portion of this not your handwriting on this exhibit?
A. No.
Q. Except for the bottom portion used by the agency?
A. Yeah.
Q. In block 10, it says, "home telephone number, 718-953-9522." Was that, indeed, your home phone number?
A. No. I was staying with someone. I was using their telephone.
Q. 718, is New York --
A. Brooklyn, New York.
Q. It is Brooklyn?
A. Yes.
Q. This 1746 Union Street was not a place you were renting?
A. No. I was staying there.

Page 246

J. Mohammed Ricketts
MR. MOSELEY: Can you just bring up the bottom of that document? That's fine. Thanks.
MR. QUICK: Mark this as Exhibit 38.
(Whereupon, the Verification of identity and nationality was marked as Ricketts Exhibit 38 for identification as of this date by the Reporter.)
Q. Mr. Rickets, Exhibit 38, Ricketts Depo 51 through 53, have you seen this before?
A. Yes.
Q. What is this?
A. It's an investigation that I got from Jamaican government.
Q. When did you receive this?
A. I was in ICE custody at the time. I was in Batavia, New York.
Q. You received this from whom?
A. It's right here (indicating).
Q. You're pointing to passport immigration and citizenship agency on page 3?
A. Yes.
Q. What did you do when you received this letter?

Page 247

J. Mohammed Ricketts
A. Well, I tried to look up my immigration case.
Q. Did you retain the original, sir?
A. No.
Q. What happened to the original?
A. I think I sent it to the board.
Q. Before the immigration board?
A. Yes.
Q. Was this the entirety of the letter, these two pages? Was there any other part --
A. There were other parts.
Q. What was it?
A. Something from the Jamaica Constabulary Force, the Jamaica police commission.
Q. The first paragraph, it talks about Emergency Certificate No. 83373. Do you know what that is?
A. Yes.
Q. What is that?
A. That's the travel document issued to me to go down to Jamaica.
Q. I see. Does this letter, Mr. Ricketts, say that you were detained in Jamaica for, I believe you said, up to a year or more?

Page 248

J. Mohammed Ricketts
A. Yes, I was detained.
Q. Does it state in the letter, refer to in this letter in some way?
A. Yes, on the very -- second to last paragraph, "He was placed in custody at the Remand Centre in Kingston and was further interviewed by members of the Investigation Unit on December 27, 2000."
Q. But they don't say how long?
A. No, they don't say how long. Yeah. Yes, on February 21, 2001, which is the second paragraph on page 2, it says, "Mr. Winston Martin of Band Master for Alpha Boys Home."
MR. MOSELEY: I just direct the Government's attention to the second page of this document, Deposition Exhibit 38, on the first full paragraph where it indicates that Mr. Winston Martin looks like expressed an interest to have Mr. Ricketts release from detention and in his custody.
Q. That's what you're discussing?
A. Yes.
MR. MOSELEY: Just to save time on the case, the Government does not contest this is,

J. Mohammed Ricketts

indeed, a true and correct copy of the Government -- excuse me -- of a report issued by the Government.

MR. QUICK: It is what it is in this deposition.

MR. MOSELEY: Okay.

Q. This December 7, 2009 letter, on page 2 where it says, "The Embassy of the United States Kingston investigated and found that Junior Mohammed Ricketts was, indeed, an American citizen, born Paul Milton Miles and changed his name because of his religion. He was repatriated in February of 2003 to the United States after the Embassy provided him with a United States passport." Sir, you testified that you were traveling with your U.S. birth certificate --

A. Yes.

Q. -- and your U.S. New York driver's license?

A. Yes.

Q. You didn't mention your U.S. Passport?

A. No.

Q. Why not?

A. Because when I came home, to get my



J. Mohammed Ricketts

passport -- I went back down there to get my property from the police department.

Q. This isn't discussing the time you went back, is it?

A. No.

Q. This is talking about your purported repatriation?

A. I don't know.

Q. What don't you know?

A. Well, they made a report. I guess when I went back down there, the time I was going back home.

Q. So then my question to you is: United States Embassy there did not provide you with a United States passport?

A. No.

Q. You didn't travel on your purported repatriation with a U.S. Passport?

A. No, they didn't.

Q. It's incorrect in that regard?

A. That's incorrect.

MR. QUICK: This is 39.

(Whereupon, the December 8, 2009 letter was marked as Ricketts Exhibit 39 for



J. Mohammed Ricketts

identification as of this date by the Reporter.)

Q. What is Exhibit 39, sir?

A. This is also on the part that I explained, the additional part that goes with the letter.

Q. This was in that prior letter as well?

A. Yes.

Q. It says, "Attached is a comprehensive report for your information and further attention." That's the two-page letter we just discussed?

A. Yes.

Q. It says, "Copy of correspondence dated September 3, 2009 is attached for ease of reference." What does that refer to?

A. I don't know.

Q. Can you read on Exhibit 39 the signature of that person, sir?

A. No. It's a superintendent of police. I can't read what that is.

Q. Indeed, do you know at all who that could have been?

A. No. But there's a telephone number right here. You may want to call.



J. Mohammed Ricketts

Q. I was just curious whether you knew.

A. No.

MR. QUICK: This is Exhibit 40.

(Whereupon, Consulate-General of Jamaica document was marked as Ricketts Exhibit 40 for identification as of this date by the Reporter.)

Q. Do you recognize Exhibit 40, Mr. Ricketts?

A. Yes.

Q. What is it?

A. This is a letter that was sent to me from the Jamaica Consulate from New York.

Q. Was it in the same package?

A. No. This is from New York to Batavia. This is New York.

Q. So you received it at a different time?

A. Yes.

Q. In your first paragraph, "I refer to correspondence resting with your letter dated 4 November 2009." What is that letter?

A. I asked them to investigate what happened to me when I first reported down in Jamaica because people didn't believe that I was in

Page 253

J. Mohammed Ricketts

custody. So I wanted an official investigation done, report done of what happened when I was there.

Q. Do you have a copy of that --

A. No. This is that --

Q. -- November 4th letter?

A. No.

Q. The third full paragraph, "Jamaican immigration authorities have now confirmed that a verification exercise has been completed in your case and that you have been confirmed as an American."

A. This is the letter, talks about this letter right here (indicating).

Q. You're pointing to what exhibit, sir?

A. 38 and 39.

Q. The confirmed as the American is the confirmation from the Jamaican authorities?

A. They sent me a copy. This is different, what they sent me.

Q. It says, "that you have been confirmed as an American." This is referring to confirmed from the Jamaican authority, not the U.S. authority?

Page 254

J. Mohammed Ricketts

A. No.

Q. Continues, "They advised you should remain in the United States of America." Who is "they advised"?

A. Jamaican Embassy.

Q. Continues,"They advised you should remain in the United States of America and your relatives contacted to authenticate your claim to United States citizenship." What relatives were contacted?

A. What they're saying is I should get my own relatives to confirm a claim. They don't care. You take care of your own family. That's my responsibility.

Q. So the use of the past tense "contacted" does not intimate that it has happened in the past?

A. No.

Q. They're telling you you should do this in the future?

A. Yes.

Q. In the next sentence, "Note was taken of the fact that the U.S. Embassy in Jamaica also investigated and found that the subject was,

Page 255

J. Mohammed Ricketts

indeed, an American citizen, born Paul Milton Miles, but changed his name because of his religion." So what U.S. Embassy investigation is this?

A. I think they're taking the same report from the police department, the one that I said was incorrect.

Q. The Jamaican police department?

A. Yes.

Q. I don't understand your response, sir. I'm sorry.

A. I'm saying they received a copy of the Jamaica police report.

Q. The American authorities?

A. No, the Jamaican Embassy. In response to that, they sent me this litter of the investigation that they were given by the Jamaica Consular.

Q. But as I just read, it says the "U.S. Embassy investigated." Was there a U.S. Embassy investigation?

A. Well, there was one. As I said, I think they took this --

MR. MOSELEY: Don't speculate what the

Page 256

J. Mohammed Ricketts

author is saying. We're not the author of the document.

MR. MOSS: Are you instructing --

MR. MOSELEY: I'm instructing my client -- I think there's a pending question. I haven't instructed my client not to answer. I object to any question to ask him about what the author of this document is saying because he's not the author of the document.

MR. QUICK: That wasn't my question, sir. Again, I will ask the same one.

Q. The U.S. Embassy in Jamaica, to your knowledge, did they ever investigate a claim?

A. Well, they started.

Q. The U.S. Embassy did?

A. Yes, they did.

Q. Who started that; do you know?

A. No, but they did.

Q. When did this investigation start?

A. About two weeks from when I was in the Remand Centre. I told you when I got released, I went back there. They told me it's not their responsibility after a while to prove I'm American. I had to prove it. It's not their

Page 257

J. Mohammed Ricketts
responsibility. They did start it. I don't know what the conclusion --
Q. It's your testimony today that the U.S. Embassy in Jamaica investigated?
A. They had started. I know what the conclusion is. They didn't give me any idea.
Q. It says, "And found that the subject was, indeed, an American citizen." You don't know, then --
A. No.
Q. -- indeed that the American Embassy in Jamaica made this conclusion?
A. I think the one best thing to solve is get in touch with Jamaica. They make a reference right here.
Q. How do you know what the U.S. Embassy investigated and found other than this letter?
A. Well, I don't know what they have. Whatever the conclusion, I have no knowledge.
Q. Apart from this statement in this letter, do you have any independent knowledge about this statement?
A. No.
Q. You weren't interviewed by anyone at

Page 258

J. Mohammed Ricketts
the U.S. Embassy in Jamaica?
A. Yes.
Q. You were interviewed?
A. Yeah.
Q. Who were you interviewed by?
A. I was taken over to the American citizen section of interview and they want me to supply additional documentation. That was basically what happened.
Q. You were taken by whom?
A. By Jamaican police, two police officers.
Q. The Jamaican police take you to the U.S. Embassy in Kingston?
A. Yes.
Q. The U.S. Embassy has how many people speaking with you?
A. I think I spoke to the supervisor of the American citizenship and he wanted additional documents.
Q. It was a he?
A. It was a he.
Q. Can you describe this individual in any way?

Page 259

J. Mohammed Ricketts
A. He was an African-American, that I know. I know -- by the time I was there, he was rotated to somewhere else.
Q. How do you know that?
A. Because when I went back there, when they told me it is not their responsibility, they didn't understand what we're talking about, so that person was no longer there.
Q. When did you go back to the U.S. Embassy in Kingston?
A. About seven or eight months after.
Q. How many times did you go to the U.S. Embassy in Kingston?
A. Two or three times.
Q. There may have been a third time?
A. Yes.
Q. What happened on that second time occasion?
A. Same thing. It's my responsibility, not theirs.
Q. Did they invite you to supply evidence?
A. Yes.
Q. What happened the third time?
A. They say it's not their responsibility.

Page 260

J. Mohammed Ricketts
Q. With whom did you meet on the third occasion?
A. Just one of the consulates.
Q. Male or female?
A. Male.
Q. Can you describe that individual?
A. Caucasian.
Q. Can you describe him beyond that?
A. No.
Q. With whom did you meet on the second occasion?
A. I think it was the same person. Second and third was the same person.
Q. Same Caucasian?
A. Yeah.
Q. In response, did you, indeed, supply any purported evidence?
A. They didn't ask me to. They just said it's not their responsibility, it was mine.
Q. So why are you meeting with them three times?
A. Because I want to know if there were any changes to it.
Q. Why would there be changes if you're

Page 261

J. Mohammed Ricketts
not making -- if you're not supplying information, why would there be any changes and if they're telling you it's not their responsibility to prove your case and you're not providing any supported evidence of U.S. citizenship, why would there be anything to investigate?
A. I don't know.
Q. You used the word "consular." Is this the U.S. Consular official?
A. Yes.
MR. QUICK: This will be Exhibit 41.
(Whereupon, the February 16, 2010 document was marked as Ricketts Exhibit 41 for identification as of this date by the Reporter.)
Q. Have you seen this before?
A. Yes.
Q. What is it?
A. It's a letter from the United States Department of State informing that their intention to revoke my U.S. Passport.
Q. This is a true copy of the letter that you received?
A. Yes, it is.

Page 262

J. Mohammed Ricketts
Q. Was anything else included within this two-page letter when you received it or is this the entirety of it?
A. This is the entirety of it.
Q. What did you do when you received this?
A. I think I responded that I would like to have a hearing on this issue of the revocation. The day before --
Q. Let me stop you there. I think this will be relevant.
MR. QUICK: This will be 42.
(Whereupon, the opposition letter was marked as Ricketts Exhibit 42 for identification as of this date by the Reporter.)
Q. I show you Deposition Exhibit 42 and ask you whether you've seen this before.
A. Yes.
Q. What is this?
A. I think this is my opposition letter.
Q. Is this four-page document on Exhibit 42 a true and accurate copy of you what you sent to the Department of State?
A. Yes, it is.

Page 263

J. Mohammed Ricketts
Q. Did you include anything else other than these four pages with your response?
A. I don't think so.
Q. You mentioned a hearing. Did you ask for a hearing?
A. Yes, I did.
Q. Why?
A. To challenge the State Department plan to revoke my passport.
Q. Did you, indeed, attend a hearing?
A. Yes.
Q. You attended a hearing?
A. Yes, I did.
Q. Where was this hearing?
A. This was in Batavia, New York at immigration --
Q. The passport hearing?
A. The passport hearing.
Q. What happened at that passport hearing?
A. What happened is before the date of the passport hearing, they gave me exhibits the day before the hearing that he had submitted. So at the time of the hearing, the hearing stated, I didn't have enough time to look through the

Page 264

J. Mohammed Ricketts
exhibits and prepare myself. So at the hearing, I told them I'm withdrawing the hearing at this time, that I would like withdraw at this time.
Q. Why?
A. Because I didn't have enough time. The documents they gave me was the night before. They were exhibits that I had never seen before.
Q. What did he give you?
A. Documents of Lizzie Page and Paul Miles and documents that he had gathered during his investigation. And I was at that time not able to prepare myself to counter these evidence.
Q. How would you have countered that evidence?
A. Well, I would.
Q. How?
A. Well, I would have, you know, tried to get evidence of both this Paul Miles, Lizzie Page and Robert Miles. I would have tried to get the evidence I needed to counter these allegations that were made. But I didn't have enough time, so I told them I would like to withdraw the hearing.
Q. Why not just seek a continuance?
A. I did not know I can do that.

J. Mohammed Ricketts
Q. Why didn't you ask for a continuance?
A. No. I had no idea I could have asked for a continuance.
Q. As you're testifying about you didn't know, you wanted to counter that evidence, do you have any idea what you would have presented to counter this evidence?
A. Not at this time.
Q. I'm sorry?
A. Not at this time.
Q. At this time?
A. Yes.
Q. As of today?
A. As of today.
Q. Well, did you know at that time when you were canceling the hearing?
A. No. As I said, I didn't have time to research how to counter it. And after that, I didn't bother.
Q. What research did you need to do?
A. I wanted to prove that Lizzie Page and Robert Miles Junior were born in the United States. I was trying to, not born in United States --
Q. That they were not born?



J. Mohammed Ricketts
A. Yes.
Q. They were your parents?
A. This one, Lizzie Page on the affidavit on the criminal investigation.
Q. Why do you say that?
A. They're not my parents.
Q. Well, why do you say that? First of all, Lizzie Mae Page?
A. Uh-huh.
Q. Were you aware that depositions were taken this week of Lizzie Mae Page and Robert Miles Junior and Paul Milton Miles?
A. No.
MR. MOSELEY: People holding themselves out to be.
Q. Were you aware of that?
A. No.
Q. So do you have any idea who this person purporting to be Lizzie Mae Page is?
A. Not at this time.
Q. When will you?
A. Sometime in the hearing.
Q. Why do you think she is not the real Lizzie Mae Page? Why are you laughing?



J. Mohammed Ricketts
A. No. As I said, not at this time. I will, you know, wait.
Q. So you can't articulate today any reason for that position?
A. Not today.
Q. I'll ask you the same question with regard to Robert Miles.
A. Same thing.
Q. And Paul Milton Miles?
A. Same thing.
MR. QUICK: This will be 43.
(Whereupon, revoked passport document was marked as Ricketts Exhibit 43 for identification as of this date by the Reporter.)
Q. Before we move on to Exhibit 43, sir, just so I'm understanding fully, as you sit here today, you're unable to articulate any reason those three individuals, Lizzie Mae Page, Robert Miles, or Paul Milton Miles are not those individuals?
A. No.
Q. Have you ever met any of them?
A. No.
Q. Have you ever seen pictures of any of



J. Mohammed Ricketts
them?
A. Yes.
Q. Where have you seen those?
A. During the criminal investigation.
Q. Let's look at 43, if we may. Do you recognize this?
A. Yes.
Q. And what is it?
A. It's a revoke of my passport.
Q. This is a true copy?
A. Yes.
Q. Did you receive a copy of the page Exhibit 43?
A. Yes, I did.
Q. What did you do with that original?
A. Well, I didn't get an original, I got a copy.
Q. What did you do with that?
A. They're in the legal file.
Q. You have a legal file about this case?
A. No. Whatever I got for my criminal.
Q. What you have in your possession when you're detained here, you have a set of papers?
A. Or my criminal case, yes.

Page 269

J. Mohammed Ricketts
Q. Did you ever try to obtain a U.S. Passport after your revocation within Exhibit 43?
A. No. I'm not allowed.
Q. Why not?
A. The State Department said I can longer allow unless the issued is resolved in the case.
MR. QUICK: This will be 44.
(Whereupon, the Complaint was marked as Ricketts Exhibit 44 for identification as of this date by the Reporter.)
Q. Have you seen Exhibit 44 before, sir?
A. Yes, I have.
Q. What is it?
A. It's a complaint filed by the Deportation Officer Castro.
Q. What happened with this criminal complaint?
A. Well, as you know rightly, this entire complaint was dismissed. The only charge they gave me was tampering with witnesses. The entire complaint by Deportation Officer Castro had filed had been dismissed by the court.
MR. QUICK: This will be 45.
(Whereupon, the July 22, 2010 letter

Page 270

J. Mohammed Ricketts
was marked as Ricketts Exhibit 45 for identification as of this date by the Reporter.)
Q. Have you seen Exhibit 45 before, sir?
A. Yes, I did.
Q. What is it?
A. It's a letter that I sent to Paul Miles.
Q. This is a true and authentic copy of what you sent to Paul Milton Miles?
A. Yes, it is.
Q. How did you know where to get hold of Paul Milton Miles?
A. I had the exhibit from the passport revocation. The address was listed there.
Q. What do you mean a passport revocation?
A. The evidence Deportation Officer Castro had provided during the passport revocation.
Q. The signature, although, it's quite eligible, would this be your signature?
A. Yes, that's my signature.
Q. Why did you send this?
A. Well, this was before the complaint was filed against me. I sent this while I was in

Page 271

J. Mohammed Ricketts
Batavia, New York. Even upon his own evidence in his affidavit that he had previously made in the criminal -- in the document that I had received from Deportation Officer Castro, I had sent this letter to him.
Q. You state, "As a matter of fact, you were born in Trinidan [sic] and Tabago" --
A. Typo, Trinidad.
Q. That's a typo?
A. Yes.
Q. -- "and I have proof." Why do you say Trinidad and Tabago?
A. Because I have some information that he was born there but I can't --
Q. What is that information?
A. I can't recall what that information is but --
Q. Let me stop you there. Is this documentary evidence?
A. No, no document. Hearsay for the people talk about the case.
Q. So I'm clear, you never had documentation --
A. No.

Page 272

J. Mohammed Ricketts
Q. Let me finish the question here.
-- that Paul Milton Miles was from Trinidad and Tabago?
A. Uh-huh.
Q. You've mentioned hearsay. Hearsay from whom?
A. I can't recall.
Q. You don't know a name?
A. No. I can't recall.
Q. Was it more than one individual?
A. I can't recall.
Q. Where were you when you received this hearsay information?
A. I was in Batavia, New York.
Q. So was this from another inmate?
A. I can't recall.
Q. Why would this case come up when you were an inmate in Batavia?
A. Because I was also in the third circuit. We all talk at the immigration case. We are all detainees.
Q. Did you mention your pending court case?
A. Uh-huh.
Q. What happens then?

Page 273

J. Mohammed Ricketts
A. Then the information I got and the affidavit that he had wrote confirm that it is true.
Q. I'm sorry, I didn't understand that.
A. The affidavit that he wrote to Deportation Officer Castro when I read it also confirmed that it's true, not that he was from Trinidad, but he obviously wasn't born in this country, regardless of the home birth.
Q. Well, we're talking about the hearsay evidence.
A. As I said, I can't recall when I got it.
Q. This is while you're in Batavia, you say you got hearsay evidence from one or more people? You don't know whom, saying what, you don't recall what they say?
A. I can't recall exactly what they tell me.
Q. What did they tell you specifically?
A. Okay. That they knew him, born in Trinidad and Tabago, but that wasn't confirming what I was thinking.
Q. Let me stop you. These one or more

Page 274

J. Mohammed Ricketts
people say by coincidence I know Paul Milton Miles as well?
A. Uh-huh.
Q. Why do you think it's the same Paul Milton Miles?
A. Well, as I said, I confirm according to his affidavit that he have made to Deportation Officer Castro, something was incorrect. It wasn't correct.
Q. Confirm to whom?
A. To myself in the affidavit that he made.
Q. I'm sorry, I don't understand you confirmed. How are you confirming to yourself?
A. I have a copy of the affidavit from the criminal proceeding. I have a passport revocation and the statement he made to Deportation Officer Castro and all the questions that deportation officer asked, where were you born, and the response was, I was born in Cumberland Hospital. That's what he says in the affidavit.
Q. Paul Miles?
A. Paul Miles. If you're born in the United States, you should know your home birth and

Page 275

J. Mohammed Ricketts
not hospital birth, so there is a conflict right there.
Q. That is your evidence?
A. Well, that's part of the something.
Q. But that doesn't relate to the hearsay evidence you told us about?
A. I'm not talking about the hearsay evidence.
Q. That's what I want to talk about.
A. As I said, I can't recall who gave it to me. But that confirmed that I know he wasn't born in America because what he said in his own affidavit.
Q. Let's forget about the affidavit and Officer Castro. You're speaking with someone, one or more people, while you're in Batavia. They say they know Paul Milton Miles?
A. That's what I heard.
Q. Where did they say they know him from?
A. They didn't tell me. Like I said, it could be the wrong Paul Miles.
Q. It could be?
A. It could be. But there are many other Paul Miles. I understand that. But what confirmed

Page 276

J. Mohammed Ricketts
to me that his American citizenship is suspicious because own affidavit that he signed off on. Forget the hearsay. He made it straight that he was born at Cumberland Hospital. So you even know that's supposed to be a home birth. That affidavit he signed on shows that there is something wrong or suspicious about the entire testimony.
Q. Why is home birth important?
A. Because you are supposed to be 51 years old, you should know exactly where you were born, at least, if anything else.
Q. You also state in this same exhibit, "I'm going to make sure that you along with the rest of your family who was given false U.S. documents U.S. by mother goes to jail."
A. Like I told you earlier, yes, they have something before the hearing.
Q. Who is "they"?
A. The rest of the family.
Q. "Who was given false U.S. documents." What false U.S. documents?
A. Birth certificate.
Q. You're saying there are false birth certificates?

Page 277

J. Mohammed Ricketts

A. Well, since you give to them false. I mean, if you were born and you have one that says born in a hospital, but you have a birth certificate that says you're born in a home birth, it's given to you falsely. Where on the birth certificate does it have Cumberland Hospital?

Q. But that's Paul Milton Miles?

A. Right.

Q. I want to speak about Lizzie Mae Page and Robert Miles.

A. They give him the birth certificate.

Q. They gave him the birth certificate?

A. Yes.

Q. Where were Lizzie Mae Page and Robert Miles born, then?

A. I don't know.

Q. You talk about false U.S. documents. The false U.S. documents you're talking about is the birth certificate?

A. Yes.

Q. Just one birth certificate?

A. For now, yes.

Q. That's Paul Milton Miles' birth certificate?

Page 278

J. Mohammed Ricketts

A. Uh-huh. In my first immigration hearing --

MR. MOSELEY: There's no question.

Q. So based on what evidence that you intend to prove to the people claiming to be the Miles family are not those people?

A. Well, first of all, during my first immigration investigation, also with the New York State Department of Social Service, Lizzie Page made a statement, which is also in the administrative record, that she was questioned about whether I was her son or not. Her statement was, "Oh, he's not my son." And she was asked where's her son. And her statement was, "I haven't seen the father of my first marriage, my first five kids." That was her statement. This affidavit --

Q. What document was this?

A. It's the one that she had made to the first officer of Social Service and Immigration Service. She stated her first five kids -- she hasn't seen from her first five kids, including Paul Miles, one of them, from her first marriage, which all the kids were from a different marriage. This new affidavit that was sent to the court

Page 279

J. Mohammed Ricketts

during when I was indicted for criminal charges, now she was saying all five kids and herself and her husband of nine kids, that was not one of her statements. Another thing, too, if you look into the Social Security file --

Q. Of whom?

A. Paul Miles and Lizzie Page. You will see when their first Social Security was ever issued to them. Point number two, second of all --

Q. What does that prove?

A. Well, it proves when you get Social Security if you're born in this country, you don't wait 10, 15 years to get a Social Security card. How do you go to school? That's what it proves.

Q. Continue.

A. So, you know, as I said, there are other things that I will try to present to you before this entire deposition is over.

Q. Have you seen the Social Security file of Paul Milton Miles?

A. Not the entire file.

Q. You say you've seen part of it?

A. Part of it, yes.

Q. How have you seen part of the Social

Page 280

J. Mohammed Ricketts

Security file?

A. No, not Paul Milton Miles, I haven't seen his Social Security file.

Q. Whose file have you seen?

A. The attorney who was assigned to me by the first record had to do a background check.

Q. Who was that attorney, by the way?

A. I forgot his name. I think he left the company. He was court-appointed attorney. He had to do checks on all the people in this third circuit argument along with parents' names on the birth certificate and it was evident something was not correct.

Q. What was evident that something was not --

A. As I said, all you had to do is look into the Social Security file and that will answer your question.

Q. So it's your testimony today that the court-appointed lawyer for the third circuit, that you had the Social Security records in his possession of Lizzie Mae Page?

A. Not the Social Security record, but files to do background check also show Social Security -- when Social Security had been filed,

J. Mohammed Ricketts
when you get the first Social Security. So, therefore, as I said, if you look into the Social Security records, you should -- that should answer the question.
Q. What's "the question"?
A. Why it take 15 years to get a Social Security if you're saying you're born in the United States.
Q. But you haven't seen any Social Security files?
A. No.
Q. Did that lawyer provide you with that lawyer's file?
A. He gave me a copy of the background check they did.
Q. He did?
A. Yes.
Q. What happened to that copy?
A. That was -- I think I throw it away.
Q. Why would you throw that away?
A. Because I thought it was not really important at the time.
Q. Why? Why did you think it wasn't important?



J. Mohammed Ricketts
A. Because I was going through the criminal proceeding at the time, so I was waiting. It's all right there.
Q. So you threw it away?
A. Uh-huh.
Q. Did you ask that lawyer whether that lawyer had another copy?
A. No. He's no longer with the company.
Q. Did you ask the lawyer whether he had another copy?
A. No, I didn't.
Q. Have you made any efforts to replicate this purported report?
A. No.
Q. Why not? Why not?
A. (Indicating).
Q. You're shrugging. Why not; you don't know?
A. No.
Q. Do you have any other evidence other than what we've discussed here today that will support your claim?
A. Not at this time.
MR. QUICK: This will be Exhibit 46.



J. Mohammed Ricketts
(Whereupon, Warning of future investigation document was marked as Ricketts Exhibit 46 for identification as of this date by the Reporter.)
Q. Look at Exhibit 46, Mr. Ricketts. Have you seen this before?
A. Yes.
Q. What is it?
A. I think it was the letter that appeared through my criminal proceeding.
Q. Appeared from where?
A. According to the judge, it was sent unknown, sent to this judge.
Q. This was sent to the judge?
A. Yes.
Q. What judge?
A. U.S. District judge in Buffalo, New York.
Q. Sent by whom?
A. Nobody knows who sent it.
Q. This was not you?
A. No, I didn't send it.
Q. You've seen it before?
A. Yes.



J. Mohammed Ricketts
Q. Where have you seen this before?
A. A copy of it was given to me by my attorney.
Q. That same 3rd Circuit attorney or a different one?
A. No, the criminal attorney in Buffalo, New York.
Q. I see. What was the implication of this letter?
A. It was disregarded by the court. It wasn't part of my sentence or anything. Plus, according to this letter, I was in marshal custody, and I think I was, if not Buffalo, the only other place, upstate New York. I don't know where this came from. It came from Staten Island or something like that.
Q. You have no idea where this came from?
A. No.
MR. QUICK: This will be Exhibit 47.
(Whereupon, the superseding indictment document was marked as Ricketts Exhibit 47 for identification as of this date by the Reporter.)
Q. I show you Exhibit 47, Mr. Ricketts.

Page 285

J. Mohammed Ricketts
Have you seen this before?
A. This is a court proceeding document.
Q. This is a true and accurate copy of that exhibit?
A. Yes, it is.
Q. In your case?
A. In my case, yes.
MR. QUICK: This will be Exhibit 48.
(Whereupon, the plea agreement document was marked as Ricketts Exhibit 48 for identification as of this date by the Reporter.)
Q. Have you seen Exhibit 48 before, Mr. Ricketts?
A. Yes, I did.
Q. What is that?
A. Plea agreement.
Q. In your case?
A. In my case.
Q. This is a true and accurate copy?
A. It is a true and accurate copy.
Q. Why did you plea in this case?
A. Well, I wrote the letter to Paul and that was the letter that caused me to be convicted

Page 286

J. Mohammed Ricketts
for tampering with witnesses. That's why I pleaded in this case, only that count, only.
Q. Why did you not fight that tampering charge, then?
MR. MOSELEY: Objection as to relevance materiality.
You may answer.
MR. QUICK: Certainly.
A. I did write the letter. I took the responsibility for my own action.
MR. QUICK: This will be Exhibit 49.
(Whereupon, the sentencing minute sheet was marked as Ricketts Exhibit 49 for identification as of this date by the Reporter.)
Q. Exhibit 49, Mr. Ricketts, have you seen this?
A. Well, I didn't get a copy of this. First time I've seen this. I didn't get a copy.
Q. Do you know what this is?
A. I think this is the sentence minute sheet.
Q. In your criminal case?
A. Yes, I think it is.

Page 287

J. Mohammed Ricketts
Q. Is there any reason for us to believe that this is not the sentencing minute sheet?
A. No.
MR. MOSELEY: We'll concede authenticity this is bearing the court document.
MR. QUICK: Okay.
Q. You received time served on this charge?
A. Yes, I did.
Q. How much time was that?
A. The case started from 2010 and it was concluded in 2014.
Q. So from 2010 to this date, July 30, 2014, you were in --
A. Marshal custody.
Q. -- federal custody for the criminal case?
A. No. I was in immigration custody in 2006. After 2010, then I was put in marshal custody. And I have been since. I mean, after 2015, then I went back to immigration custody.
Q. Sir, 2010 to 2014, during your pending criminal case here of 10-403, were you in this

Page 288

J. Mohammed Ricketts
criminal custody?
A. In marshal custody, yes.
Q. Then after July 30, 2014 --
A. I was placed back in INS custody.
MR. QUICK: This will be Exhibit 50.
(Whereupon, the June 9, 2015 letter was marked as Ricketts Exhibit 50 for identification as of this date by the Reporter.)
Q. I'm showing you Exhibit 50, Mr. Ricketts. Have you seen this before?
A. Yes, I did.
Q. What is it?
A. Letter I sent to the director here.
Q. Why did you send it?
A. Because I need assistance to get my property.
Q. At the top of this letter -- by the way, did you type this letter yourself?
A. On a computer.
Q. You typed it?
A. Yes.
Q. No one helped you?
A. No.

Page 289

J. Mohammed Ricketts
Q. What computer was that?
A. In the facility over there.
Q. You typed this from just a blank sheet?
A. Yes.
Q. Why at the top here is Ricketts spelled R-i-c-k-e-t-s. Is that correct?
A. No, that's a type error.
Q. That's typo?
A. Yeah.
Q. At the bottom it's printed, "Sincerely Junior Rickets"?
A. Yeah.
Q. R-i-c-k-e-t-s. Is that another typo?
A. Yeah.
Q. Is that your signature?
A. Yeah. I forgot another T.
Q. You forgot another T?
A. Yeah.
MR. QUICK: This is Exhibit 51.
(Whereupon, the June 10, 2015 letter was marked as Ricketts Exhibit 51 for identification as of this date by the Reporter.)
Q. Exhibit 51, Mr. Ricketts, have you seen

Page 290

J. Mohammed Ricketts
that before?
A. Yes.
Q. What is that?
A. Let them know I received my bag. I know what happened.
Q. What happened?
A. I was going through the dictionary and I see the word Rickets. All the time I've been spelling it wrong. It's only spelled with one T. It's a typo. I think it's spelled with one T.
Q. Exhibit 51, you typed this yourself?
A. Yeah.
Q. As you did Exhibit 50?
A. Yeah. It's not a typo.
Q. Why are you consulting the dictionary?
A. Because I was doing my work and when I put the name Rickets on the screen it was like, it was, Microsoft Word say it's wrong. It's one T, not two T's.
Q. Is this your signature on Exhibit 51 --
A. Yes.
Q. -- with one T?
A. Yes.
Q. Did you, indeed, receive your bags?

Page 291

J. Mohammed Ricketts
A. Yes, I did.
Q. Have you received all of your bags?
A. Yes.
Q. You've located all your personal possessions --
A. Yes.
Q. -- that you had?
A. Yes.
Q. Does that include legal paperwork?
A. Yes.
MR. MOSELEY: Just one minute. This document, that one, what number do you have on that one?
MR. MOSS: Number 46.
MR. MOSELEY: Thank you.
MR. MOSS: And you're holding up the warning of future investigation.
MR. MOSELEY: Correct.
Q. Mr. Ricketts, may I reach and get these exhibits from you?
A. Yes.
Q. I want to return briefly to Deposition Exhibit 16, which is Bates Ricketts Depo 27, in the middle on there, to the right of your picture,

Page 292

J. Mohammed Ricketts
which you said is, indeed, your picture, it says "Person to contact in case of emergency is Lizzie Mae Page." Why Lizzie Mae Page?
A. I put whatever name was on the birth certificate when I applied for the passport.
Q. For an emergency?
A. Yes.
Q. Why not say Keturah Campbell?
A. No.
Q. Why not?
A. I never used -- I don't think I ever used Keturah Campbell on my passport application.
Q. This is just in case of an emergency?
A. Yes.
Q. Had you ever met Lizzie Mae Page?
A. Not the one you have. Well, no.
Q. You say not the one I have. Have you met any Lizzie Mae Page?
A. No.
Q. So why if something does happen to you in an emergency if someone needed to contact a third party, why are you saying to contact Lizzie Mae Page?
A. I don't know.

Page 293

J. Mohammed Ricketts
Q. Did you know a Viola Campbell at any point?
A. Not, but the name came up somewhere. I think on the birth certificate that I got there was a Viola Campbell on the birth certificate I got from Jamaica.
MR. QUICK: This will be Exhibit 52.
(Whereupon, the letter was marked as Ricketts Exhibit 52 for identification as of this date by the Reporter.)
Q. Do you recognize Exhibit 52, sir?
MR. MOSELEY: Can you bring that up on the screen?
MR. QUICK: Of course.
Q. Please look either on the screen or what's in front of you, sir.
A. Yes, I've seen it before.
Q. Where have you seen this before?
A. It was presented as an exhibit in my criminal case.
Q. What year would this have been; which criminal case?
A. 2010.
Q. This is signed Keturah Moulton. Do you

Page 294

J. Mohammed Ricketts
know who Keturah Moulton is?
A. No.
Q. Is she at all associated with Keturah Campbell?
A. It says Keturah Campbell Moulton in the middle here, so I guess it is.
MR. MOSELEY: Don't guess.
A. I don't know who that person is.
Q. Do you know whether Keturah Campbell with whom you lived ever changed her name in any way?
A. No.
Q. The address 2223 Contelyou, C-o-n-t-e-l-y-o-u, Road in Brooklyn, do you know what that refers to?
A. No.
Q. Did you ever live there?
A. No.
Q. Do you know if Keturah Campbell or Keturah Moulton ever lived there?
A. Not that I know of.
Q. Did Ms. Campbell, to your knowledge, ever remodel her apartment?
A. Not that I know of.

Page 295

J. Mohammed Ricketts
Q. When this was purportedly written in 1983, you're still at Wingate?
A. I think so, yes.
Q. Do you recognize that signature at the bottom in any manner?
A. No.
Q. Is that at all what the signature of Keturah looked as the signature certificate on the high school records?
A. I didn't recognize the signature at all.
Q. She says, "Also enclosed in the envelope is a photocopy of my son Junior Ricketts end of term report, which I think will aid you to evaluate him better." Does that Junior Ricketts refer to you?
A. I'm not sure.
Q. Could it?
A. No. I don't think.
Q. Why not?
A. I'm not. If this was written to the immigration thing right over here, does it have a file along with the photograph. If this is written to immigration, it has to have a file.

Page 296

J. Mohammed Ricketts
Q. I don't understand your question.
MR. MOSELEY: Just a moment. The question is -- the issue is, do you have copies of -- this comes from U.S. Legacy INS file, don't you have the back-up documentation or is that all that you have?
Q. You don't know what this is referring to, sir?
A. No, I don't.
MR. QUICK: If we can take a break.
Mr. Moseley, do you have any follow-up questions?
MR. MOSELEY: I don't. No.
MR. QUICK: If we can just take a quick break.
(Whereupon, a short recess was held from 4:21 until 4:27.)
Q. Mr. Ricketts, in June of this year, did you have a DNA -- were you taken to this facility to have a DNA swab?
A. Yes.
Q. That was you?
A. Yes, that was me.
Q. Have you ever met anyone named Paul



Under Protective Order

J. Mohammed Ricketts

Milton Miles?
A. No.
Q. You never met anyone who purported to be Paul Milton Miles?
A. No. Because the only time I knew that only person, Paul Miles -- actually, this is when deportation provide me with this exhibit passport revocation. That's the only time.
Q. There should not be anyone named Paul Milton Miles at Wingate High School?
A. Yes, myself. You said if I know anyone prior.
Q. Those high records that we discussed today have Junior Ricketts. It doesn't not mention Paul Milton Miles, you said?
A. The one you gave me?
Q. Exactly.
A. That's not the complete records.
Q. It's not the complete records?
A. You gave me the Junior Ricketts records, but you haven't given me the complete records. If you're saying that the records you gave me there is no Paul Milton Miles, yes, but that's not the complete records.



J. Mohammed Ricketts

Q. Other than you, there was never any Paul Milton Miles at Wingate?
A. There was no other Paul Milton Miles that I've heard of until after deportation present me with the accurate document. Even when they questioned Lizzie Mae Page, she says she had not seen her son for so many years. I never really -- other than that, there was no Paul Miles until I received the documents.
Q. You talked about Wingate you had a period of time where you weren't at Wingate, you went to another institution?
A. Uh-huh.
Q. Were you ever absent for long periods of time while at Wingate, while attending Wingate?
A. Yes.
Q. When was that?
A. I think was about '81 or '82.
Q. How long were you absent?
A. As I said, I dropped out. That's why I was late to graduate so I tried to -- when I went back to Erasmus, I tried to get back in again to Wingate, you know, whatever provide me to get back in there.



J. Mohammed Ricketts

Q. You were absent from Wingate because you dropped out?
A. Right.
Q. You weren't kicked out of the school for any reason?
A. No.
Q. It was on your own?
A. Yes.
Q. Is there anything else you want to add today, sir?
A. No.
Q. Do you want to change anything that you testified to today, sir?
A. No.
MR. QUICK: Mr. Moseley, do you have any questions?
MR. MOSELEY: I have nothing.
MR. QUICK: I think we are done.
MR. MOSELEY: You'll be preparing the original transcript and with the exhibits and if you would send to me since Mr. Ricketts is in prison and we'll -- I'll get to him so he can review it and sign it. We haven't waived signature, have we?



J. Mohammed Ricketts

MR. QUICK: I'm sorry?
MR. MOSELEY: We have not waived signatures?
MR. QUICK: No.
MR. MOSELEY: So then, as I understand it, the Government probably pays for the original transcript. And I think the Federal practice, I believe also pay for a copy for me.
MR. QUICK: That, I don't know.
MR. MOSS: I remember the judge saying something about a discovery fund, perhaps, if need be.
MR. MOSELEY: I thought the Federal practice in Southern Eastern District of New York was a person taking the plaintiff in the parties' depositions in the case pays for the original transcript and the copy.
(Time noted: 4:32 p.m.)

______________________________
JUNIOR MOHAMMED RICKETTS

Subscribed and sworn to before me
this ___ day of ____________, 2015.

______________________________
Notary Public

INDEX


| WITNESS: | EXAMINATION BY: | PAGE |
|---|---|---|
| JUNIOR MOHAMMED RICKETTS | MR. QUICK | 4 |


EXHIBITS

RICKETTS EXHIBITS:


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Jamaica Passport | 31 |
| 2 | Birth Certificate | 41 |
| 3 | I94 Document | 43 |
| 4 | I94 Document | 46 |
| 5 | I94 Document | 50 |
| 6 | I94 Document | 51 |
| 7 | I94 Document | 52 |
| 8 | School Transcript | 53 |
| 9 | Diploma | 84 |
| 10 | Seletive Service System form | 85 |
| 11 | Birth Certificate | 94 |
| 12 | Application for Jamaican Passport | 105 |
| 13 | Handwritten letter | 111 |
| 14 | Jamaican Passport | 117 |
| 15 | Notice of Approval Relative Immigration Visa Petition | 137 |
| 16 | U.S. Passport application | 141 |
| 17 | Copy of driver's license and SS# | 145 |
| 18 | U.S. Passport | 148 |
| 19 | Application for SS# Card | 152 |
| 20 | Petition for change of name | 156 |
| 21 | Application for SS# Card | 163 |
| 22 | Court Order for name change | 168 |
| 23 | Proof of Publication | 169 |


(Continued...)



EXHIBITS

RICKETTS EXHIBITS:


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 24 | Birth Certificate | 171 |
| 25 | Birth Certificate | 176 |
| 26 | Application for SS# Card | 178 |
| 27 | Update for U.S. Passport | 184 |
| 28 | Amendment and Endorsement | 189 |
| 29 | Brooklyn College transcript | 193 |
| 30 | Application for SS# Card | 197 |
| 31 | Application for SS# Card | 200 |
| 32 | Application for SS# Card | 202 |
| 33 | Information document | 217 |
| 34 | Judgment in criminal case | 220 |
| 35 | February 7, 1996 letter | 224 |
| 36 | July 13, 1996 letter | 228 |
| 37 | Passport application | 243 |
| 38 | Verification of identity and nationality | 246 |
| 40 | Consulate of Jamaica document | 252 |
| 41 | February 16, 2010 letter | 261 |
| 42 | Opposition letter | 262 |
| 43 | Passport revocation document | 267 |
| 44 | Complaint | 269 |
| 45 | July 22, 2010 letter | 270 |
| 46 | Warning of future investigation | 283 |
| 47 | Superseding indictment | 284 |
| 48 | Plea agreement | 285 |
| 49 | Sentencing minutes | 286 |
| 50 | June 9, 2015 letter | 288 |
| 51 | June 10, 2015 letter | 289 |
| 52 | Letter | 293 |




CERTIFICATION

I, SUZANNE CATALANO, hereby certify that the Examination Before Trial of JUNIOR MOHAMMED RICKETTS was held before me on the 9th day of July, 2015; that said witness was duly sworn before the commencement of his/her testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Examination Before Trial of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel;

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of July, 2015.

______________________________________



DEPOSITION ERRATA SHEET

Our Assignment No.

Case Caption: RICKETTS vs. U.S. ATTORNEY GENERAL

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ____________, 20___.

___________________________________

JUNIOR MOHAMMED RICKETTS

Page 305

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

JUNIOR MOHAMMED RICKETTS

Page 306

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

JUNIOR MOHAMMED RICKETTS

# Respondent's Exhibit B

Page 1

U.S DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
CASE NO.: 1:15-cv-00329-MKB-LB
------------------------------------)
JUNIOR MOHAMMED RICKETTS, a/k/a )
JUNIOR NATHANIEL RICKETTS, a/k/a )
PAUL MILTON MILES, )
Petitioner, )
vs. )
U.S. ATTORNEY GENERAL LORETTA E. )
LYNCH, )
Respondent. )
------------------------------------)

DEPOSITION OF STEVEN SCHWARTZ
New York, New York
Wednesday, July 8, 2015

Reported by:
ANGELA BITJONIDES
JOB NO. 124925

Page 2

July 8, 2015
2:44 p.m.

Deposition of STEVEN SCHWARTZ, held at the offices of Department of Justice, 201 Varick Street, 12th Floor, New York, New York, pursuant to Subpoena, before Angela Bitjonides, a Notary Public of the State of New York.

Page 3

A P P E A R A N C E S:

LAW OFFICE OF THOMAS E. MOSELEY
Counsel for Petitioner
101 Gateway Center, Suite 2600
Newark, New Jersey 07102-5397
BY: THOMAS E. MOSELEY, ESQ.

OFFICE OF IMMIGRATION LITIGATION
Counsel for Respondent
P.O. Box 878, Franklin Square Station
Washington, D.C. 20044
BY: ERIK R. QUICK, ESQ.
-and-
BENJAMIN MARK MOSS, ESQ.

Page 4

A P P E A R A N C E S (CONT'D):

NEW YORK CITY LAW DEPARTMENT
Administrative Law Division
Counsel for Witness
100 Church Street, Room 5-153
4th Floor Service Window
New York, New York 10007
BY: LOUISE LIPPIN, Senior Counsel.

ALSO PRESENT:
DAN MEYER, PARALEGAL
Office of Immigration Litigation.
SHARI DAWKINS, ASSISTANT GENERAL COUNSEL
Department of Health & Mental Hygiene.
AVI CASTRO, ADJUSTOR.

Page 5

S T I P U L A T I O N S

IT IS FURTHER STIPULATED AND AGREED that the within examination may be subscribed and sworn to before any notary public with the same force and effect as though subscribed and sworn to and before this court.

Page 6

S T E V E N S C H W A R T Z , called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

THE COURT REPORTER: Please state your name and address for the record.

THE WITNESS: Steven Schwartz. My business address is 125 Worth Street, New York, New York 10013.

THE COURT REPORTER: Thank you.

DIRECT EXAMINATION BY
MR. QUICK:
Q. Mr. Schwartz, my name is Eric Quick and I'm the attorney at the U.S. Department of Justice Office of Immigration Litigation in Washington D.C. and we represent the respondent in this case, Loretta E. Lunch, the U.S. Attorney General.
Mr. Schwartz, have you ever served as a 30(b)(6) deposition designee before?
A. I have not.
Q. Have you ever the had your deposition taken before today?
A. Not to my recollection.
Q. So obviously there is a Court Reporter

Page 7

Schwartz

here and although our colloquy may seem that sitting here regardless across from one another at the table, we can't have nods or shakes of the head or inaudible responses because the Court Reporter can't take them down accordingly. For that reason, we have to actually articulate our thoughts. Even though we me be gesturing as well. You understand you're under oath today?
A. Yes.
Q. Have you taken any medication within the last 20 hours that would affect your testimony here today?
A. No.
Q. So what is your understanding of your roll here today?
A. I am representing the New York City Department of Health and Mental Hygiene Bureau of Vital Statistics.
Q. What determines you to be qualified today to serve as this designees?
A. Our general counsel.
Q. Are you competent to testify today also as a business records custodian of your office?
A. Yes.

Page 8

Schwartz

Q. In other words, you're able to authenticate documents produced pursuant to the Subpoena today?
A. Correct.
Q. Now, how long have you been an employee of that New York City Department of Health and Mental Hygiene?
A. Since 1985.
Q. What is your current job title?
A. New York City Registrar of Vital Statistics.
Q. How many registrars are there?
A. In New York City.
Q. Yes, sir.
A. One.
Q. You are "he" correct?
A. Correct.
Q. Can you tell me how long have you served in that current title?
A. Since 1995.
Q. So 20 years. Can you tell me, just briefly, and in a layman's lawyer-like terms, what are your day-to-day job duties?
A. I'm responsible for many of the policy

Page 9

Schwartz
decisions concerned with colleagues with policy decisions as well as the operational aspect of the operational of the policies and procedures of our office.
Q. When you say "operational aspect" are you talking about personnel?
A. No, substantive issues.
Q. Such as what?
A. Applications of the New York City Health Code to specific policies and procedure. I'm consulted frequently by our Bureau Vital Statistics Staff about the application of either the New York City Health Code or our rules and regulations pertaining to processing of records.
Q. Are you a lawyer, sir?
A. No, I am not.
Q. Can you tell us what your educational background is? College and/or graduate school.
A. I have a bachelor of arts degree from John Hopkins University and I went to the John Hopkins School of Hygiene and Public Health and have a Ph.D.
Q. How many people, then, do you supervise in your current job description duties?

Page 10

Schwartz
A. I have no direct report.
Q. How many people do you supervise? Anybody in particular?
A. I do not.
Q. Since you've held this current job title for about 20 years, what was your first position in 1985 when you were first hired?
A. I worked in the Division of Environmental Health.
Q. What was your job title there?
A. I think I started as Community Coordinator.
Q. How long did you hold that position?
A. I would estimate a year or two.
Q. So from perhaps 1985 to 1986. What did you do thereafter? Your next job, that is.
A. I stayed in the Division of Environmental Health Service for approximately five or six years.
Q. Doing what? What were your job titles there in those ensuing five years?
A. Various responsibilities. Including, coordinating the first Clean Indoor Air Act to limit smoking. I, ultimately, became Assistant Commissioner in the Division in Environmental Health

Page 11

Schwartz
Services and at one point I was responsible for the Restaurant Inspection Program.
Q. Anything else when you were there in Environmental Health Services?
A. It was a unit prior to my becoming Assistant Commissioner where I was head of a smaller united relating to environmental Sciences. It's a while ago.
Q. If you had that position, as you said, for five or six years, perhaps up to 1991, what was your next position with the City?
A. I transitioned for a years or two to the HIV Aids Program and, essentially, a research capacity. That was until 1992.
Q. What did you do after 1992?
A. In 1992 I became the Director of the Office of Vital Statistics and held that position as the Director of the Vitals Statistics for three years. So I've been in the later that office of Vital Statistics later transitioned into the Bureau of Vital Statistics and the Office of Vital Statistics was, essentially, the epidemiological aspect -- the public health aspect -- of Vital Statistics. And, then, in 1995 I also assumed the

Page 12

Schwartz
role of registrar.
(Schwartz Exhibit 1, Subpoena, marked for identification, as of this date.)
Q. What I do want to show you what we marked as Deposition Schwartz 1. This is the Subpoena that somebody in my office issued for today. Have you seen that document before?
A. Yes, I have.
Q. You have reviewed each of those topics?
A. Yes.
Q. Is there anything within those topics to which you're not prepared to testify today?
A. No.
Q. Sir, have you brought any documents with you today in response to this Subpoena and deposition?
A. I have some records -- some copies of records -- that were requested.
Q. Have you brought with you today for instance copies of Birth Certificates?
A. Yes.
Q. Have you brought with you any sort of manuals as well from the City?
A. My counsel has.



Under Protective Order

Page 13

Schwartz

Q. Very good. We will refer to those today throughout the deposition. So I understand because I'm just a lawyer. I want to understand, you have not personally registered birth certificates physically here in the City; have you?

A. Could you explain your question more?

Q. You've been the director -- so other people physically are taking information and generating Birth Certificates and registering those Birth Certificates with your office?

A. It is my signature on the Birth Certificates.

Q. Is it an electronic signature or your actual signature?

A. It is most exclusively preprinted.

Q. How many are issued each year in the City here?

A. There are approximately 125,000 births in New York City. So every newborn parent gets a free copy of a New York City Birth Certificate called a Certificate of Birth Registration. So that's 125,000 -- roughly 125,000 births that are registered or reported to the New York City Health Department. But, if you're asking about how many

Page 14

Schwartz

certified copies we issues.

Q. That's another question, I would suppose.

A. It would be another question.

Q. How many of those would there be then?

A. About 350,000 certified copies of birth certificates pursued annually.

Q. How many amended birth certificates would be issued, say in 2014, within the City, if you know or could estimate?

A. We process about 35 to 40,000 corrections of amendments of birth and death records. So a substantial portion of those are for birth certificates.

Q. In this case we're dealing with a Birth Certificate issued within the City in 1964. Are you competent today to testify to the practices of birth registration in 1964?

A. I was not in the office in 1964.

Q. That's my question, yes.

A. But, I am familiar with the practice as I understand them during that period.

Q. You're familiar with those practices in 1964 be part of your current job duties; would it not?

Page 15

Schwartz

A. Correct.

Q. Then, you would also be familiar with amendments to birth certificates?

A. Yes.

Q. Pre your time in 1985 in the Vital Statistics Office?

A. Pre-1992, yes.

Q. Was this practice the same from borough to borough within the City?

A. In 1964 there were regional registration offices. There were actually borough offices but they were all under the same bureau.

Q. So when you're testifying here today about registration or amendment in Brooklyn, that would also be within your expertise today?

A. Correct.

Q. Now, I would like you to turn, if you could, to the Topic Number 1 on page 6 of this Subpoena. I just want to briefly go through some of these topics and if in testifying about these topics that there are documents you brought with you that are responsive to that particular topic and would aid in your testimony, you tell us, and, then, we will mark those as well as exhibits. Okay?

Page 16

Schwartz

A. Okay.

Q. I see you have a pile of exhibits on your left-hand side. If there is something that would aid in your testimony or wish us to discuss, just say that.

A. Thank you.

Q. If you need to take a break to refer to something, you're in charge here in the deposition. So you get to that do as well.

A. Thank you.

Q. So topic 1 is "Any and all policies practices and procedures pertaining to the issuance of birth certificates. Including, procedure and evidentiary standard for issuance. Any approval or review procedures related to interactions with communications with local hospital regarding local births."

So my question to you, then, is say in 1964, if a baby was born in the hospital, what would be the procedure for registering a Birth Certificate or a birth in a hospital in 1964 in the New York City area?

A. The hospital is responsible for reporting all births that occur in that hospital or births



Under Protective Order

Page 17

Schwartz

that may have been brought to that hospital. In 1964 it was a completely paper-based system. There are -- each hospital -- each birthing hospital -- has a Birth Registration Office. There was likely a worksheet to collect information from the parents. Essentially, to collect information so that a Birth Certificate could be prepared.

Q. That would be name, birth date and place?

A. Parent's name, parent's place of birth, a place for the physician or certifier's signature. And, there would also have been medical information that was collected. A Birth Certificate has two portions to it. A Certificate of Birth and then there is a confidential medical report of birth that contains medical information.

Q. Such as what?

A. Such as congenital abnormalities, abnormal conditions of the newborn. Other public health information.

Q. Is that part of the Birth Certificate itself?

A. It's important to make the distinction between the Certificate of birth and the Confidential Medical Report of Birth. So what it is

Page 18

Schwartz

issued to an applicant upon request of the Birth Certificate is the Certificate of Birth. Not the Confidential Medical Report of Birth. So the Confidential Medical Report of Birth collects information for public health statistical purposes.

Q. When the hospital generates this information used to create a certificate, is a doctor's signature required?

A. So in 1964 the Health Department would have provided a blank -- a form of a Birth Certificate on 100% cotton paper and that original document would be completed. Might be typed. Might have been handwritten by largely by a Birth Registration Clerk at the hospital and then signed by a certifier. Generally, a physician.

Q. But, it need not be a physician?

A. It might have been. It may have been a Certified Nurse Midwife.

Q. Who aided at the hospital?

A. Correct.

Q. Now, with regard in 1964 to babies born outside of the hospital. What information, then, is it necessary to create the reports that you've been testifying to, how is that different?

Page 19

Schwartz

A. If a birth occurred outside the hospital and there are lots of circumstances under which that might have occurred. It might have been an intended out-of-hospital or extramural birth. Like, a family plan to give birth at home or it might have been an unplanned birth in a taxi cab. And, even New York City Cab Drivers know if a birth occurs in a cab that they are to go to a hospital.

Q. This really happens?

A. We do get them all. 100% of all births are reportable in New York City. So if a birth occurred at home or anywhere else, the birth is generally reported to a birthing hospital and they would prepare that. They would prepare that birth record and that birth record would have the place of birth as well. So the place of birth might have been a street intersection or it might have been a home address. So it would be clear on the certificate where the place of birth occurred and then it would have been registered in a hospital.

Q. But still registered by a hospital and forwarded on to Vital Statistics?

A. Yes. There are other cases where a birth might be registered later but still must be -- all

Page 20

Schwartz

births that occur -- all birth events that occur in New York City must be reported to the Bureau of Vital Statistics and New York City Health Department.

Q. If a baby is born outside of the hospital, is a witness required to find that yes this birth did happen in the City of New York at the intersection or in a taxi cab or is the mother's statement sufficient?

A. If the birth occurred and it was under the purview of a licensed midwife; then, we would -- the Department would accept that. And, there are cases when births occur and are unattended by a licensed practitioner and sometimes they are reported by families directly. And, then, we would ask for evidence of that -- what other evidence of that birth.

Q. Such as what?

A. If there were witnesses in attendance; then we would ask for that information. I don't know all the details of how it would have been done in 1964, but consistent with our practices today. We would ask for any corroborating evidence like prenatal care visits and medical records to show

Page 21

Schwartz

that not only did the birth occur on that date, time and place, but that it occurred in New York City.

Q. If I could, then, skip to Topic Number 4 on page 7 of Deposition Exhibit 1. It talks about "The organization and structure of the New York City Department of Health and Mental Hygiene, including the departments, sections, or other subdivisions of those agencies with duties or responsibilities related to the investigation and issuance of birth certificates from 1964 to present."

So, briefly, if you could tell us how has the Office of Vital Statistics or Health and Mental Hygiene organized? In other words, can you give us any sort of quick organizational structure?

A. In the present day?

Q. Let's start with the present day. Yes, sir.

A. In the present day, the Bureau of Vital Statistics reports to the Division of Epidemiology in the New York City Health Department. So that the Division of Epidemiology is chaired by a Deputy Commissioner and that Deputy Commissioner reports to the Commissioner of Health.

Q. Within the Bureau of Vital Statistics,

Page 22

Schwartz

are there subdivisions therein? For instance, is there a Birth Registration Division or Birth Amendment Division? Its sounds probably like a juvenile question but we just don't know how it's done.

A. There is a Birth and Death Registration Office.

Q. That's one office?

A. One office that does Birth and Death Registration. Actually, it's birth/death/induced termination of pregnancy and spontaneous termination of pregnancy. All four events are reportable to the New York City Health Department. There is a Corrections and Amendment Unit that processes similarly corrections and amendments.

Q. Separate from that?

A. Within the Bureau of Vital Statistics. That second unit is Corrections and Amendments.

Q. In 1964, how was it different, if you know?

A. There were borough offices reporting to a central office. I don't have specific details about the borough offices. We also have a Records Management Unit that essentially is responsible for

Page 23

Schwartz

the record retention to a certain extent retrieval of those archival records. We are the custodian of the records.

Q. The physical aspects?

A. The physical and now the electronic aspects of that. And, then, our final division or unit is Public Service Operations which is responsible for the issuance of certified copies of births, deaths, and termination of pregnancies.

Q. Topic Number 5 on page 8, it's seek the "New York City Department of Health and Mental Hygiene Policies and Procedures and Practices in place regarding the maintenance of records concerning the issuance of birth certificates from 1964 to present."

So perhaps this dovetails with your last segment of testimony about the physical maintenance of records. How are they physically maintained in 1964 for the issuance of birth certificates?

A. In 1964 we had a vault that -- several vaults -- that actually maintained the original cotton paper birth record -- the paper itself. And, after those records were accessioned and when they were registered they were also microfilmed. So we

Page 24

Schwartz

have the original cotton paper record from 1964. We have microfilmed copies, microfilmed originals and microfilmed copies of the originals stored in different places. So upon request we can produce these records.

Q. And, physically, go back and go to one of those three sets?

A. Correct.

Q. Is there a preferred search? Would one go to either the original or the copies of the microfiche or one go to the cotton bond original when preparing for today's deposition?

A. We have a more modern method for much of our records today and that is an electronic image of those original records. So we used a number of different processes to retrieve the records that we have provided today.

Q. Can you tell me about any of those? How you did that?

A. We mostly used microfilm records and for the most recent record -- the current record -- was from an electronic image.

MR. QUICK: Before we do proceed, I do want to state that, then, everything hereafter

Page 25

Schwartz

in this deposition would be subject to the Courts in this case, June 9, 2015 protective order.

Q. So I'm going to ask you, then, with regard to the particulars in this case, sir. Then proceed with Topic Number 6 whether any individuals were born in Brooklyn, New York on August 31, 1964 who were named Paul Milton Miles?

A. Is that your question before me now?

Q. It is unartful as it were.

A. There was one such birth in 1964.

Q. I see you do have a red folder there. Is that material the same as your exhibits on the left-hand side?

A. Yes.

Q. Perhaps, we can draw from the exhibits that you produced today.

MR. QUICK: If you have no objection, we will use your handy-dandy explanation as a cover sheet for each of these.

MS. LIPPIN: That's okay.

THE WITNESS: It is.

(Schwartz Exhibit 2, Birth Certificate of Paul Miles Milton, marked for identification,

Page 26

Schwartz

as of this date.)

Q. Sir, I believe you have the same in front of you. Do you not? The same exhibit? These two pages?

A. Yes.

Q. We can discuss?

A. Yes.

Q. With regard to page 1e on this exhibit, Depo 230 is the Bates, but it's also Schwartz Deposition Exhibit 2. It says "Original birth record of Paul Milton Miles; filed September 4, 1964." Sir, did you prepare this one line explanation?

A. Yes, I did.

Q. Then, on page 2, Bates 231, can you tell us what this is, sir?

A. That is the original birth record of Paul Milton Miles that was filed with our office on September 4, 1964.

Q. This page that I have is the same as the one in front of you?

A. Correct.

Q. Now, sir, if I could just ask you, first of all, it has a certificate number 156-64-337372,

Page 27

Schwartz

what is that number?

A. It is the New York City Birth Certificate Number for that record of Paul Milton Miles.

Q. So does each Birth Certificate issued in the City in 1964 have a separate and unique certificate number?

A. It does.

Q. Does the 156 prefix mean anything in particular?

A. It's does.

Q. What does it mean?

A. It means New York City.

Q. What does 64 mean?

A. That means the registration year.

Q. And, what, if anything, does 337372 mean?

A. That's the rest of the certificate number. It includes a borough code in there. So it is essentially a sequential number assigned by borough in 1964.

Q. What portion of that 337372 is a borough code, if you know?

A. I believe it is the first digit.

Q. What, if anything, would the remaining five digits signify?

Page 28

Schwartz

A. I don't know. Aside from it being a sequential number.

Q. It doesn't necessarily mean that there were 37,371 prior to this?

A. It does not mean that.

Q. Now, you said, sir, that -- and correct me if I'm wrong -- there was one Paul Milton Miles born on August 31, 964?

A. Correct.

Q. In the City of New York?

A. Correct.

Q. How do you know that?

A. I personally did the search.

Q. How did you search?

A. I searched through our electronic database.

Q. What were your search parameters?

A. Since this was a question about a birth on a single date.

Q. Yes.

A. -- I searched that single date.

Q. Everyone born on August 31, 1964?

A. And looked for that name and there was only one.

Page 29

Schwartz
Q. How many were born on that date in New York City?
A. I do not have that information.
Q. Did your search include all of the boroughs -- not just Brooklyn?
A. Correct.
Q. So from your other testimony I understand there were indeed separate by borough, did you search only in Brooklyn or did you search throughout the City?
A. I searched our collective records.
Q. So if there was someone with that name and birth date in New York City and not in Brooklyn or in Manhattan -- I'm sorry, but not Brooklyn -- your search would have found that?
A. Correct.
Q. If it was someone in Queens, you would have found that as well?
A. Yes.
Q. Now, you said that you looked at electronic. Is this simply from a computer screen -- computer database -- that you were searching?
A. Yes.

Page 30

Schwartz
Q. So you didn't physically go through the cotton weave originals in your search?
A. I did not.
Q. Would there be any reason to do that?
A. No.
Q. So there is no reason to think the cotton weave original pile from that date would deviate from computer search?
A. No reason.
Q. Here it is says the birth is August 31, 1964. The date of report is September 2, 1964. Is there a requirement that a birth be reported within a certain number of days after the birth date?
A. The requirement, I believe, at the time was that the birth had to be reported within five days.
Q. This also states in Block 6, the place of birth, is in Brooklyn. And, on part D, if not in hospital, street address: 855 Lafayette Avenue. So from this is my understanding this was out of hospital birth?
A. Yes.
Q. It has a father of Robert Miles and a mother, Lizzie Mae McLaughlin. What type of proof

Page 31

Schwartz
would be required in 1964 to register those individuals as the parents of this child in 1964?
A. My understanding is the same as it would be today and that our department relies on the hospital to collect the information.
Q. Would those individuals be required to produce any sort of identifying information? For instance, a driver's license?
A. It would have depended on the hospital's policy.
Q. Do you know this particular hospital's policy was -- Greenpoint Hospital in 1964?
A. I do not.
Q. Is there anything else with regard to this particular page you want to explain to us as a laymen?
A. No.
Q. If we can go to the next exhibit. This is the first Correction of Birth Record. I'm reading from your summary. This will be marked as Exhibit 3, I believe. The Bates numbers are 232, 233 as produced here.
(Schwartz Exhibit 3, Correction of Birth Certificate, marked for identification, as of

Page 32

Schwartz
this date.)
Q. Let's turn to Schwartz Exhibit 3. These are Bates numbered 232, 233, 234 and 235. So tell us, sir, what is on the first page on 232? The first page.
A. My cover sheet?
Q. Yes, sir. Your cover sheet.
A. So my cover sheet explains that there were three corrections to the original birth record. The first was the time of birth was changed from 2:35 a.m. to 1:30 a.m. the second correction was the mother's maiden name was changed from McLaughlin to Page. And, the third correction was the father's given name changed from Robert to Robert, Junior.
Q. You prepared that summary yourself for today?
A. I did.
Q. If we could turn to page 233, then. The second of this deposition sequence, can you tell us what this page is?
A. This is a New York City Bureau of Records and Statistics Birth Certificate Correction Application Form that has been signed by both parents, Robert Miles, Junior., and Lizzie Miles and

Page 33

Schwartz
it is a request to correct the time of birth, the maiden name and the father's given name.
Q. This is an application in of itself?
A. It's an application.
Q. Signed presumably by Robert Miles and Lizzie Mae Miles on the bottom?
A. Yes.
Q. How did you find this document?
A. The Department maintains a history of all of the correction application forms and the corrections themselves.
Q. In searching for the Paul Milton Miles on August 31, 1964, did you find this particular amendment or application for the correction of birth certificate?
A. Yes.
Q. In other words, this page 233 was somehow associated with the birth certificate that you just testified to?
A. That is correct.
Q. If we can go to page 234, page 3 of this deposition exhibit, can you tell us what this is?
A. This is a summary of the documentary evidence submitted and summary of the corrections

Page 34

Schwartz
that were prepared of that record.
Q. This is not part of the application made by the parents?
A. This was prepared by a Vital Records staff member.
Q. Is this summary then of the requested changes or is this an order to change in accordance with the application?
A. It is a summary of the changes.
Q. Why is there a summary of the changes?
A. It is the approval of someone who is probably a Deputy City Registrar in the Bureau of Vital Statistics who authorized the corrections?
Q. Do you know who would be required to authorize the corrections in accordance with this particular application?
A. It would have been clerk following the procedures of the Department at the time.
Q. There is no reason to think procedures were not followed, in other words, in this particular case?
A. Correct.
Q. Now, on that page, 234, on the top right-hand corner there -- and I'm trying to read

Page 35

Schwartz
the handwriting -- "Parents Marriage Cert: Dillon County, South Carolina. Date: December 20, 1959." Would that refer, then, to evidence that was produced by these parents in support of their application?
A. Yes, that would be consistent with other procedures.
Q. So presumably they produced their own Marriage Certificate?
A. Correct; presumably.
Q. Then, it says "Robert Miles, Junior and Lizzie Mae Page By: W.E. Allen (Probate Judge)" would that also be part of that same proof or do you know?
A. I don't have any specific knowledge but it would be consistent.
Q. It seems to be signed "J. Caiate" would that be some such thing someone from the borough of Vital Statistics?
A. Yes.
Q. Approving that particular request?
A. Yes.
Q. Then, underneath this "Mother in error gave stepfather's name McLaughlin at time of child's

Page 36

Schwartz
birth instead of true maiden name Page. J.C." Then, again, that would be from the Vital Statistics employee giving a little bit of an explanation in support of this application?
A. Yes.
Q. Then underneath this it says "Parent's application before three months. J.C." what does that refer to, if you know?
A. Yes, the Health Code at the time in 1964 provided for a substitution of a birth record -- a correction -- if a hospital made an error or if a family corrected the error within three months. It was a specific provision in the New York City Health Code at the time that provided for that. So it is called a substitution.
Q. That would be in the case of a hospital error?
A. A hospital error or information brought to the hospital. In this case to correct errors.
Q. Brought by these parents?
A. Correct.
Q. Then, on the following page number 235 states, if you can tell us what this is?
A. So this is the result of the corrections

Page 37

Schwartz
from the previous three pages. So this a corrected Birth Certificate and at the time the way to correct these records was to draw a line through each of the original pieces of information and write above the new information.
Q. That notation, would that be on the copy of the original or would this actually be made on the original?
A. It would have been made on the original.
Q. It says the date of report is 9/2/64. That is the same report date as on Exhibit 2. So the report date would remain the same despite the subsequent amendment?
A. Correct.
Q. So in this we see the hours crossed off to be 1:30 and not 2:35 a.m. McLaughlin is crossed off to note Page and perhaps the Junior for Robert Miles, Junior was added by the clerk?
A. Yes.
Q. These changes would have been made by an authorized representative of the Vital Statolithics?
A. Yes. And, what you also see is in addition of a new date, November 16, 1964, is when the correction would have been made.

Page 38

Schwartz
Q. Approved or made or is there a distinction?
A. Approved.
Q. On those three pages, sir, pages 232, 234 to 235, these are true and accurate copies under your investigation today for this deposition today?
A. They are.
Q. They are authentic?
A. They are.
Q. I will ask you the same question with exhibit 2, page 231, the original Certificate of Birth, that is also a true and accurate authentic copy of what you found in your investigation?
A. They are.
Q. Is there anything else you would like to explain to us before we move on from Exhibit 3 in educating the layman?
A. No.
Q. Sir, in any of these amendments, are those out of the ordinary in your professional experience?
A. No.
Q. If we can continue with a new Schwartz Deposition, I believe 4. These are Bates-stamped

Page 39

Schwartz
236 and 237. It begins "New Typed Substitute Birth Record."
(Schwartz Exhibit 4, New Typed Birth Substitute Birth Certificate, marked for identification, as of this date.)
Q. So we're clear, sir. What has been marked -- and make sure that is the same as those pages you have in front of you.
A. Yes.
Q. With regard to the cover page and the typed explanation, you made these as well?
A. I did.
Q. It says "New Typed Substitute Birth Record of Paul Milton Miles filed October 26, 1964 that reflects the corrections made on November 16, 1964." So can you tell us on page 2 of what this is?
A. This is a substitute record that accurately reflects the information that was corrected on the previous exhibit. This was not a standard protocol creating this. The previous document that had the lines drawn through it -- actually, that was -- that should have been -- that should not have been necessary. It should have

Page 40

Schwartz
going directly to a typed or other written -- either typed or handwritten records of the birth. So in this case it appears upon review at the time that a supervisor probably realized that a substitute birth record should have been created and substitute birth records do not show the correction history. So it is accurate but it should have gone directly from the original birth record to the record that does not show any changes. What you can see is it went from a handwritten record to a typed written records. So that typed written record accurately reflects the corrections. It does not show the correction history which is appropriate for what is called a Three-month Substitution Birth Certificate.
Q. In other words, there is nothing out of the ordinary in the way this was prepared?
A. Correct.
Q. It says "Filed on the upper left-hand corner 149436, what does that number refer to?
A. It is our tracking number so we can match up the original birth record to a corrected record in our file. So we can find a correction history.
Q. How would one find that number on the Deposition Exhibit 3 in some way?

Page 41

Schwartz
A. It is actually on -- I don't have the same numbers you have.
Q. It is on Bates Number 234 of Schwartz Depo 2?
A. So this would have been in an envelope and in the envelope it has that tracking or that accession number 149436, yes.
Q. That would match the handwritten number on page 237. It makes perfect sense. Again, this is a true, accurate and authentic copy?
A. It is.
Q. I see there is no date of report, however, on this most recent document, on Exhibit 4.
A. It's true, it's not there.
Q. Would there be cause for concern?
A. No.
Q. Is there anything else you would like us to know about that most recent Exhibit 4?
A. There is nothing out of the ordinary.
Q. Just to be clear as well, each of these what you have been testifying to have that same certificate number as well 156-64-337372; do they not?
A. They do.

Page 42

Schwartz
Q. If we can move on to your next, I believe, six pages that are associated with one another inclusive of your explanation; is that correct? These were produced to us in one file. I want to make sure they're all together.
A. Yes.
Q. These will be the next Schwartz Exhibit 5. These are Bates 238 through 243.
(Schwartz Exhibit 5, Subpoena, Bates 238 through 243, marked for identification, as of this date.)
Q. Sir, if you can tell us what this first page is.
A. This is a summary I prepared, second correction of the birth record of Paul Milton Miles. It was filed on February 1, 1990 that reflects four items.
Q. What are they?
A. A Court Order to change the name of Paul Milton Miles to Junior Mohammed Ricketts effective August 19, 1984. An application submitted to the Bureau of Vital Records on December 5, 1989 to change the name on the record. Application for name change approved by the Bureau of Vital Records on

Page 43

Schwartz
January 26, 1990 and application for name change filed by the Bureau of Vital Records 1990.
Q. You prepared that yourself for today?
A. I did.
Q. If we can go to the next page. What is this next page?
A. This is an envelope that contain the corrections.
Q. Again, on the upper left-hand corner there appears to be a number that would be, again, the number on the envelope?
A. Correct.
Q. To which you testified previously, again, a unique identifying number for this particular amended request?
A. Yes. And, it has the signature of a Deputy City Registrar who had approved the corrections.
Q. This is, then, evidencing the approval itself, page 2?
A. Yes.
Q. 239?
A. Yes.
Q. The next page, I believe, is 240. If you

Page 44

Schwartz
can tell us what that is.
A. This is an application form for correcting a birth certificate and the correction is to change the name of Paul M. Miles to Junior M. Ricketts and it is signed by Junior Ricketts.
Q. It also signed to the left of his signature buy a Notary Public or Commissioner, would this be someone from your office at the time or could it have been someone --
A. Outside of the office.
Q. Someone outside that purportedly would have witnessed his signature?
A. Correct.
Q. That doesn't necessarily indicate an approval or signature from your office itself?
A. Correct.
Q. The stamp just under the bar chart there, "Original certified document evidence required" is that stamped in from your office? Not all of it is legible but certainly those three first lines are.
A. Yes, stamped by our office.
Q. What does that stamp then certify or mean?
A. It's indicating that it was original

Page 45

Schwartz

evidence.
Q. Original evidence required and original evidence produced by the applicant?
A. Yes, that's actually on the next page.
Q. Page 4, okay.
A. The name change order on the bottom of the page in handwritten letters it's "OVMH." The "OV" means original viewed and "MH" would be a clerk's initials indicating the original Court Order was personally viewed by a Vital Records Clerk.
Q. In this instance where the applicant, him or herself, comes to the desk at your office and produces this original evidence?
A. Or by mail.
Q. Then, you would return the original evidence to the applicant?
A. Correct.
Q. In this case, do you know or is there any indication whether this is an in-person application or through the mail?
A. I do not know that.
Q. Indeed, would these records so indicate anywhere?
A. Not necessarily.

Page 46

Schwartz

Q. Would either in-person or by mail evidence be sufficient to change the name in the Birth Certificate?
A. If we received an original -- the original raised seal or Certified Court Order. That's what we would look for. But, it's clear the Vital Records Clerk saw an original.
Q. Now, the following page is presumably then another part of that original documentation. It has number 16359 in the upper left-hand corner. It's the page following the OVMH. I believe it's Bates 242?
MR. MOSELEY: I think you mean the upper right-hand corner.
Q. I'm sorry, the upper right-hand corner.
A. Yes, I see that.
Q. Presumably, the second page of the original documentation he produced. What is the 16359 refer to, if you know, on page 242?
A. It is another corresponding number that's actually visible on the corrected birth record, the last page. It shows it as beginning with a Y.
Q. So that's from your office?
A. Our office. That's another essentially

Page 47

Schwartz

tracking number.
Q. What does the Y stand for, if you know?
A. It's part of our records system for filing. So at the time a Y number was used.
Q. The file, again, left-hand corner filed 149436 --
A. That's the number we've seen before.
Q. Indeed. So, then, that purports, does it not, with these requested amendments?
A. Correct.
Q. The full name Paul Milton Miles is then stricken or struck out one time?
A. Interlineated.
Q. A legal term perhaps in the Vital Statistics Bureau to Junior Mohammed Ricketts. Is this, then, an official name change as reflected in this one page?
A. Correct.
Q. Who would this have been written in by?
A. A Vital Records Clerk.
Q. Do you know who that clerk would be?
A. We would.
Q. How can we so discern?
A. It's actually on the upper right. There

Page 48

Schwartz

is a stamp that says Deputy City Registrar and has a date of February 1, 1990. It has there is actually a little stamp that says "Name change due to Court Order" and there is a person's signature there and it is P. Molina and that name -- that Vital Records Clerk's name also shows up on the envelope Petra Molina.
Q. That would be on Bates 239 in the same exhibit sequence?
A. Yes.
Q. On the interlineated page underneath P. Molina is the date change or change to Court Order there is date?
A. 8/19/84.
Q. Then, on the left-hands side there is a writing as well. Almost looks like "Child" but I can't read that. Do you know what that refer to? I don't know whether it does indeed says child.
A. It probably does and it probably is referring to that it is the child or registrant's name that has changed.
Q. The child of the parents in the original birth record individual?
A. Yes.

Page 49

Schwartz
Q. Again, would these change, then, have been made on the original cotton bound document within the vault?
A. Yes.
Q. So that would be actually physically brought out and the cotton document would have been hand interlineated?
A. Yes.
Q. So if we were to go to the cotton document that's what we would show?
A. Yes.
Q. So if I could just then be clear. Is there more than one cotton document? I just used that term loosely for one of a better term. I kind of like the idea there are still cotton documents floating around in the world. Is there more than one original?
A. The record was replaced with another cotton document that had been prepared and that's the one.
Q. The last document?
A. The last document. It was typewritten. Well, the last when it switched to from a handwritten document and then it was prepared and

Page 50

Schwartz
typewritten.
MS. LIPPEN: This one? The one that doesn't have the date, 237?
THE WITNESS: Correct.
Q. You're looking at a document which would be Exhibit 4, page 237 exactly?
A. Yes.
Q. The question was, you were referring to Schwartz Exhibit 4, pages 237. The change that we were just speaking about on the interlineated document on document 5 would have been then made on that particular original?
A. Yes.
Q. Can I ask you, then, which brings up an interesting issue, if indeed the interlineated was made on an original document, how do we have Schwartz Exhibit 4, pages 237 which is an uninterlineated document?
A. That was the substitute. The three-month substituted record.
Q. Exactly. So that remains in its unaltered form in your records?
A. Until it was interlineated. So that was the substitution that the original record was

Page 51

Schwartz
substituted because it was a three-month substitution record.
Q. There is a copy made. There is a microfiche copy each phase of the process so we know and can track each phase of the process in a linear or chronological manner?
A. Correct.
Q. Again, this is Schwartz Exhibit 5 is an authentic copy of the document that you have found in your investigation?
A. It is.
Q. A true and accurate copy; is it not?
A. Yes.
Q. Now in discussing Schwartz Exhibit 5 and this name change, is the Office of Vital Statistics opining on the legality of the documenting or supporting evidence? In other words, when we're looking at this Court Order name change, your office at the Borough of Vital Statistics is not investigating whether indeed that Court Order name change was a proper one, are you? You're just looking at the certified copy of a Court Order and going by that?
A. Correct.

Page 52

Schwartz
Q. You're not investigating the circumstance of the Court proceeding itself and opining on the validity of that when making your change?
A. Correct.
Q. So, then, to switch gears a little bit. On Exhibit 5, is there anything else that you think we should know about in your explanation? I think you've been fairly thorough. Anything else you want to explain to us either on the mechanics of the process or what the document reflects?
A. No thank you.
Q. I believe you testified previously only one individual was born in New York on August 31, 1964 named Paul Milton Miles; is that correct?
A. Correct.
Q. Topic Number 8 of the Subpoena in the 30(b)(6) request on page 8 states "If reasonable and not unduly burdensome to search how many individuals named Paul Milton Miles were born in Brooklyn, New York January 1, 1955 through January 1, 1970." Did you make this investigation?
A. I did.
Q. What did you find?
A. I found one.

Page 53

Schwartz
Q. What did you do in this investigation?
A. I searched our electronic system and it was capable of searching from January 1, 1955 through January 1, 1970 and it turned up only one individual named Paul Milton Miles.
Q. So your electronic database could just search by name?
A. Correct.
Q. It didn't require you to go day by day or year by year to search for those names?
A. Correct.
Q. What are the search parameters in your computer? How far back could we go to ascertain that? I limit it here to January 1, 1955 but how far back could we go?
A. We could go probably on births go to 1920.
Q. Electronically searchable?
A. Electronically.
Q. Is there any reason to think that computer search wasn't accurate?
A. No reason to question it.
(Schwartz Exhibit 6, Certification of Birth, marked for identification, as of this

Page 54

Schwartz
date.)
Q. I also wanted to show you Schwartz Exhibit 6. This is Bates Number 2. Have you seen this before?
A. Yes.
Q. What is?
A. It is a Certification of Birth. A copy of a Certification of Birth that had been produced by our Vital Records system issued on September 12, 1989.
Q. Why have you seen this before?
A. It was in the material.
Q. Attached to this deposition?
A. Actually, I'm not sure about it.
Q. But you have seen it before somewhere? If you don't know, that's also fine.
A. I have seen it. I've seen it before.
Q. Was this in your records somewhere?
A. It was sent to me by our...
MS. LIPPIN: I'm not sure how we got this. I think its got your number on it.
MR. QUICK: So I could have provided it.
Q. Document number on the upper right-hand

Page 55

Schwartz
side is D887436, what does that refer to?
A. It is a serial number simply of that piece of paper.
Q. Not about the original birth record itself?
A. No, it's simply a control number for us to control our safety paper.
Q. So if there was another certification of birth generated on this individual, a different document number, a unique identifying document number would be made?
A. Correct.
Q. Just so we're clear as well, that also has the certificate number 156-64-337372. That is, again, the original birth certificate number we've been dealing with in this case?
A. That's correct. That number does not change for that record.
Q. I also note, sir, that you brought with you and have produced this week in response to our 30(b)(6) Subpoena a number of manuals from your office and I could, if we could just briefly identify them and you could tell us their importance with regard to your testimony.

Page 56

Schwartz
One was the Office of Vital Records, Corrections and Amendments Unit. This will be marked next. Processing Manual dated May 2, 2014. This is Bates 18 through 81.
(Schwartz Exhibit 7, Office of Vital Records, Corrections and Amendments Unit, marked for identification, as of this date.)
Q. Sir, have you seen this before?
A. I have.
Q. What is this?
A. It is the current processing manual of the Office of Vital Records, Corrections and Amendments unit.
Q. Why is this of importance to today's testimony?
A. I believe it's responsive to the request for information on any and all policies and practices or procedures. I believe one that was requested is relating to corrections and amendments.
Q. I'm referring here not to Bates Number but the page number of this particular document. In other words, page number assigned by the Vital Statistics Manual itself. On page five, for instance, there is some yellow highlighted text. On

Schwartz
page 14 there is yellow highlighted text. And, on pages 28 and 29 and 31, just by way of example, these are highlighted text. Are these highlighted in the manual itself or highlighted as illustrative in response to our Subpoena?
A. This are our manuals as we use them.
Q. But my question is, is the highlighting meant to be responsive to our Subpoena itself or is this actually highlighted in the manual everyone sees?
A. Everyone.
Q. This is, again, a true, accurate and authentic copy of the processing manual of May 2, 2014?
A. Yes.
Q. This would also deal with the manner in which corrections and amendments would be made to birth certificates from 1964, for instance?
A. There would have been changes. These are other current processes but the policies are largely the same.
Q. If we can go on to the next one which is the 2013 Records Management Manual; Births, Deaths, AOPS, Applications/Documents and Stops. Do you have


Schwartz
that?
A. I do.
(Schwartz Exhibit 8, Records Management Manual, marked for identification, as of this date.)
Q. This is previously marked 30(b)(6) Depo 82 through 129. Sir, what is this particular exhibit?
A. This is our most recent processing manual from 2013 relating to records management of the Bureau of Vital Statistics.
Q. This are records management not inclusive of corrections and amendments or would it be inclusive of corrections and amendments?
A. It may have correction and amendments searching in there. This actually is it shows some of the systems that we actually use to search records.
Q. The actual screen shots, in other words?
A. Correct.
Q. That would comport with the manner in which you searched for today's depositions?
A. That's right. It is responsive to the requests for our policies and procedures.


Schwartz
Q. Again, this is a true, accurate and authentic copy of that particular manual?
A. It is.
Q. I believe the next one is Birth Registration Protocols, 2013. This will be marked as well. Three relatively cute babies on the front.
(Schwartz Exhibit 9, Birth Registration Protocols, marked for identification, as of this date.)
Q. This is 30(b)(6) Depo 3 through 17. Sir, what is this?
A. This is our Birth Registration Protocol Manual that's been updated through January 2013. That summarizes our policies and procedures for registrations of birth.
Q. And hospital births?
A. All births that occur in New York City.
Q. Out of hospitals, street corners and taxicabs?
A. On velocities.
Q. Again, this is a true, accurate and authentic copy?
A. It is.
Q. This is, again, in response to any


Schwartz
particular topic number, if you know?
A. It's actually responsive to Topic 2 which is policies and procedures, investigation of local births claims. Including, procedure and evidentiary standards for issuance, review of procedures, interactions with local hospitals.
Q. That's why I haven't in a long drawn out sequence of questions ask about particular topics because I assumed they would indeed be within this large stack of documents. Again, this is a true, accurate and authentic copy?
A. Correct.
Q. Then, this will be the final exhibit.
(Schwartz Exhibit 10, Public Service Operations Manual, marked for identification, as of this date.)
Q. This is Bates 130 to 229. The Public Service Operations Manual, 2013. And, is this in response to a topic?
A. It's in response to Topic Number 1 pertaining to issuance of Birth Certificates and last revised March 2013.
Q. Would this include issuance of birth certificates in 1964?

Schwartz
A. These are the current procedures but they were comparable, yes.
Q. They weren't different in any material manner, in other words?
A. Thank you, yes. Not in any material manner.
Q. Again, a true and accurate authentic copy of this 2013 manual?
A. Yes.
Q. Sir, can one under either New York State Law or New York State Regulations or City Regulations, in any legal manner that you're aware of, can you undo an amendment to a Birth Certificate that was later found fraudulent?
A. If we were presented with evidence. I'm not sure I understand the question.
Q. Well, if one is provided with evidence, what kind of evidence would one need to provide and who would need to provide it for you to -- and I said "undo an amendment" -- perhaps some jurisdictions have fraud notations to a birth records stating that prior amendment or correction was indeed fraudulent on subsequent investigation. I don't know whether New York has a comparable



Schwartz
allowance. I guess that's my question.
A. When you say "New York" this actually is New York City because New York City is independent of New York State.
Q. Exactly.
A. If the Department of Health were presented evidence that would probably require a Court to make a finding of fact; then, we would not issue a Certified Copy of that record if we were either so ordered or directed.
Q. Would the record in some manner reflect a fraudulent notation or fraudulent aspect of that birth record? You said you wouldn't produce certified copies. Would the record itself note a fraudulent aspect to corrections or amendments?
A. We do have methods for marking a records so that it would not be issued. For example, there are records that are not issued if we receive notice of a missing child. So a record is noted and we will not issue that record. If we know a record to be invalid for some reason, we would not issue it.
Q. I suppose I pause as well because not issuing a certified copy is different than reflecting a fraudulent character to the record in



Schwartz
some manner. Some jurisdictions one would actually request a birth record -- a Birth Certificate -- and there will be an amendment to the Birth Certificate saying someone has done an investigation. And, for instance, this birth date is fraudulent. One can actually search the records and find this fraudulent notation made by the registrar or the Vital Statistics or whatever comparable bureau in that jurisdiction. Does New York City have such a fraud notation capability aside from not issuing a certified copy?
A. There would be a note. Our system would enable us to annotate a record.
Q. How would that be annotated?
A. In our electronic system and so there are different categories.
Q. If one were to print out, then, for instance, the birth record as it is looks today, would that fraudulent notation in your computer system be reflected on a paper copy?
A. I would have to check. We would not issue it. We do have provisions for sealing records.
Q. What is that provision?



Schwartz
A. Where a record would be -- if for some reason we found that a record was either invalid or it could by placed under seal.
Q. Presumably, your fraudulent notation in your computer records would then preclude?
A. It would preclude issuance.
Q. What is the process for getting that seal in place? You spoke of a Court Order required for a Court Order or some fact finder?
A. It wouldn't necessarily require a Court Order if we were presented evidence that our office was satisfied that the record should not be issued.
Q. In your explanation here, are there City regulations that we can look to for this process or is this an interoffice process?
A. Generally, we seal records for certain purposes. For example, original adoption records are placed under seal and such record not to be opened except by Court Order. Similarly, for adding a father's name, the original record is placed under seal or transgender Birth Certificates, the original records is placed under seal.
Q. Is this by regulation or just by office protocol?

Page 65

Schwartz
A. By operation of the New York City Health Code.
Q. So it is within the code itself?
A. Yes, to place a record under seal.
Q. What about the fraud notation in your computer system? Is that somewhere we can look in the New York City Code?
A. That would be by operation of procedure.
Q. In the policy manual -- in any of those that you produced and we discussed and labeled today -- do you know whether that's contained within any of those manuals?
A. I'm not aware of that.
Q. Is there any manual that you can point to or discuss that would tell us how a fraud notation would be made in your computer system?
A. I would have to check.
Q. We talked also about amending a birth certificate or correcting one that parents, for example, can do that. And, we, also, discussed a Order can do that. Can the police do that, for instance? They come in and say in our investigation an amendment should be made.
A. Your police?

Page 66

Schwartz
Q. Any police. New York City Police? I'm just a civil trial attorney. I'm not the police.
A. It would be unusual but we could do it.
Q. So I guess my question is what sources? Parents, we've discussed, Court Order, perhaps police. Anyone else that can amend a Birth Certificate that you can think of sitting here today?
A. Could you be more specific or more general?
Q. In artful again. It's a vague question because I don't know the parameters of the answer. Who can amend the Birth Certificate besides the parents or Court Order or the actual birth registrant?
A. When you say "amendment"?
Q. For instance, a new birth date or a new name.
A. Well, for a new name there are specific procedures prescribed by law that would require a Court Order to change a name. So for very specific purposes there are prescribed very specific procedure for doing that. And, as I said a moment ago, there are certain forms of amendments that

Page 67

Schwartz
cause the original record to be sealed such as an adoption with the original records and original evidence are placed under seal.
Q. You mentioned some New York City Regulations about the sealing of a Birth Certificate. As you sit here today, do you know the number of those regulations? What number it is? 18 point-something? Do you know what those regulations are?
A. Under the New York City Health Code, it's Article 207.5.
MR. QUICK: Let's take a small break. We're almost done.
(Short recess).
MR. QUICK: I just a few more questions.
Q. Sir, in your professional experience, are you aware of any instance that your office has notated, for instance, in the computer system, a fraud aspect to a birth amendment?
A. I don't have specific recollection but I do know our system does permit annotations of records.
Q. So it may well have happened in the past?
A. It may well have.

Page 68

Schwartz
MR. QUICK: Thank you.
I have no further questions.
Mr. Moseley?
CROSS-EXAMINATION BY
MR. MOSELEY:
Q. I'm Thomas Moseley and I am the attorney for the petitioner in this case. I just have a few questions. You testified earlier that in addition to the recording of the birth there would be a doctor's note of some kind with respect to medical conditions. Is that of a child at birth?
A. In the Confidential Medical Report of Birth.
Q. Did your search find a Confidential Medical Report for Paul Milton Miles?
A. I don't recall that it did. In fact, it did. I did find a Confidential Medical Report.
Q. Are you able to share that with us?
A. I'm not.
Q. You're not able to share that with us because?
A. Because it's confidential.
Q. It's confidential pursuant to New York City Regulations?

Schwartz

A. Yes.

Q. Would a Court Order be a sufficient basis for disclosing if we were, for example, to obtain a Court Order from the Magistrate Judge requesting production of that?

A. We would have to check with our counsel's office.

Q. Generally speaking, without disclosing general specifics. Just for my education, would you tell us what kind of information is contained in that report -- in the medical report? Is it physical characteristics? Is it medical problems?

A. In 1964 it included previous to this pregnancy number born dead. The gestational ages of those. The race of the mother and father. The dates of a first prenatal visit, mother's blood group and RH factor, conditions present during this pregnancy and it provides checkboxes of various medical conditions. Such as hypertensive disease. I'm just reading from the check boxes.

Q. I guess my additional question, would it contain any information about the characteristics of the child?

A. It contain weight at birth. Aside from



Schwartz

weight at birth and mother and father's race I don't see anything that pertains to the child. Position at delivery.

Q. Just so that I understand your responsibilities of your agency, if after the parents register a child's birth and they abandon the child or give custody of the child to New York City, the care and custody of that child is not within the responsibility of your agency?

A. It is not. And, just to be accurate, the parents don't register the birth. The hospital reports the birth to us for registration.

Q. But, records with respect to the care of the child by New York City would not be records that your office maintains?

A. That is correct.

Q. If you know, in 1964, which City Agency would have had that responsibility?

A. I would not.

Q. Turning to what's been marked for identification as Schwartz Exhibit 2. If you go to the actual Certificate of Birth. I believe that Bates-stamped 231. If you go to the bottom, it's signed off, is it not by a physician?



Schwartz

A. Yes.

Q. Based upon what you know the practice and procedure at that time, how would the physician have obtained the information that's set forth on page Bates-stamped 231?

A. It's appear from this record the birth occurred at home and it shows that the physician gave his hospital affiliations. But, otherwise, it was presumably provided by the parents.

Q. Based upon your familiarity with the practice in 1964, would the parents have gone to the hospital and given the information of father and mother to Dr. Glen?

A. The birth may well have -- if the birth occurred at home; then, the physician likely attended at home.

Q. This information set forth under the father's and mother's information is information that they provided the doctor?

A. Presumably.

Q. The doctor would not, for example, independently verify that Robert Miles was age 26 or he was born in South Caroline or a factory worker. He would take that information presumably from



Schwartz

Mr. Miles?

A. That sounds correct.

Q. He would not be required to do his own independent investigation?

A. No.

Q. Now, turning, I think, this is part of Exhibit 3. I believe it's page Bates-stamped 234. The summary of document documentary evidence submitted as sealant facts contained therein on the upper right-hand corner where it refers to the parents Marriage Certificate. Do you see that?

A. Yes.

Q. In your search of the records, was the actual copy of the actual Marriage Certificate attached to that document? It does not appear to be but I wanted to be certain.

A. No, the records I produced are the only record we have on this.

Q. So based upon your familiarity with the practice at that time it was sufficient for the agency employee to summarize what the document said? In this case what the Marriage Certificate said?

A. Yes.

Q. He wasn't in -- he or she -- was not



Under Protective Order

Page 73

Schwartz

independently required to verify the accuracy or authenticity of the Marriage Certificate?

A. That's correct.

Q. In the documents that you've produced, just for simplicity, the birth record documents Exhibit 2 through 6, are there any fraud notations?

A. No.

Q. Now, turning to what is -- I gather you've not in your search been able to locate manuals from 1964?

A. Have not.

Q. But, the manuals that you produced Exhibits 8, 9 and 10, in your opinion, are represent materially roughly the same procedure that would have been employed at the time in 1964?

A. Yes.

Q. If I may turn to Exhibit 7 on page 3. It talks about general guidelines for examining corrections applications and it talks about item 4, paragraph 4, evaluate the submitted documentation?

A. Yes.

Q. Would those same general guidelines apply to the applications for name change on the Birth Certificate? You examine the documentation and see

Page 74

Schwartz

that it's either original or certified and satisfies the requirements for making a name change?

A. Yes, name change requirements are very specific.

Q. You said that at the time -- going back to 1964 -- there were regional offices. Correct me if I'm not using the right terminology.

A. Borough offices.

Q. Would you happen to know for births at 855 Lafayette, what the borough office was at that time?

A. I do not.

Q. Is it likely there was only one borough office for the borough of Brooklyn?

A. Likely, yes.

MR. MOSELEY: I don't have anything else.

FURTHER DIRECT EXAMINATION BY MR. QUICK:

Q. Just to follow up. With the marriage certificate whether that would be part of the record, is it all unusual it's not part of the record?

A. Its not.

Q. It's not a requirement, in other words?

Page 75

Schwartz

A. No.

MR. QUICK: Okay, you are done. Thank you.

(Time noted: 4:56 p.m.)

____________________________

STEVEN SCHWARTZ

Subscribed and sworn to before me this _____ day of____________, 2015.

__________________________________

Notary Public

Page 76

C E R T I F I C A T E

STATE OF NEW YORK )

) ss.:

COUNTY OF NASSAU )

I, ANGELA BITJONIDES, a Notary Public within and for the State of New York, do hereby certify:

That STEVEN SCHWARTZ, the witness whose deposition is hereinbefore set forth, was duly sworn by me, and that such deposition is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of July, 2015.

____________________________

Angela Bitjonides

---------------------I N D E X--------------------

NAME OF WITNESS EXAMINATION BY PAGE

STEVEN SCHWARTZ MR. QUICK 6,74

MR. MOSELEY 68

----------------INFORMATION REQUESTS--------------

DIRECTIONS: NONE

RULINGS: NONE

TO BE FURNISHED: NONE

REQUESTS: NONE

MOTIONS: NONE

---------------------INDEX---------------------

EXHIBIT NO. MARKED FOR IDENTIFICATION

Exhibit 1 Page 12

Exhibit 2 Page 25

Exhibit 3 Page 31

Exhibit 4 Page 39

Exhibit 5 Page 42

Exhibit 6 Page 53

Exhibit 7 Page 56

Exhibit 8 Page 58

Exhibit 9 Page 59

Exhibit 10 Page 60



DEPOSITION ERRATA SHEET

Our Assignment No.: 124925

Case Caption: JUNIOR MOHAMMED RICKETTS-V-U.S.

ATTORNEY GENERAL LORETTA E. LYNCH

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereon, with the understanding that I offer these changes as if still under oath.

Signed on the _____________ day of

_____________, 20____.

_____________________________

STEVEN SCHWARTZ



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change: ______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

SIGNATURE:___________________DATE:_____________

STEVEN SCHWARTZ



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

Page No._____Line No._____Change to:_____________

_______________________________________________

Reason for change:______________________________

SIGNATURE:_______________________DATE:__________

STEVEN SCHWARTZ

DEPOSITION ERRATA SHEET

Our Assignment No.: 124925

Case Caption: JUNIOR MOHAMMED RICKETTS-V-U.S. ATTORNEY GENERAL LORETTA E. LYNCH

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereon, with the understanding that I offer these changes as if still under oath.

Signed on the 15th day of September, 2015.

[signature]

STEVEN SCHWARTZ

DEPOSITION ERRATA SHEET

Page No. 9 Line No. 21 Change to: Johns Hopkin University and I went to the Johns

Reason for change: Transcription Error

Page No. 9 Line No. 22 Change to: Hopkin School of Hygiene and Public Health and have

Reason for change: Transcription Error

Page No. 14 Line No. 2 Change to: certified copies we issue.

Reason for change: Transcription Error

Page No. 14 Line No. 7 Change to: certificates purchased annually.

Reason for change: Transcription Error

Page No. 14 Line No. 12 Change to: or amendments of birth and death records. So a

Reason for change: Transcription Error

Page No. 37 Line No. 22 Change to: authorized representative of the Vital Statistics?

Reason for change: Transcription Error

Page No. 51 Line No. 20 Change to: at the Bureau of Vital Statistics is not

Reason for change: Transcription Error

SIGNATURE: [signature] DATE: 9.15.15
STEVEN SCHWARTZ

DEPOSITION ERRATA SHEET

Page No. 59 Line No. 21 Change to: On velocipedes.

Reason for change: Transcription Error

Page No._____ Line No._____ Change to:_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

Reason for change:_____

SIGNATURE: [signature] DATE: 9.15.15
STEVEN SCHWARTZ